## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

IN RE:

Miami Beverly, LLC,

1336 NW 60, LLC
Reverend, LLC
13300 Alexandria Dr. Holdings, LLC
The Holdings at City, LLC

      Debtor.

_____/

CASE NO. 18-14506-BKC-LMI
Chapter 11 (Lead Case)


Jointly Administered
Case No. 18-14509-BKC-LMI
Case No. 18-14510-BKC-LMI
Case No. 18-14511-BKC-LMI
Case No. 18-14512-BKC-LMI

### MOTION PURSUANT TO 11 U.S.C. § 543(d)(1) TO EXCUSE RECEIVER FROM COMPLIANCE WITH TURNOVER REQUIREMENT AND TO ESTABLISH POWERS AND DUTIES OF RECEIVER *NUNC PRO TUNC* TO PETITION DATE

Linda Leali, the court-appointed Receiver (the "**Receiver**") in the matter styled *City of Miami v. Miami Beverly LLC, et al.* (Case No. 2014-027781-CA-01) (the "**Receivership Case**") in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (the "**State Court**"), by counsel, hereby files this *Motion Pursuant to 11 U.S.C. § 543(d)(1) to Excuse Receiver from Compliance with Turnover Requirement and to Establish Powers and Duties of Receiver Nunc Pro Tunc to Petition Date* (the "**Motion**") seeking entry of an Order: (1) excusing Receiver from compliance with the turnover requirements of 11 U.S.C. § 543; and (2) establishing the powers and duties of Receiver in the above captioned consolidated Chapter 11 cases (collectively, the "**Bankruptcy Case**") of Miami Beverly, LLC, 1336 NW 60, LLC, Reverend, LLC, 13300 Alexandria Dr. Holdings, LLC, and The Holdings at City, LLC

1

(collectively, the "**Debtor**" or "**Defendants**"). In support of this Motion, Receiver states the following:

1.       The Court has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core matter pursuant to 28 U.S.C. § 157(b)(2).

## PRELIMARY STATEMENT

2.       Three years ago, the Receiver was appointed at the request of the City of Miami. At the time of the Receiver's appointment, the Receivership Properties (defined below), which are the subject of the Receivership Case, were in serious disrepair and threatened the health, safety, and welfare of the community. Additionally, there were large monetary sums owed to the City of Miami as a result of outstanding liens due to, among other things, code violations, and the continual accrual of per diem charges.

3.       Simply put, the owners of the Debtor are slumlords. During the Receivership Case, the Debtor, their owners, and attorneys flaunted the State Court. They took five failed appeals and were held in contempt of court and sanctioned to pay the Receiver and her counsel in excess of $30,000. Over three years of receivership administration and despite the Debtor, Receiver has improved the Receivership Properties. [1] This Bankruptcy Case was filed on the eve of a foreclosure sale resulting from the City of Miami's final judgment entered on December 24, 2015 in the amount of $3,126,387.62, which bears interest at 4.75%. As such, this Bankruptcy Case abounds with notions of abstention and bad faith.

4.       In email correspondence dated April 24, 2018 from counsel for Debtor, Mr. Ido Alexander states, "Debtor is agreeable with payments and post petition services, and consents to

---

[1] *See infra* paragraph 6.

use of accounts." It is against this background that the Receiver requests excusal from compliance with the turnover required under the Bankruptcy Code and direction about her powers and duties.

5.     Since the filing of this Bankruptcy Case, the Receiver has continued to manage the Receivership Properties and had fully expected by now that an agreed motion to be filed by the Debtor seeking a receiver-in-possession. Despite promises, the Debtor has not filed anything of the sort.

## BACKGROUND

6.     On October 29, 2014, the City of Miami filed a *Complaint for Injunctive Relief and Money Damages* against Defendants, [2] on behalf of itself and the citizens of the City of Miami in order to enforce its City Code and protect the tenants residing within the Defendants' properties (the "**Receivership Properties**").[3]

7.     Thereafter, the City of Miami sought entry of a final judgment from the State Court. An Order Granting Default Final Judgment was entered on June 4, 2015 and a Final Judgment was entered on December 24, 2015 (collectively, the "**Final Judgment**"). A copy of the Final Judgment is attached hereto as **Exhibit** "**A**."

---

[2] *See also Receiver's Motion to Modify Capital Rental Agency, Inc. Property Management Agreement* ("**Capital Motion**") dated August 26, 2016 at ¶ 1; *Motion to Modify Receivership Order to Authorize Issuance of Receivership Certificates and Motion to Authorize Issuance of Receivership Certificate* ("**Certificate Motion**") dated May 2, 2017 at ¶ 2; and *Motion to Modify Receivership Order to Excuse Receiver from Paying Property Taxes* ("**Tax Motion**") dated March 2, 2018 at ¶ 1.

[3] The Receivership Properties are comprised of 147 one, two and three bedroom units located in Miami in the communities commonly known as Liberty City and Overtown. The Receivership Properties are located at: (1) 1341 NW 60th Street, Miami, Florida; (2) 1335 NW 60th Street, Miami, Florida; (3) 6820 NW 17th Avenue, Miami, Florida ("**6820**"); (d) 1710 NW 1st Court, Miami, Florida; (4) 1730 NW 1st Court, Miami, Florida; (5) 1558 NW 1st Avenue, Miami, Florida; (6) 1231 NW 61st Street, Miami, Florida; (7) 6040 NW 12th Avenue, Miami, Florida; and (8) 1250 NW 62nd Street, Miami, Florida. Except for 6820, which is currently vacant, all of the buildings comprising the Receivership Properties have tenants occupying at least some of the units. *See, e.g.*, *Chapter 11 Case Management Summary* filed in each of the above captioned cases.

8.      In connection therewith, the City of Miami sought the appointment of a Receiver over the Receivership Properties. *See* Capital Motion at ¶ 2, Certificate Motion at ¶ 2, Tax Motion at ¶ 2.

9.      At that time, the Receivership Properties had been plagued by years of gross mismanagement, including, among other things:

a.  City of Miami Code violations and deferred maintenance issues (one building is entirely uninhabitable);

b.  Utilization of an unlicensed property manager named "Done Right Management, LLC" for leasing of units in violation of Florida law;

c.  Failing to spray the Receivership Properties for various pests including cockroaches and rats;

d.  Failing to obtain proper licensing required by the Florida Department of Business & Regulation;

e.  Several Receivership Properties had never had a certificate of use during the entirety of the time that the Defendants' owned the buildings;

f.  Low collections (one building's tenant body was on rent strike);

g.  Substantial criminal activity, including drug trafficking and violence (certain of the Defendants' on-site workers who were also tenants were arrested for possession of drugs and have been evicted by the Receiver); and

h.  Failure to maintain insurance policies on the Receivership Properties.

Certificate Motion at ¶ 3.

10.     The extent of the deterioration was such that the Receivership Properties have been the focus of intense media scrutiny, including multiple television and print stories. [4] *See*

---

[4] *See e.g.*, Gustavo Solis, Liberty City Complexes Plagued by Neglect, *The Miami Herald*, September 3, 2013; Nadege Green and David Smiley, Tenants of Miami Slums Seek Better Life, *The Miami Herald*, December 6, 2014; David Smiley, Hope for Miami "slum" Tenants After City Wins Court Case, *The Miami Herald*, June 4, 2015; David Smiley, Politicians Say Miami "Slums" Prove Need for New Laws, *The Miami Herald*, January 23, 2016; Christina Vazquez, www.localten.com, May 26, 2015, http://www.local10.com/news/tenants-of-dilapidated-apartment-file-lawsuit-against-slumlord-millionaire; Christina Vazquez, www.localten.com, May 19, 2015, http://www.local10.com/news/landlords-of-miami-residents-living-in-slums-deny-owning-properties; Christina Vazquez, www.localten.com, July 9, 2015, http://www.local10.com/news/evictions-possible-if-tenants-in-vaknin-run-properties-dont-start-paying-rent; Christina Vazquez, www.localten.com, March 8, 2016, http://www.local10.com/consumer/call-christina/miami-hearing-board-drastically-reduces-money-owed-by-vaknin-run-property; and Ariza, Mario, www.newtimes.com, February 17, 2017,

4

Certificate Motion at ¶ 4. During this same time, other properties owned by the Debtor's principal were placed into Receivership in Houston, Texas. Ultimately, the properties in Houston were condemned and there has been an effort to certify a class action against the principal of the Debtor in Houston relating to these condemned properties.

11.    The Receivership Properties were subject to substantial unresolved building, solid waste, fire, and code compliance violations issued by the City of Miami. Many of the units were overgrown with mold, and balconies, windows and other structural units were in significant disrepair. In addition to physical disrepair, certain of the buildings lacked the 40/50-year certification required by the City of Miami and the Florida Building Code. Others lacked the required Business Tax Receipt or Certificate of Use. *See* Certificate Motion at ¶ 5.

12.    Based upon the evidence provided to the State Court at a hearing held June 4, 2015, the Court determined that the Receivership Properties were in serious disrepair and threatened the health, safety, and welfare of the community. *See* Certificate Motion at ¶ 6 and Tax Motion at ¶ 3

13.    On account of the State Court's June 4, 2015 determinations, by orders dated June 4, 2015 and June 10, 2015 (together, the "**Receivership Order**"), the State Court appointed Receiver as receiver regarding the Receivership Properties. A true and correct copy of the Receivership Order is attached hereto as **Exhibit** "**B**." *See also* Certificate Motion at ¶ 7 and Tax Motion at ¶4.

14.    Among other things, the Receivership Order authorized Receiver to manage the Receivership Properties and to seek to correct the various code violations.

---

http://www.miaminewtimes.com/arts/artists-say-overtown-landlords-wont-pay-for-murals-they-commissioned-9145130.

15.    The Defendants began violating the Receivership Order as soon as it was entered, including filing a lawsuit directly against the Receiver in her individual capacity in violation of the Receivership Order. [5] The Defendants filed numerous motions which appeared to have no object other than to undermine the Receiver's ability to carry out her duties and to drive up the costs of the Receiver while simultaneously objecting to the Receiver's fees and costs. [6]

16.    The Defendants filed five separate appeals styled *Miami Beverly LLC v. City of Miami*, Florida Third District Court of Appeals Case Nos. 15-1600, 15-2547, 16-683, 17-549 and 17-1014. All five of these appeals have been ruled upon by the Third District Court of Appeal against appellant. [7] It is important to note that these five appeals created substantial uncertainty in the Receivership and served to limit the Receiver's ability to borrow funds on reasonable terms as her ultimate authority was called into question. Moreover, when the case began, the Receiver had obtained a verbal commitment from a lender from a local bank that rescinded the commitment when learning the identity of the principal of the Debtor.

17.    Additionally, on September 26, 2016, the Defendants filed the *Defendants' Amended Motion to Close Violations* (the "**Access Motion**"). In the Access Motion, among other things, the Defendants asserted that they were "willing to correct and close the pending

---

[5] For such conduct, the State Court entered an *Order Awarding Sanctions to Receiver* (the "**Sanctions Award**") providing: "Sanctions are hereby entered against the Sanctioned Parties, jointly and severally, in the amount of $32,572.22 for fees and costs incurred by the Receiver related to bringing and prosecuting the Motion and defending the Lawsuit, including the fees and costs of Counsel and the fee expert." A copy of the Sanctions Award is attached hereto as **Exhibit** "**C**."

[6] This Court should be aware that the Debtors' current counsel (non-bankruptcy) has been found to have debt not dischargeable under 11 U.S.C. 523 in a Federal Bankruptcy Case based upon fraud, larceny and embezzlement. *See* attached as **Exhibit** "**D**". During this case she was also ordered to obtain ten continuing learning education credits which she failed to do on a timely basis. After further order of the State Court she completed the courses.

[7] Appeal No. 15-1600 Affirmed on October 28, 2015; Appeal No. 15-2547 dismissed on December 21, 2015 by order of Judge; Appeal No. 16-683 affirmed August 24, 2016; Appeal No. 17-549 affirmed September 6, 2017; and Appeal No. 17-1014 dismissed by order of Judge October 5, 2017. The dockets are attached hereto as **Exhibit** "**E**."

6

violations on or before January 31, 2017 for all of the eight properties that have open violations pursuant to the Code Enforcement Board's wishes." Access Motion at ¶11. Based on these representations and Defendants' commitment to fund repairs and maintenance of the Receivership Properties, the Receiver, Defendants, and the City of Miami agreed to entry of an order that permitted a licensed and insured general contractor to access all of the Receivership Properties to make repairs at the Defendant's expense (the "**Access Order**") subject to the conditions of the Access Order. The Access Order was entered by the State Court on October 24, 2016. The Defendants' representation that they would "correct and close pending violations on or before January 31, 2017" was not met. *See* Certificate Motion at ¶ 10.

18.     Later, when it became apparent that the Defendants were not going to comply with the Access Order and the five appeals had been resolved, the Receiver filed the Certificate Motion seeking to borrow funds to upgrade the electrical systems at four of the buildings. This motion was promptly objected to by the Debtor on the basis that they could fund the repairs on a less expensive basis. Under strict terms, the parties agreed to allow the Debtor to commence the electrical repairs under a short time frame or permit the Receiver to borrow the funds to do so. The Debtor paid its selected electrician to upgrade the electrical system at the cheapest of the buildings and thereafter the Receiver worked to obtain the certificate of use and Business Tax Receipt at this building. However, in the last two weeks, the Receiver has learned that while the work apparently passed the City of Miami's code inspections it was a deficient upgrade. Two of the apartments did not have the electricity turned on at the time of the repairs and inspection. Upon renting the two apartments, it became apparent that the internal wiring at the apartments had not been upgraded by the Debtor as the electrical systems did not work upon being turned on

by Florida Power and Light. To resolve the issue, at unnecessary additional costs, Receiver is employing an electrician to upgrade the affected units' internal electrical wiring. Receiver has been informed by Debtor's representative that they did not contract with the electrician to do this work.

19.    In summary, despite the hurtles erected by the Defendants, during a three year receivership of 147 units across several buildings owned by six companies, the Receiver has been able to substantially improve the Receivership Properties and has increased the rent roll from rental deposits of $3,150.00 for the period June 10 through June 30, 2015, to rental deposits of $31,311.00 for the month of July 2015, and to rental deposits of $48,281.00 for the month of February, 2018. *See Receiver Linda M. Leali's Initial Report and Inventory dated July 8, 2015*; *Receiver Linda M. Leali's Second Report dated August 10, 2015*; and *Receiver Linda M. Leali's Report for February 2018.*

20.    After three years of efforts and fighting at every turn, the City of Miami set its Final Judgment for foreclosure sale on April 18, 2018. It is against this backdrop that the Defendants filed Chapter 11 bankruptcy petitions on April 17, 2018 (the "**Petition Date**").

21.    Debtor has, in fact, previously consented to Receiver remaining in possession of Debtor's assets and books and records.

22.    As of this date, no trustee or examiner has been appointed in this Bankruptcy Case and no committee of unsecured creditors has been appointed.

## DISCUSSION

23.    Pursuant to 11 U.S.C. § 101(11), Receiver became a "custodian" for the Debtor's assets when the Bankruptcy Case was filed. Specifically, 11 U.S.C. § 101(11)(A) defines

8

"custodian" as a "receiver or trustee of any property of the debtor, appointed in a case or proceeding not under this title:" Further, 11 U.S.C. § 101(C) defines a "custodian" as "trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of debtor's creditors."

24.    Generally, upon obtaining knowledge of a bankruptcy proceeding, a "custodian" of a debtor's property (1) is not permitted to disburse or take any action in the administration of property of the estate except to preserve such property, (2) must turn over to the debtor any and all property of the debtor that was held or transferred to the custodian, including proceeds, product, offspring, rents or profits of such property, and (3) must file an accounting of such property. *See* 11 U.S.C. §§543(a) and (b).

25.    Specifically, 11 U.S.C. § 543 provides:

(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.

(b) A custodian shall—

(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; and

(2) file an accounting of any property of the debtor, or proceeds, product, offspring, rents, or profits of such property, that, at any time, came into the possession, custody, or control of such custodian.

11 U.S.C. §§ 543(a) and (b).

26.    However, 11 U.S.C. § 543(d)(1) provides an exception to the turnover requirement imposed on custodians. Specially, 11 U.S.C. § 543(d)(1) provides:

(c)  After notice and hearing, **the bankruptcy court**-

(1) **may excuse compliance** with subsection (a), (b), or (c) of this section **if the interests of creditors** and, if the debtor is not insolvent, of equity security holders **would be better served by permitting a custodian to continue in possession, custody, or control of such property**, and

(2) shall excuse compliance with subsections (a) and (b)(1) of this section if the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition, unless compliance with such subsections is necessary to prevent fraud or injustice.

11 U.S.C. §543(d) (emphasis added).

27.    Pursuant to 11 U.S.C. § 543(d)(1), after notice and hearing, this Court may excuse Receiver's compliance with 11 U.S.C. § 543, "if the interests of creditors … would be better served by permitting a custodian to continue in possession, custody, or control of such property." *See, e.g.*, *In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 20212); *In re Orchards Village Invest., LLC,* 405 B.R. 341, 353 (Bankr. D. Oregon 2009); *In re E.S. Bankest, L.C.*, Case No. 04-10941-BKC-AJC, ECF No. 125 (Bankr. S.D. Fla. Sept. 30, 2004); *In re 245 Associates, LLC*, 188 B.R. 743 (Bankr. S.D. N.Y. 1995); *In re Uno Broadcasting Corporation*, 167 B.R. 189 (Bankr. D. Ariz. 1994); *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328 (Bankr. S.D. Ohio 1990); *In re Matter of WPAS, Inc.*, 6 B.R. 40, 43-44 (Bankr. M.D. Fla. 1980).

28.    In that regard, Judge Paskay notes the following in *WPAS*:

"…there is no doubt that upon the intervention of the bankruptcy proceeding, a non-bankruptcy custodian receivership shall terminate and the custodian appointed by a non-bankruptcy court must, as a general proposition, deliver the property to the trustee, or, in the case of a relief chapter proceeding, to the

10

Debtor, and must account for the properties which came into his possession, custody or control as a custodian.  To mollify the seemingly harsh and apparently inflexible requirement of § 543b, Congress provide in § 543d for dispensation of the apparent mandatory requirement of turnover provisions of the Section under certain circumstances. ***Accordingly, the Court may dispense with the enforcement of the mandate to oust a non-bankruptcy custodian from possession and control of the properties of the Debtor and may authorize the custodianship to proceed, after notice and hearing, if the interests of creditors would be better served.*** The Section is merely a recognition of a long-recognized doctrine of abstention now expressly codified by Congress in § 305 of the Bankruptcy Code which permits the court to decline to entertain any controversy which otherwise would be within its judicial competence if to do so would in the best interest of all parties concerned, although not necessarily the interest of the debtor."

*In re Matter of WPAS, Inc.*, 6 B.R. at 43 (emphasis added); *see also In re Falconridge,* 2007 WL 3332769 (Bankr. N.D. Ill. 2007); *Matter of Plantation Inn Partners,* 142 B.R. 561, 5674 (Bankr. S.D. Ga. 1992); *In re CCN Realty Co.,* 19 B.R. 526, 528 (Bankr. S.D.N.Y. 1982).

29.    When a receiver is excused from the turnover requirements of 11 U.S.C. § 543, the bankruptcy case continues with the receiver in possession of the debtor's property subject to the bankruptcy court's jurisdiction.  *In re 245 Associates, LLC*, 188 B.R. at 749.

30.    The determination as to whether the receiver should be excused from the turnover requirements under Section 543 is "fact intensive, turning upon whether the assets of the particular debtor should be administered by the existing custodian or returned to the debtor." *See In re Uno Broadcasting Corporation*, 167 B.R. at 200. In analyzing the facts of such case, the Court must decide whether, as between the debtor and the custodian, the interests of creditors are better served if the assets remain with the custodian or are turned over to the debtor.

31.    The movant's burden under 11 U.S.C. § 543(d)(1) is to show that the creditors, generally, would be better served by the continuation of the custodianship relationship. Further, in considering whether to exercise its discretion under 11 U.S.C. § 543(d)(1) to excuse a

11

custodian from turnover, a Court should consider several factors bearing on whether the interests of creditors would be better served by excusing the custodian from turnover and other requirements of 11 U.S.C. § 543(a) and (b).  *See In re Lizeric Realty Corp.,* 188 B.R. 499, 506-07 (Bankr. S.D.N.Y. 1995); *In re Orchards Village Invs., LLC,* 405 B.R. 341, 353-354.  Among the factors that courts usually consider when deciding whether to excuse turnover are:

    a.   whether there will be sufficient income to fund a successful reorganization;

    b.   whether the debtor will use the turnover property for the benefit of the creditors;

    c.   whether there has been mismanagement by the debtor;

    d.   whether or not there are avoidance issues raised with respect to the property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate;

    e.   the fact that the bankruptcy automatic stay has deactivated the state court receivership action; and

    f.   whether the custodianship is part of a larger matter that is better resolved in a court other than bankruptcy court.

*In re Dill*, 163 B.R. 221, 225 (E.D. N.Y. 1994) (citing *In re Constable Plaza Associates*, 125 B.R. 98, 103-04 (Bankr.  S.D. N.Y. 1991); *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. at 332, *First Nat'l Bank v. Powers Aero Marine Service (In re Powers Aero Marine Service)*, 42 B.R. 540, 544-45 (Bankr. S.D. Tex. 1989) (stating that a debtor's proposed use of only significant assets unlikely to result in sufficient income for successor reorganization); *In re CCN Realty Corp.*, 19 B.R. 526; 528 (Bankr. S.D.N.Y. 1982); and *In re WPAS,* 6 B.R. at 44; *In re Ericson,* 26 B.R. 973 (Bankr. C.D. Cal. 1983). The factors outlined in these cases evolve from the presupposition that the turnover provisions of 11 U.S.C. § 543 are part of the statutory

expression of the Congressional preference that a Chapter 11 debtor be permitted to operate and control its business during the reorganization process.

32.    In this Bankruptcy Case, all six factors weigh in favor of excusing turnover.

33.    In applying these factors to the instant matter, there is no doubt the Receiver is best suited to remain in custody and control of Debtor's property.

**Insufficient Income to Fund Reorganization**

34.    This Bankruptcy Case was filed on the eve of a foreclosure sale. Apart from substantial judgments in favor of the City of Miami, unpaid real property taxes and unpaid, yet awarded, professional fees for the Receiver and the Receiver's professionals, there are no other liquidated claims. Debtor's real property needs to be sold or refinanced with the proceeds of same used to fund repairs and pay creditors. A bankruptcy administration may assist in achieving a balance of the proper management and administration of the real property with a fiduciary, like the Receiver, overseeing marketing efforts and repair expenditures under court oversight.

35.    Given its performance thus far, there is little likelihood that Debtor will be able to progress through this chapter 11 case and towards a viable resolution. The Debtor have been provided a multitude of opportunities to make good in these cases but at every turn they have cut costs and quality to the detriment of the tenants. As noted above, most recently, the Receiver has learned that the electrical upgrades paid for and coordinated by the Debtor at one of the buildings were allegedly completed in an incomplete fashion.

36.    As set forth above, when the electricity was activated in the apartments without electricity, it became evident that the internal wiring had not been upgraded and was old and not functional. This is a classic example of the work by the Debtor, even when conducted by

licensed electricians it is of poor quality. [8] Debtor was thereafter strictly denied access unless being directly coordinated by a general contractor or licensed electrician. Additionally, the Debtor's on-site representative who was coordinating under the Access Order is presently illegally renting his apartment out as an Airbnb.

37.     There is little likelihood or probability that Debtor can be rehabilitated by the former principals given the conduct of those parties pre-petition. Given these issues, it would be an absurd result to require turnover of possession and control of Debtor's assets to the slumlords of Debtor. Alternatively, the Receiver is in the best position to be able to place the mechanisms that will lead to a successful resolution of this Bankruptcy Case in a timely and efficient manner.

**Debtor Will Not use Receivership Properties to Benefit of Creditors**

38.     If the Receivership Properties are sold expeditiously, sale proceeds can be used to pay liquidated creditors and provide a fund for payment of unliquidated claims as they become liquidated.

39.     Receiver contends that if Debtor were managing the Receivership Properties, they would be at risk based on the prior conduct of persons in control of Debtor. Consequently, as the State Court found, a fiduciary is needed to preserve the Receivership Properties.

40.     Under the control of its principals, Debtor will ***not*** use the Receivership Properties for the benefit of creditors and will ***not*** act in the best interests of creditors. On the other hand, Receiver is a fiduciary appointed by a court of competent jurisdiction and has already demonstrated that she has and is continuing to act in the best interests of all creditors, including through her efforts prior to the filing of this bankruptcy case.

---

[8] In another case, under the Access Order, the Debtor made repairs to an electrical box which resulted in the box being upside down. *See* **Exhibit** "**F**".

**There Has Been Substantial Mismanagement by Debtor**

41.    As outlined above, prior to the Receiver's appointment, there had, in fact, been substantial and extensive mismanagement. In this Bankruptcy Case, keeping Debtor's principals from being "landlords-in-possession" is in the best interest of all creditors.

**This Court Should Establish Receiver's Powers & Duties in Bankruptcy**

42.    This Bankruptcy Case began as a City of Miami code enforcement action and a State Court filing. Nearly three years have transpired under the Receiver's control and State Court oversight. The subject of this Bankruptcy Case involves the Receivership Properties, which were in serious disrepair and as such, threated the health, safety, and welfare of the community. There are large monetary sums owed to the City of Miami as a result of outstanding liens due to, among other things, code violations, and the continual accrual of per diem penalties.

43.    Receiver proposes this Court establish powers and duties of Receiver in this Chapter 11 case so as to avoid any disputes in connection therewith. Thus, the Receiver requests this Court grant Receiver the powers and rights, and impose the duties of, a debtor in possession under 11 U.S.C. §§ 1107 and 1108. Specifically, in addition to the leasing and day-to-day management of the Receivership Properties, the Receiver seeks to be installed as the estate representative to market and sell the Receivership Properties with closing on or before September 30, 2018.

**Bankruptcy Case Deactivates State Court Receivership**

44.    Receiver asserts the filing of this Bankruptcy Case effectively deactivates the State Court's receivership and Receiver's role therein, unless this Court takes action to re-empower same.

15

**Debtor's Bankruptcy Case is Better Resolved in State Court**

45.     Receiver has been in place for three years. Despite many challenges and without knowing what 11 U.S.C. § 543 turnover brings, other than more challenges, Receiver sees it as her duty to remain in possession until a disposition of the Receivership Properties. While habitable, the units (and the tenants) are vulnerable. The disruption necessarily occasioned by displacing the Receiver would be borne by those must vulnerable.

46.     Based upon the foregoing, the Receiver respectfully submits that it is in the best interest of creditors to excuse the Receiver from the turnover requirements and for the Receiver to remain in possession of Debtor's assets instead of turning over such assets to Debtor under the control of its principals. The Receiver proposes that the Court establish the powers and duties of the Receiver in this Chapter 11 case so as to avoid any disputes in connection therewith.

**<u>RELIEF REQUESTED</u>**

47.     It is in the best interest of all creditors for Receiver to be empowered with the powers and rights, and have the duties of a debtor in possession pursuant to 11 U.S.C. § 1107 and 1108. After being excused from turnover requirements of 11 U.S.C. § 543, Receiver would be "…the functional equivalent to a trustee." *See In re Uno Broadcasting Corporation*, 167  B.R. at 201. "Once excused from compliance and allowed to remain in possession, a custodian is in the same fiduciary capacity as a trustee or debtor in possession."  *See In re Posados Associates*, 127 B.R. 278, 281 (Bankr. D. N.M. 1991); *In re 245 Associates, LLC*, 188 B.R. at 743.

48.     The facts of *In re Uno Broadcasting Corporation*, 167 B.R. at 201 are similar to this Bankruptcy Case. The Court in *Uno* found the assets of the chapter 11 debtor should remain

16

in the hands of a pre-petition receiver appointed by a federal district court, thereby excusing the receiver's compliance with turnover requirements. *See id.* at 191.

49.    The *Uno* court found that where the receiver had been proceeding expeditiously and professionally to manage the debtor's affairs, had experience in the industry that the debtor operated, and debtor's sole shareholder was unable to manage the business due to his imprisonment, further management change would cause substantial disruption, duplication, costs and confusion. *See id.* at 191. Here, while Debtor's principles are not in prison, this case remains precedential.

50.    Further, the Court in *Uno* found the receiver, having been excused from turnover, was the functional equivalent of a trustee and "must now have obligations and responsibilities to all creditors of the estate…." *See id.* at 201. After declining to consider the receiver as a debtor-in-possession because the receiver was in possession, the Court ultimately directed the parties to fashion an order specifically delineating the rights, powers, and duties of the receiver to avoid any confusion. *See id.* at 201-202.

51.    The court in *In re 400 Madison Ave. Ltd. P'ship*, 213 B.R. 888, 898 (Bankr. S.D.N.Y. 1997) similarly concluded: "The bankruptcy court has the supervisory power over a receiver and supersedes the authority of a state or federal court which appointed the receiver."

52.    That same court further held: "The Bankruptcy Court may issue such additional orders or amendments of prior orders as it deems appropriate to govern the receiver's management of estate property." *Id.*

53.    Similarly, Judge Cristol approved a similar motion and order in *In re E.S. Bankest, L.C.*, Case No. 04-10941-BKC-AJC, ECF No. 125 (Bankr. S.D. Fla. Sept. 30, 2004). In

that case, Judge Cristol entered an order shortly after the petition date excusing the pre-petition receiver from turnover requirements of 11 U.S.C. § 543 and endowing that receiver with the rights and duties of a debtor in possession.

54.    Under the facts of this Bankruptcy Case and for all the reasons stated above, it is clear that excusing Receiver from the turnover requirements of 11 U.S.C. § 543(b) will be more beneficial to the creditors than turnover. No other, viable party knows Debtor's operations and assets relating to the Receivership Properties better than Receiver. To that end, Receiver requests this Court enter an order endowing Receiver with the powers, rights, and duties of a debtor in possession under 11 U.S.C. § 1107 and 1108 of the Bankruptcy Code.

55.    It is not in the best interests of the creditors to appoint a separate trustee in this Bankruptcy Case for several reasons. First, there is no factual basis for the appointment of a chapter 11 trustee under 11 U.S.C. § 1104(a)(1). Receiver has been in place for approximately three years and has faithfully and effectively performed her duties as a fiduciary appointed by the State Court. Cause does not exist for the appointment of a trustee. There is no fraud, dishonesty, incompetence, or gross mismanagement of Debtor's affairs under the control of Receiver.

56.    The mere fact that a custodian is in place is not, in and of itself, grounds for appointment of a trustee. Rather, the Receiver has done an excellent job identifying issues that occurred pre-receivership and identifying, preserving, maintaining, and collecting Debtor's property. Moreover, Receiver has performed an extensive analysis of Debtor's operations and is best suited to continue the rehabilitation process of the Receivership Properties. Therefore, it is clearly in the best interests of the creditors that Receiver remain in possession of the Receivership Properties as opposed to turning over such assets to a separate trustee.

57.     Second, there is no factual basis for the appointment of a trustee under 11 U.S.C. § 1104(a)(2), which provides that the Court may appoint a trustee if the appointment is in the best interests of creditors. It would be extremely inefficient and not in the best interests of creditors to appoint a trustee to replace Receiver given the extent of Receiver's substantial knowledge and understanding of the assets, litigation claims, and other matters related to Debtor. *See Uno Broadcasting Corporation*, 167 B.R. at 200 (explaining there would be substantial disruption, duplication, costs, and confusion flowing from additional change).

58.     Receiver will comply with applicable bankruptcy law regarding employment of professionals and compensation of Receiver and her professionals. *In re 245 Associates, LLC*, 188 B.R. 743 (explaining a receiver remaining in possession of assets must follow the procedures for employment of professionals at 11 U.S.C. § 327).

59.     Receiver is prepared to be governed by 11 U.S.C. § 326 and 330 regarding her compensation. Receiver's professionals have agreed to be compensated pursuant to 11 U.S.C. § 330 and 331. *See In re Yellow Cab Cooperative Association*, 185 B.R. 844, 851 (Bankr. D. Co. 1995) (where turnover has been excused, the courts have concluded that compensation for a receiver is subject to the requirements of 11 U.S.C. § 330).

60.     In the event this Motion is not granted, Receiver hereby requests, out of an abundance of caution, that at a minimum: (1) a trustee should be appointed pursuant to 11 U.S.C. § 1112(b)(1) and (4)(B); or (2) this Bankruptcy Case should be converted to chapter 7.

WHEREFORE, for reasons outlined above, Receiver respectfully requests entry of an Order (1) granting this Motion; (2) excusing Receiver from compliance with the turnover requirements of 11 U.S.C. § 543; (3) cloaking the Receiver with the powers, rights, and duties of

19

a debtor in possession under 11 U.S.C. § 1107 and 1108; (4) in the event this Court does not empower Receiver with the powers, rights, and duties of a debtor in possession under 11 U.S.C. § 1107 and 1108, establishing the powers and duties of Receiver in this Bankruptcy Case; (5) authorizing the Receiver and her professionals to be compensated pursuant to 11 U.S.C. § 326 and 330; and (6) granting any further or additional relief this Court deems necessary or appropriate.

Respectfully submitted on May 14, 2018.

> Messana, P.A.
> *Counsel for Linda Leali, Receiver*
> 401 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, Florida 33301
> Telephone: (954) 712-7400
> Facsimile:  (954) 712-7401
> Email: tmessana@messana-law.com
>
> /s/ Thomas M. Messana
> Thomas M. Messana
> Florida Bar No. 0991422
> Chris Broussard
> Florida Bar No. 0095894

# Exhibit A
## FINAL JUDGMENTS

CFN: 20150355950 BOOK 29642 PAGE 1658
DATE:06/04/2015  10:45:15 AM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 14-027781 CA 23

CITY OF MIAMI,

        Plaintiff(s),

    vs.

MIAMI BEVERLY LLC, 1336 NW 60 LLC, REVEREND LLC, 13300 ALEXANDRIA DR. HOLDINGS LLC, THE HOLDINGS AT CITY LLC, AND THE HOLDINGS AT CITY II LLC,

        Defendant(s).

_____/



FINAL ORDERS AS TO ALL PARTIES
SRS DISPOSITION
NUMBER_____ *12*
THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS FINAL ORDER IS AS TO ALL PARTIES.
    Judge's Initials_____

Barbara Areces
Circuit Court Judge

2015 JUN -4  AM 9: 34
FILED FOR RECORD

## ORDER GRANTING DEFAULT FINAL JUDGMENT

    This cause came before the Court on June 4, 2015 on the Motion for Default Final Judgment pursuant to Fla.R.Civ.P. 1.500(e) filed by Plaintiff, CITY OF MIAMI, and the Court having reviewed the file and being otherwise duly advised in the premises, it is hereby:

    **IT IS ORDERED AND ADJUDGED:**

    1.    The Clerk's Default was properly entered after service was effectuated upon the Defendants and the Defendants filed no response pursuant to the Florida Rules of Civil Procedure 1.500(a).

CFN: 20150355950 BOOK 29642 PAGE 1659

CASE NO.: 14-027781 CA 23

2.    A Final Judgment in hereby GRANTED in favor of Plaintiff, The City of

Miami, as Defendants have filed to file any pleading with the Court.

**DONE AND ORDERED** in Chambers at Miami-Dade County, Florida this 4th
day of June, 2015.

BARBARA ARECES
CIRCUIT COURT JUDGE

Barbara Areces
Circuit Court Judge

cc:

| | |
|---|---|
| Miami Berverly LLC<br>c/o Leonard Flowers, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 | The Holdings at City II, LLC<br>c/o Leonard Flowers, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 |
| 1336 NW 60 LLC<br>c/o Leonard Flowers, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 | The Holdings at City, LLC<br>c/o Leonard Flowers, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 |
| Reverend, LLC<br>c/o Leonard Flowers, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 | 13300 Alexandria Dr. Holdings, LLC<br>c/o Denise Vaknin, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 |
| The Holdings at City III, LLC<br>c/o Leonard Flowers, Registered Agent<br>1250 NW 62nd Street, Apt. #1<br>Miami, Florida 33147 | Freedom Apartments, LLC<br>c/o Denise Vaknin, Registered Agent<br>99 Roberts Road<br>Englewood Cliffs, NJ 07632 |

542550

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 14-027781 CA 23

CITY OF MIAMI,

       Plaintiff(s),

  vs.

MIAMI BEVERLY LLC, 1336 NW 60            **FINAL JUDGMENT**
LLC, REVEREND LLC, 13300
ALEXANDRIA DR. HOLDINGS LLC,
THE HOLDINGS AT CITY LLC, AND
THE HOLDINGS AT CITY II LLC,

       Defendant(s).

_____/

     THIS CAUSE having come on to be heard on Plaintiff's, City of Miami's ("City"), Motion for Default Final Judgment and the Court having granted City's Motion on June 4, 2015 and having reviewed the affidavits in support, it is hereby;

     **IT IS ORDERED AND ADJUDGED** that the Final Judgment is entered in favor of the Plaintiff, City of Miami, against Defendants Miami Beverly LLC, 1336 NW 60 LLC, Reverend LLC, 13300 Alexandria Dr. Holdings LLC, The Holdings At City LLC, And The Holdings At City II LLC, as follows:

A.   <u>INJUNCTION</u>

     A permanent injunction is issued in favor of the City against Miami Beverly, LLC, 1336 NW 60 LLC, Reverend LLC, 13300 Alexandria Dr, LLC Holdings, LLC, The Holdings at City, LLC, and The Holdings at City II, LLC ("Defendants") as follows:

1.   The Defendants are enjoined from any further violations of the Code of the City of Miami, as amended; and

2.   The Defendants are temporarily enjoined from allowing or causing new tenants to inhabit these properties until all violations are complied.

CASE NO.: 14-027781 CA 23

B.    MONETARY JUDGMENT

A money judgment is entered in favor of the Plaintiff, City of Miami against the Defendants as follows:

1.    The Plaintiff, City of Miami, shall recover from the Defendant, **MIAMI BEVERLY, LLC,** the sum of $163,567.92;

2.    The Plaintiff, City of Miami, shall recover from the Defendant, **1336 NW 60, LLC,** the sum of $461,577.84;

3.    The Plaintiff, City of Miami, shall recover from the Defendant, **REVEREND, LLC,** the sum of $809,039.25;

4.    The Plaintiff, City of Miami, shall recover from the Defendant, **13300 ALEXANDRIA HOLDINGS, LLC,** the sum of $1,093,569.80; and

5.    The Plaintiff, City of Miami, shall recover from the Defendant, **THE HOLDINGS AT CITY, LLC,** the sum of $598,632.81

This Judgment against all Defendants shall bear interest at the rate of 4.75% a year, for which let execution issue forthwith.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 12/24/15.

BARBARA ARECES
CIRCUIT COURT JUDGE

FINAL ORDERS AS TO ALL PARTIES
SRS DISPOSITION NUMBER    12

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

Judge's Initials    BA

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom

service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Keith D. Silverstein, Esq.
Attorney for All Defendants

Linda Leali, Esq.
Court Appointed Receiver

Rachel S. Glorioso Dooley, Assistant City Attorney
City of Miami – Office of the City Attorney

# Exhibit B

## RECEIVERSHIP ORDER

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION
CASE NO: 14-27781

CITY MIAMI Plaintiff(s),

vs.

MIAMI BEVERLY LLC et al,
                            Defendant(s),

ORDER
GRANTING/~~DENYING~~
PLAINTIFF'S/~~DEFENDANT'S~~
Motion to Appoint
Receiver

_____/

THIS CAUSE having come on to be heard on _____6-4-15_____
on Plaintiff's/Defendant's Motion

_____ TO APPOINT RECEIVER _____

and the Court having heard arguments of counsel, and being otherwise advised in the premises, it is hereupon

ORDERED AND ADJUDGED that said Motion be, and the same is hereby

GRANTED. LINDA LEALI IS HERBY
APPOINTED AND THE CITY SHALL PROVIDE
TODAY BY E-COURTSY A PROPOSED ORDER.

_____

_____

_____

DONE AND ORDERED in Chambers at Miami-Dade County, Florida this___4___

day of
_____JUNE_____ , 2015 .

_____
CIRCUIT COURT JUDGE

Copies furnished to: Counsel of Record

117_01-554   3/11

Barbara Areces
Circuit Court Judge

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CITY OF MIAMI,                                              CIRCUIT CIVIL DIVISION

       Plaintiff,                                        CASE NO.:  14-27781 CA 01 (23)

vs.

MIAMI BEVERLY LLC;
1336 NW 60 LLC;
REVEREND LLC;
13300 ALEXANDRIA DRIVE HOLDINGS LLC;
THE HOLDINGS AT CITY LLC;
THE HOLDINGS AT CITY II LLC

       Defendants.
_____/

## ORDER APPOINTING RECEIVER

THIS CAUSE having come before the Court for hearing June 4, 2015 on the Plaintiff's Motion for Appointment of Receiver, and the Court having reviewed the file, heard the testimony, and being otherwise duly advised in the premises, it is hereby:

ORDERED AND ADJUDGED as follows:

1.      The Plaintiff's Motion for Appointment of a Receiver is GRANTED.  It is undisputed that the properties that are the subject of this cause are in serious disrepair and threaten the health, safety and welfare of the community.  Additionally, there are large monetary sums owed to the Plaintiff as a result of outstanding liens due to, among other things, code violations, and the continual accrual of per diem penalties.    A receiver is necessary to properly manage and prevent the continued deterioration of these properties (thereby also protecting the community) and to maximize their income producing potential. These properties require regular, ongoing management and/or maintenance services in order to retain and possibly increase their value,

1

including without limitation retaining existing tenants, attracting new tenants, and completing necessary measures intended to allow full realization of their value, and to correct all code violations.

2.      Linda Leali, Esq., [hereinafter "Receiver"], 777 Brickell Avenue, Ste. 1210, Miami, Florida 33131, is appointed Receiver of the properties commonly described as follows:

        a. 1341 NW 60th Street, Miami, Florida;
        b. 1335 NW 60th Street, Miami, Florida;
        c. 6820 NW 17th Avenue, Miami, Florida;
        d. 1710 NW 1st Court, Miami, Florida;
        e. 1730 NW 1st Court, Miami, Florida;
        f. 1558 NW 1st Avenue, Miami, Florida;
        g. 1231 NW 61st Street, Miami, Florida;
        h. 6040 NW 12th Avenue, Miami, Florida; and
        i. 1250 NW 62nd Street, Miami, Florida.

[hereinafter collectively referred to as the "Property"[1]].

Receiver has agreed to an hourly rate of $300.00 for her services and $125.00 for her administrative staff, and shall be entitled to same for work reasonably and properly performed.

3.      Within two (2) days from the date of this order, Receiver shall post a bond in the amount of $30,000.00, to secure her performance as such, and file her Oath of Receiver wherein she agrees to undertake the faithful performance of her receivership duties and obligations.

4.      Once the bond is posted and the Oath is filed, Receiver shall immediately ensure that the Property is appropriately insured, and shall take immediate possession and control of the Property, together with all improvements thereon, revenues, income, profits, deposits, existing accounts, cash on hand, contracts of purchase and sale, leases, permits, certificates and books and records pertaining to such Property.  The Receiver shall act in accordance with and shall have all of the usual, necessary and incidental powers of a receiver afforded by Florida Law,

---

[1] Note: "Property" can also refer to a specific property and not all the properties together, depending on the context.

(subject to limitations set forth in this order) to maintain, operate and preserve the Property including the powers and authority enumerated in this Order.

5.      Upon the entry of this Order, Defendants are ordered to cooperate with the Receiver in the transition of the administration and management of the Property and within three (3) days of this Order Date shall disclose and provide copies to the Receiver of all of the following pertaining to the Property (to the extent that such items are in its possession, custody or control):

a.   All keys.
b.   All records pertaining to occupancy including by way of illustration but not limitation, all leases, rent rolls, credit card billings, and cash receipt journals;
c.   Any tenant or occupant ledgers;
d.   The petty cash fund, if any;
e.   A current aged account receivables or delinquency report;
f.   An aged listing of all trade payables and other payables;
g.   A copy of any records relating to operating expenses for the Property;
h.   A list of utilities and utility accounts;
i.   Year-end 2014 operating statement with general ledgers and year-to-date 2015 operating statement with general ledgers;
j.   All on-site employee payroll records and employee files and applications;
k.   An inventory of all equipment, furniture, vehicles, and supplies for the Property;
l.   All existing service contracts;
m.   All franchise, management and/or operating agreements, including all amendments;
o.   All pending bids for contractor work;
p.   The Declaration page of all insurance policies on the Property and their terms, evidence of coverage and contact information for any insurance agent;
q.   All vendor insurance certificates;
r.   Surveys, floor plans and drawings, to the extent Defendants have any;
s.   Documents identifying and summarizing all pending litigation (excluding this action);
t.   All electronic documents, related to the operation of the Property, including but not limited to, all records concerning the profits, finances, issues and operation and management of the Property, accounts with any financial institutions, vendors, suppliers, merchants, and tenants, Defendants' tax identification numbers;
u.   Any permits and approvals;
v.   All tenant security deposits and any other security deposits from any potential buyers;
w.   All listing agreements for the Property;

> x.  All information and documents regarding any remaining warranty items from contractors, sub-contractors, or manufacturers from construction of the buildings on the Property and a list of all contractors and sub-contractors who constructed the buildings on the  Property; and
>
> y.  Such other records pertaining to the management of the Property as may be reasonably determined to be necessary by the Receiver.

6.      Defendants and any third parties receiving notice of this Order shall also surrender to the Receiver and account for all monies that they currently or may later possess (and/or that is or becomes subject to their control) from revenue, profits, rents and/or income collected from the operation of the Property, including any money held in accounts maintained by Defendants at any financial institution related to the Property.

7.      Defendants and its property managers, affiliates, operators, employees, and agents are prohibited from removing any personal property belonging to the Property or diverting any Property income or rents.

8.      Defendants shall fully cooperate with the Receiver in adding the Receiver as additional insured and the Receiver as a loss payee on all insurance relating to the operation and management of the Property including, but not limited to, fire, extended coverage, property damage, liability, fidelity, errors and omissions, and workers' compensation, automobile liability and umbrella liability coverage related to the Property. Defendants and their property managers, employees, and agents are prohibited from cancelling, reducing, or modifying any and all insurance coverage in existence with respect to the Property.  In the alternative, the Receiver may, in her reasonable discretion replace the insurance relating to the operation and management of the Property.

9.      Immediately upon the posting of the bond and the filing of her Oath, and continuing until expiration or termination of the receivership, the Receiver shall perform all of the following that

from time to time applies and/or is necessary to preserve and protect the Property and

community, and is vested with the authority, powers and duties delineated below:

    a. To maintain, secure, manage, operate, repair, and preserve the Property;

    b. To change any and all locks to the Property (if deemed appropriate by Receiver) and, if appropriate, limit access to some or all of the Property;

    c. To assume control over the Property and to collect and receive all Income from the Property;

    d. To prepare and maintain complete books, records, and financial reports of the Property, including, but not limited to, operating statements, income statements, balance statements, and all other statements prepared for the Property in a form acceptable to the Court;

    e. To hire, or discharge, on-site employees or independent contractors without any liability to the Parties;

    f. To establish pay rates for any on-site employees;

    g. To review existing workers' compensation, disability, general liability and "all risks" hazard insurance and to purchase such insurance, including automobile liability coverage and umbrella coverage, in an amount determined appropriate by the Receiver to protect the Property, and name the Plaintiff, the Receiver, any Property manager and Defendants as additional insureds, as the Receiver deems appropriate for the Property's preservation and protection;

    h. To maintain a separate account with a federally insured banking institution or a savings association with offices in the State of Florida in the name of the Receiver, from which the Receiver shall disburse all authorized payments as provided in this Order;

    i. To receive and endorse checks pertaining to the Property either in the Receiver's name or Defendants' name;

    j. To pay all appropriate real estate taxes, personal Property taxes, sales or use taxes, any other taxes or assessments against the Property under Defendants' tax identification number;

    k. To prepare and file any tax returns stemming from the Property and the operation of the Property as may be required by law (including gross receipts, sales and use or other tax returns). The Receiver shall not be responsible for the preparation and filing of any income tax returns for the Defendants, but shall, within thirty (30) days of receipt of a written request to do so, provide Defendants with information relating to the operation of the Property arising from and after the date of her appointment as Receiver in order to permit Defendants to file its/their income tax returns. Defendants shall provide to the Receiver any information needed to file any tax returns for the Property;

    l. To contest, protest, or appeal any ad valorem tax or assessment, real estate tax, personal Property tax, or other tax or assessment pertaining to the Property, should she deem it appropriate. Any refund or reimbursement of taxes whether paid by the Receiver or Defendants shall be deemed Income;

    m. To operate the Property under any existing name or trade name (or new name, if the Receiver deems appropriate to do so);

n.  To open and review mail directed to Defendants and their representatives pertaining to the Property;

o.  To seek assistance of law enforcement officials as necessary to preserve the peace and protect the Property;

p.  To continue, manage, operate, lease, market, and negotiate, modify, cancel, or enter into listing agreements and contracts to lease the Property;

q.  To enforce, amend, terminate any existing contract(s) not required for the operation of the Property;

r.  To reject any unexpired contract(s) entered into by Defendants, and/or its authorized agent, that are not required for the operation of the Property;

s.  To execute, cancel, modify, renegotiate, or abrogate all service, maintenance or other contracts relating to the operation of the Property;

t.  To make payments and disbursements, in the ordinary course of business, as may be needed and proper for the preservation of the Property;

u.  To maintain appropriate insurance, continue any current policies in place, and purchase further insurance as the Receiver deems appropriate, as defined below, and shall name the Plaintiff, any property manager and Defendants, as additional insureds, and Plaintiff as loss payee;

v.  To enter into leases and do all things necessary to continue normal property operation;

w.  To modify existing contracts in the ordinary course of the business of the Property;

x.  To pay all utilities, expenses and other obligations secured by, or which may give rise to liens, and all other outstanding obligations to suppliers and servicers in the ordinary course of business, including, obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership;

y.  To make repairs necessary for the maintenance of the Property, in order to preserve the Property in the ordinary course of business, provided, however, that the Receiver shall not make any improvements, repairs and/or remediations having a cost of $2,500.00 or more on any given individual rental unit without first obtaining approval from the Court;

z.  In the event the cost of improvements, repairs and/or remediations  to individual rental units cost $2,500 or more, to engage contractors and skilled trades on a competitive bid basis, and to execute such contracts for such purposes as the Receiver deems appropriate, but ***must first seek court approval***;

aa. To borrow funds for purposes relating to the operation of the Property. However, the Receiver shall not borrow funds without first providing the Plaintiff and Defendants with advance written notice and a reasonable opportunity to elect to advance funds required by the Receiver, and ***must first seek court approval***;

bb. To take all steps necessary to comply with all requirements, regulations and laws applicable to the Property, and to deal with all regulatory authorities in connection with the same;

cc. To employ, if necessary, bookkeeping, accounting, legal and clerical services deemed necessary for the proper management of the Property, but *must first seek court approval* and justify the work required and the charges/fees/wages incurred as a result;

dd. To employ a manager or managing company to perform the planning, scheduling and supervising of all on-site services as directed by the Receiver, including but not limited to, managing tenant rosters, on-site collection of rents, coordinating any and all inspections and repairs, scheduling and supervising the activities of all other on-site vendors, managing and coordinating communications with the Receiver and other pertinent parties, and any other pertinent on-site services requested by the Receiver, but *must first seek court approval for rates and fees charged for specific services*; and

ee. To institute, prosecute, defend, compromise, and/or intervene in, or become a party to, such actions or proceedings in state or federal courts which may, in the Receiver's opinion, be necessary for the protection, maintenance and preservation of the Property, for the carrying out of the terms of any order of the Court affecting the Property, to collect rents and other amounts now or hereafter becoming due, to evict and/or remove tenants or other persons or entities from the Property, and/or to defend against any action brought against the Receiver acting in such capacity.  This also applies to administrative proceedings, arbitrations, or other proceedings that involve the Property.

10.    Notwithstanding the foregoing, the Receiver and the Receivership estate shall not be liable for the payment of taxes of any kind, assessments, goods, or services provided to Defendants or the Property or utility charges prior to the date of this Order.

11.    Any individual or entity receiving a copy of this Order is hereby enjoined and restrained from discontinuing service to the Receiver or the Property based upon the non-payment of such taxes, assessments, goods or services or utilities prior to the date of this Order and from attempting to collect taxes, assessments, invoices, and utility charges from Receiver predating the date of this Order.  Each utility company or entity providing service to the Property shall forthwith transfer any deposits which it holds to the exclusive control of the Receiver and shall be prohibited from demanding that Receiver deposit additional funds in advance to maintain or secure such service.

12.    The Receiver is directed to prepare and file within thirty (30) days of the date of this Order and on the tenth day of each month thereafter, so long as the Receivership is in force, a

report as is required by Fla.R.Civ.Pr. 1.620, under oath, setting forth and reporting all changes in assets in her charge or claims against the assets that have occurred during the preceding month. [The first report due July 10, 2015, shall be for the period ending June 30, 2015]. The Receiver shall file such reports with the Clerk of this Court and shall serve a copy of each report upon counsel for Plaintiff, the Defendants, and the Court. The Report must clearly and separately account for the different properties within the Property.

13.    Without limiting or expanding the foregoing, the Receiver is authorized to exercise all powers generally available and shall be subject to all the duties of a Receiver under the laws of the State of Florida that may be incidental to the management and operation of the Property, as described in this Order. The Receiver shall have any additional powers that are provided by law and that the Court may from time to time direct or confirm.

14.    The Receiver shall, during the pendency of this action, have the right to apply to this Court for further instructions or directions.

15.    The authority granted to the Receiver is self-executing, unless the action requires approval. The Receiver is authorized to act on behalf of and in Defendants' name (or the Receiver's name), as the Receiver deems appropriate without further order of this Court and without personal recourse against the Receiver (subject to the general provisions, below).

16.    In the event that the revenue from the Property is not sufficient to pay the expenses of the preservation, operation, maintenance or restoration of the Property in accordance with the terms of this Order, and to pay the Receiver, Plaintiff is hereby specifically authorized to advance, at Plaintiff's sole discretion, said sums to the Receiver as are necessary for the payment of same, and the Receiver may issue Receiver Certificates upon terms, including interest rate, approved by order of the Court, to reflect and secure said advancements.

17.     All advances to the Receiver by Plaintiff for the benefit of the Property excluding fees and costs of the Receiver, but including any advances for working capital or improvements shall be deemed protective advances.  Any such protective advance shall be fully secured by a first priority mortgage lien and security interest against the Property. All such funds advanced, including interest on advances, shall be deemed a prior lien before the repayment of any and all other claims against the Property (except for taxes and assessments having first priority as a matter of law) or proceeds of either of them.

18.     Each month the Receiver, her attorneys, accountants and bookkeepers, shall be authorized to receive compensation for the time they have devoted to this Receivership.  The Receiver shall submit to the parties an account of the fees and other charges incurred and revenues received.  The parties shall have ten (10) days thereafter to file any objection to the compensation requested.  If no objections are filed, the Receiver is authorized to make payment to herself, and her attorneys, accountants and bookkeepers for the services for the applicable period from any source received by the Receiver as assets of this Receivership without further order of this Court.  Any timely objection shall be brought on for an expedited hearing for a resolution by this Court.  The Receiver's fees and expenses incurred by the Receiver in the proper performance of her duties hereunder, shall be paid to the extent funds are available, first from the revenues derived from the operation or liquidation of the Property, and if these are not sufficient, then from the proceeds of receiver certificates, as set forth above.

19.     Nothing in this Order shall require the Receiver to advance funds other than from Income or from other funds made available to the Receiver pursuant to the terms of this Order without a bond or security for payment satisfactory to the Receiver.

20.     The Receiver shall not be liable for any claim, obligation, liability, action, cause of action, cost or expense of Defendants or the Property arising out of or relating to events or

circumstances occurring prior to the entry of this Order, including without limitation, any contingent or unliquidated obligations and any liability from the performance of services rendered by third parties on behalf of Defendants and any liability to which Defendants are currently or may ultimately be exposed under any applicable laws pertaining to the ownership, use or operation of the Property (collectively all of the foregoing is referred to as "Pre-Receivership Liabilities"). The Receiver shall not be obligated to advance any funds to pay any Pre-Receivership Liabilities.

21.     The Receiver and the Receiver's attorneys and agents: (i) may rely on any and all outstanding court orders, judgments, decrees and rules of law, and shall not be liable to anyone for their own good faith compliance with any such order, judgment, or decree or rule of law; (ii) may rely on, and shall be protected in any action upon, any resolution, certificate, statement, opinion, report, notice, consent, or other document believed by them to be genuine and to have been signed or presented by the proper parties; (iii) shall not be liable to anyone for their good faith compliance with their duties and responsibilities as receiver, or as attorney or agent for the Receiver; and (iv) shall not be liable to anyone for their acts or omissions, except upon a finding by this Court that such acts or omissions were outside the scope of their duties or were grossly negligent.  Except for matters set forth in subsection (iv), persons dealing with the Receiver shall only look to the Receivership assets to satisfy any liability, and neither the Receiver nor her attorneys or agents shall have any personal liability to satisfy any such obligation.

22.     No person or entity shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting a suit or action provided, however, that no prior Court order is required to file a motion in this action arising from the Receiver's gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with this Order or any other order of this Court in this action.

23.     The Receiver and her employees, agents and attorneys shall have no personal liability in connection with any liabilities, obligations, liens, or amounts owed to any of Defendants' creditors because of her duties as Receiver.  Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be solely determined in accordance with Florida law.

24.     The Receiver and her employees, agents, and attorneys shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with this Court's orders.

25.     Defendants, all Property managers of Defendants and all those in active participation or concert with them who receive notice of this Order, and all those having claims against the Property, who receive notice of this Order, are enjoined from and shall not:

    a.  Commit Waste.  Commit or permit any waste on all or any part of the Property, or suffer, commit or permit any act on all or any part of the Property in violation of the law, or remove, transfer, encumber, or otherwise dispose of any of the Property.
    b.  Collect Income.  Demand, collect, receive, discount, or in any other way divert or use any of the Income.
    c.  Terminate Any Utility Service.  Terminate or withhold any electric, gas, water, sewer, telephone, or other utility service supplying the Property, require any utility deposit or otherwise interfere with the continued operations of the Property.
    d.  Interfere with the Receiver.  Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Property.
    e.  Transfer (without Court approval) or Encumber (other than to refinance) the Property.  Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage (except to refinance), create a security interest in, encumber (except to refinance), conceal, or in any manner whatsoever deal in or dispose of the whole or any part of the Property including, but not limited to, the Income without prior court order.
    f.  Impair the Preservation of the Property.  Do any act which will, or which will tend to impair, defeat, divert, prevent, or prejudice the preservation of the Property, including the Income, or the preservation of Plaintiff's interests in the Property and the Income.

26.    The Receiver shall faithfully perform and discharge the Receiver's duties in accordance with this order.

27.    The Court finds there is no just reason for delay and therefore enters this Order as a final order.

28.    The Court shall retain jurisdiction over this action, the Property, and the parties for the purpose of giving such other relief upon proper showing as is consistent with this Order and substantial justice.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 06/10/15.

BARBARA ARECES
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.  The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

# Exhibit C

**SANCTIONS AWARD**

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CITY OF MIAMI,                                       Case No. 2014-027781-CA-01

           Plaintiff,

vs.

MIAMI BEVERLY LLC; 1336 NW 60 LLC;
REVEREND LLC; 13300 ALEXANDRIA
DRIVE HOLDINGS LLC; THE HOLDINGS
AT CITY LLC; THE HOLDINGS AT CITY II LLC,

           Defendants.

_____/

## ORDER AWARDING SANCTIONS TO RECEIVER

THIS CAUSE came before the Court on March 27, 2017 to consider the amount of sanctions to award pursuant to the *Receiver's Motion for Order of Contempt and for Sanctions* (the "Motion") and this Court's *Order Granting Receiver's Motion for Order of Contempt and for Sanctions* dated October 17, 2016 (the "Sanctions Order"), which Sanctions Order determined, among other things, the Receiver's (defined herein) entitlement to a sanctions award and reserved jurisdiction to determine the amount of such sanctions award. The Court has reviewed:

(i)     the Contempt Motion dated August 31, 2016;

(ii)    the *Defendants' Motion to Dismiss Receiver's Motion for Order of Contempt and for Sanctions* dated September 27, 2016;

(iii)   the *Receiver's: (I) Supplement to Receiver's Motion to Dismiss Receiver's Motion for Order of Contempt and for Sanctions; & (II) Reply to Defendants' Motion to Dismiss Receiver's Motion for Order of Contempt and for Sanctions* dated October 3, 2016;

(iv)   the Receiver's *Notice of Filing Receiver's Bill of Particulars for, Among Other Things, Attorney's Fees and Costs Related to the Receiver's Motion for Order of Contempt and for Sanctions* dated October 4, 2016;

(v)    the Sanctions Order dated October 17, 2016; and

(vi)   the *Defendants' Objections to Receiver's Bill of Particulars Filed on October 4, 2016* dated December 21, 2016.

1

The Court finds that proper notice has been given of the Contempt Motion, Sanctions Order and the notice of hearings on same, and upon: (i) review of the pleadings and docket in this matter, (ii) the testimony and sworn declarations of Linda Leali (the "Receiver") and Thomas Messana (together with Messana, P.A., "Counsel"), who this court found to be credible witnesses based on, among other things, their demeanor, (iii) the testimony of Elizabeth Hernandez, a qualified fee expert who this court also finds to be credible, (iv) the argument of counsel for the Receiver, (v) the argument of Ms. Smith, counsel for the Defendants, and (vi) otherwise finding good cause to grant the relief requested in the Motion and determining the amount of the sanctions award, the entitlement to which was determined in the Sanctions Order, for the reasons stated on the record and herein, it is

ORDERED AND ADJUDGED as follows:

1.     This Court finds that the Receiver suffered damages in the form of, among other things, legal fees and costs in prosecuting the Contempt Motion and defending the Lawsuit[1] occasioned by Miami Beverly LLC, 1336 NW 60 LLC, 13300 Alexandria Dr. Holdings LLC, Reverend LLC, the Holdings at City LLC, and the Holdings at City II LLC (together with their principal, Mrs. Denise Vaknin, the "Defendants") and their counsel, Renee M. Smith (together with the Defendants, the "Sanctioned Parties").

2.     This Court finds that the services dedicated by the Receiver in connection with the Motion and related to the defense of the Lawsuit in the amount of 10.8 hours are fair and reasonable considering the *Rowe*[2] factors and *Lewis*[3] principals, as applicable. This Court finds the hourly rate of the Receiver of $300/hour is fair and reasonable considering the *Rowe factors* and *Lewis* principals,

---

[1] *Miami Beverly LLC et. al., v. Linda Leali and Linda Leali, Esq.,* Case No. 2016-020115-CA-01, Eleventh Judicial Circuit of Miami-Dade County, Florida (the "Lawsuit").
[2] *Florida Patient's Compensation Fund v. Rowe*, 472 So. 2d 1145 (Fla. 1985).
[3] *Lewis v. Gramil Corp.*, 94 So. 2d 174  (Fla. 1957).

2

as applicable. This Court finds the total fee requested by the Receiver in connection with the Motion in the amount of $3,060.00 is reasonable.

3.      This Court finds that the services dedicated by the Receiver's Counsel in the amount of 65.7[4] hours are fair and reasonable considering the *Rowe* factors and *Lewis* and principals, as applicable. This Court finds the hourly rates of the Receiver's Counsel of $565/hour for Mr. Messana, $365/hour for Mr. Lieberman, $275/hour for Mr. Zeichman and $195/hour for Ms. Barrus are fair and reasonable considering the *Rowe* factors and *Lewis* principals, as applicable. This Court finds that $26,502.50 in fees and $259.72 in costs for Counsel are reasonable.

4.      This Court finds that fee expert, Elizabeth Hernandez' hourly rate of $500 is reasonable and that her 5.5 hours of time spent in connection with the hearing to determine reasonableness of fees are reasonable. This Court finds that the fees of Elizabeth Hernandez in the total amount of $2,750.00 are reasonable and compensable in the form of sanctions against the Sanctioned Parties.

5.      Sanctions are hereby entered against the Sanctioned Parties, jointly and severally, in the amount of $32,572.22 for fees and costs incurred by the Receiver related to bringing and prosecuting the Motion and defending the Lawsuit, including the fees and costs of Counsel and the fee expert (the "Sanctions Award").

6.      The Sanctions Award shall be paid by the Sanctioned Parties, from non-estate funds, without regard to any claim by the Sanctioned Parties by way of setoff or otherwise, to the Receiver, on the following schedule:

    A.      $10,857.41 on or before May 3, 2017;

---

[4] This Court did not allow Counsel's request for fees with respect to: (i) a certain August 29, 2016 time entry to "prepare Receiver's first request for production of documents to Defendants" in the amount of 1.9 hours billed by N. Barrus; and (ii) a certain September 12, 2016 time entry to "Revise request for production of documents to Defendants, prepare notice of production to D. Vaknin" in the amount of .9 hours billed by N. Barrus.

3

      B.     $10,857.41 on or before June 5, 2017; and

      C.     $10,857.40 on or before July 6, 2017.

7.     Upon timely compliance by the Sanctioned Parties of each payment required above, the Sanctioned Parties shall file a Notice of Compliance advising this Court that such payment was timely made.

8.     The Sanction Award is determined to be fair and reasonable considering each and every factor contemplated by *Florida Patient's Compensation Fund v. Rowe,* 472 So. 2d 1145 (Fla. 1985), the principles of *Lewis v. Gramil Corp.*, 94 So. 2d 174, 177 (Fla. 1957) and within the Court's inherent authority. *See Moakley v. Smallwood,* 826 So. 2d 221, 224 (Fla. 2002).

9.     This Order is without prejudice to the Receiver pursuing any other damages incurred on account of the Sanctioned Parties wrongful acts described in the Motion.

10.     This Court reserves jurisdiction to enforce the terms of this Order and to take any and all actions necessary to effectuate same, including, without limitation, the entry of a Final Judgment in the amount of the Sanctions Award against the Sanctioned Parties in the event the Sanctioned Parties fail to timely comply with the payment requirements herein.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 04/06/17.

 

BARBARA ARECES
CIRCUIT COURT JUDGE

**No Further Judicial Action Required on <u>THIS MOTION</u>**
**CLERK TO <u>RECLOSE</u> CASE <u>IF</u> POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email

4

confirmation which includes all emails provided by the submitter. The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.
Copies furnished to:
Thomas M. Messana, Esq., Messana, PA, 401 East Las Olas Boulevard, Suite 1400, Fort Lauderdale, Florida 33301, who is directed to serve copies on the following:

**Linda M. Leali, Esq.,** Receiver
**Rachel Dooley, Esq.,** Assistant City Attorney
**Renee Smith, Esq.,** Counsel to the Defendants

# Exhibit D
## VOYATZOGLOU V. HAMBLEY (HAMBLEY)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re:

RICHARD ROBERT HAMBLEY
and RENEE MARIE SMITH-HAMBLEY,

Chapter 7

Case No.:   8-99-85575-mlc

Debtors.

---------------------------------------------------------x

THEODOSIOS VOYATZOGLOU
and TE 2000, INC.,

Plaintiffs,

Adv. Proc. No.: 8-99-8483-dem

-against-

RICHARD ROBERT HAMBLEY
and RENEE MARIE SMITH-HAMBLEY,

Defendants.

---------------------------------------------------------x

## DECISION AND ORDER AFTER TRIAL

APPEARANCES:

Sanford P. Rosen & Associates
Attorneys for the Plaintiffs
747 Third Avenue
New York, New York 10017
By:  Sanford Rosen, Esq.

Renee Marie Smith, Esq.
Pro Se Defendant
9350 South Dixie Highway, Floor 10
Miami, Florida 33315

Richard Robert Hambley
Pro Se Defendant
711 SW 13th Street
Fort Lauderdale, FL 33315

DENNIS E. MILTON
United States Bankruptcy Judge

The plaintiff Theodosios Voyatzoglou is an individual and the plaintiff TE 2000

Inc. ("TE 2000") is a Florida corporation with its principal place of business in Broward County,

Florida. In 1997 and 1998, the defendants Richard Robert Hambley ("Hambley") and Renee

Marie Smith ("Smith")[1] owned all of the equity of Millennium IT (Thailand) Ltd.

("Millennium"). Voyatzoglou formed TE 2000 for the purpose of holding the shares of

Millennium which he had agreed to purchase from the defendants. On May 14, 1998,

Voyatzoglou and the defendants entered into a "Heads of Agreement" pursuant to which the

defendants agreed to sell to Voyatzoglou fifty per cent of the equity of Millennium for $300,000.

Voyatzoglou made installment payments to the defendants on May 15, 1998 and June 2, 1998, in

the amounts of $50,000 and $125,000, respectively. Subsequently, a dispute arose between

Voyatzoglou and the defendants, and Voyatzoglou failed to make any additional payment for the

shares of Millennium.

On July 13, 1999, the defendants Hambley and Smith filed a voluntary petition for

relief under Chapter 7 of the Bankruptcy Code. The plaintiffs timely filed their proof of claim.

The plaintiffs listed the basis for the claim as conversion, fraud, breach of contract, RICO

violations, and civil theft.[2]     The defendants did not object to the proof of claim.

---

[1]  The defendants were married when they filed their petition. Following their divorce, Renee Smith -Hambley resumed the use of the name of Renee Smith.

[2]  Previously, on October 8, 1998, the plaintiffs commenced an action against the defendants in the Circuit Court of the 17th Judicial District for Broward County, Florida (the "State Court Action"). The complaint in the State Court Action contained causes of action for conversion, fraud, breach of contract, breach of fiduciary duty, negligence, conspiracy, and violations of Florida's Racketeer Influenced and Corrupt Organization Act. The State Court Action

On November 3, 1999, the plaintiffs commenced this adversary proceeding by filing the Complaint. The Complaint contained five causes of action, which plaintiffs denominated as Claims for Relief. On July 19-20, 2004, the Court held a trial on the issue of the dischargeability of the claim. On February 28, 2005, the plaintiffs filed their Proposed Findings of Fact and Conclusions of Law. On March 25, 2005, Hambley filed a letter in lieu of a post-trial submission. On April 5, 2005, the plaintiffs submitted a reply to Hambley's letter. The Court then reserved decision.

As set forth more fully below, the Court holds that the defendants are not barred from contesting the allegations of the Complaint in this adversary proceeding as a result of their actions in defaulting in the State Court Action (First Claim For Relief). The Court finds that the plaintiffs have met their burden of proof with regard to their claim and the Court fixes the amount of this claim in the amount of the proof of claim, $ 700,000.00 plus interest costs and attorneys fees (Second Claim For Relief). The Court further finds that this debt is non dischargeable under Bankruptcy Code Sections 523(a)(2)(Third Claim For Relief), 523 (a)(4)(Fourth Claim For Relief) and 523 (a)(6)(Fifth Claim For Relief).

## JURISDICTION

This Court has subject matter jurisdiction over this core proceeding pursuant to 28 U.S.C. §§1334(b) and 157(b)(2) and the Eastern District of New York standing Order of reference dated August 28, 1986. This decision constitutes the Court's findings of facts and conclusions of law to the extent Fed. R. Bank. P. 7052 requires.

---

sought a judgment against the defendants in the amount of $700,000, and interest, costs, and attorneys' fees. The plaintiffs attached the Complaint in the State Court Action, the proposed amendment to the State Court Complaint, and the Heads of Agreement to the proof of claim.

3

## FINDINGS OF FACT

The Court makes the following findings of fact. In 1997, the defendants owned all of the equity in Millennium. Compl. ¶ 7, Answer ¶ 1. The defendants sought outside investors in the company, which was based in Thailand. Voyatzoglou, Tr. I at 5, lines 11-22;[3] Millennium Solicitation Letter, Ex. 1. The defendants claimed Millennium was in the business of distributing computer software designed to address the year 2000 Millennium Bug.[4] Solicitation Letter, Pl. Ex.1. By January 1998, the need for investors became acute as the company's financial situation worsened. Smith, Tr. I at 146-147.

In early 1998, a mutual friend, Alex Villalon ("Villalon"), introduced Voyatzoglou to the defendants. Tr. I at 5; Smith Tr. I at 147, lines 23. Villalon knew the defendants were seeking investors and that Voyatzoglou was also in the computer software business. Voyatzoglou, Tr. I at 5, lines 13-20; Smith Tr. I at 147-148.

A.   The Defendants Falsely Told Voyatzoglou That Millennium Had Exclusive Rights in Thailand to the ConSyGen Y2K Program.

The defendants had prepared a solicitation letter for the purpose of soliciting new investors and marketing Millennium (the "Solicitation Letter"). Smith, Tr. I at 53, lines 11-14, 17-18. In the Solicitation Letter, the defendants claimed that Millennium was a distributor of ConSyGen 2000 Y2K Bug Software (the "Y2K Program"). See Pl. Ex. 1. The Solicitation Letter alleged that this program was the only automated program which could fix the Millennium

---

[3] References preceded by the prefix "Tr. I" refer to the transcript of trial proceedings on July 19, 2004. References preceded by the prefix "Tr. II" refer to the transcript of trial proceedings on July 20, 2004.

[4] The Year 2000 Millennium Bug purportedly would affect the world's computers on January 1, 2000. The computer code had been designed several decades before and would read any year entered based on the last two digits of the previous century. For example, "00" would be read as the year 1900, not 2000. Many believed this could cause problems if not addressed. Solicitation Letter, Ex.1; Voyatzoglou's testimony, Tr. I at 6, lines 2-11.

4

Bug, and that it could do so faster and with fewer errors than hand correction. Id. The

defendants also alleged that they had exclusive rights to distribute the Y2K program in Thailand,

as well as exclusive rights to other computer programs:

> We [the defendants] are holding exclusive rights for Thailand,
> to the only technology existing that can perform mainframe
> conversions through a fully automated process . . . .
> We have ...[s]igned all of the contract and agreements that
> grant us exclusive rights to ConSyGen 2000 Y2K solution
> in Thailand.

Pl. Ex. 1. Voyatzoglou testified that Villalon gave him the Solicitation Letter in or around March

1998. Tr. I at 11-12. Voyatzoglou also testified the defendants told him that they had exclusive

rights to the Y2K Program when he first spoke to them in March 1998 and that they were aware

he had seen the Solicitation Letter. Id. at 8, lines 4-9, at 12, lines 4-9 and at 102, lines 10-15.[5]

However, the defendants did not have exclusive rights to the Y2K Program in

Thailand. Id. at 145-46. Smith testified that the defendants had entered into a teaming

agreement with ConSyGen which they believed granted them exclusive rights to the Y2K

Program in Thailand. Id. at 146. Smith stated that the defendants learned in January 1998 that

they were mistaken when ConSyGen cancelled the original teaming agreement and entered into a

new one with the defendants. [6] Ibid. Examination of the second teaming agreement between

---

[5] Smith testified that the defendants did not forward the Solicitation Letter to Voyatzoglou, did not give it to Villalon, did not use the Solicitation Letter after January 1998, and did not know how Voyatzoglou had received a copy of it. Tr. II at 53-54. The Court finds Smith's version of events to be less than credible. The Court finds that Villalon gave Voyatzoglou the Solicitation Letter and introduced the parties to each other for purpose of a proposed investment by the plaintiffs in Millennium.

[6] The defendants claimed in the Solicitation Letter that they had spent $250,000 for the exclusive rights to the Y2K Program. Pl. Ex. 1. Smith testified that the defendants had actually signed a promissory note for $250,000, but that the promissory note was destroyed when ConSyGen cancelled the original teaming agreement. Tr. II at 52, lines 3-18. She further testified the defendants did not inform Voyatzoglou that the $250,000 note was destroyed and that

5

ConSyGen and the defendants revealed a date of April 2, 1998, three months after Smith claimed
the original one had been cancelled and the new one issued. See Conversion Services Teaming
Agreement between ConSyGen and Millennium, Pl. Ex. 2. The new teaming agreement
unequivocally stated that the agreement was nonexclusive: "[Millennium] may offer
[ConSyGen]'s services to [Millennium]'s Clients requiring such services…. The relationship
between [Millennium] and [ConSyGen] shall be nonexclusive." Pl. Ex. 2 at 1, ¶¶1, 4.

In April 1998, the sale price for the purchase of fifty per cent of the stock in
Millennium was $250,000. Smith, Tr. I at 153, lines 10-25. Tr. I at 18, lines 2-16. In December
1997, the Solicitation Letter had claimed the defendants had incurred $150,000 in expenditures,
in addition to the $250,000 for the "exclusive" rights to the Y2K Program. Voyatzoglou testified
that the defendants informed him that they had invested almost $250,000 in Millennium by April
1998. He testified that he agreed to invest an amount equal to the amount of the defendants'
investment in exchange for fifty per cent of Millennium's stock, and an extra $50,000 to
capitalize the business and move Millennium's headquarters into better office space. Tr. I at 18,
lines 9-16, at 24-26. See also Heads of Agreement, Compl., Ex. A. Voyatzoglou testified that he
was unaware that Millennium's rights to the Y2K Program were nonexclusive until the discovery
phase of this adversary proceeding. Tr. I at 13, lines 10-17.

The Court finds that the defendants falsely informed Voyatzoglou, both in writing
and orally, that Millennium had exclusive rights to the Y2K Program, and that they falsely stated
in writing that they had invested $250,000 for that exclusive right, when they knew that they

---

the defendants were no longer liable on it. Tr. II at lines 19-23.

6

were no longer liable to ConSyGen on the promissory note.

B.    The Defendants Falsely Told Plaintiffs That Millennium Had Signed Contracts.

The Solicitation Letter also alleged that Millennium had numerous customers. It provided in pertinent part that "[e]very one of [60 mainframe users in Bangkok] [Thailand] will be coming to us" for the Y2K program. Pl. Ex. 1. In addition, the defendants claimed that manufacturers of mainframes were "recommending us [the defendants] to perform the Y2K conversions on their equipment...." Id. Voyatzoglou testified before they signed the Heads of Agreement on May 14, 1998, the defendants had informed him that Millennium had many large clients for the Y2K Program including IBM Thailand, Sun Microsystems, Digital, Hewlett Packard, Tandem as well as telecommunication companies, financial institutions, and Thai government agencies. Tr. I at 21-23. Voyatzoglou later learned that none of these entities was a customer of Millennium and that some were direct competitors. Id. at 23, lines 7-9.

Smith testified the defendants had informed Voyatzoglou that they had no signed customers. Id. at 149, lines 21-24. Smith's testimony is contradicted by an e-mail from Hambley to Voyatzoglou dated March 25, 1998 which read: "[o]ur clients include: IBM Thailand, Sun Microsystems, Digital, Hewlett Packard . . . Financial Institutions and the government agencies." Pl. Ex. 5. On May 13, 1998, the same date Voyatzoglou signed the Heads of Agreement, the defendants sent another e-mail which stated, "Siam Motors (Nissan) has delivered us 2.8 millions LOC [line of credit] with a thoroughly completed questionnaire. ConSyGen is committed to the project." Pl. Ex. 22. This e-mail was sent on Smith's e-mail account and signed by Hambley. Smith, Tr. II at 22, lines 6-10. On cross-examination, Smith admitted that Siam Motors was not a customer, and that the defendants were attempting to solicit business from them at that time. Id.

7

at 23-24. Smith admitted no contracts had been signed with any customers before they entered into the Heads of Agreement. Id. at 26-27.

The Court finds that the defendants falsely claimed in both written and oral statements made before the parties entered into the Heads of Agreement that Millennium had customers committed to using the Y2K program.

C.      The Defendants Violated the Heads of Agreement.

Hambley sent Voyatzoglou a Letter of Intent, prepared by Smith, and dated May 12, 1998, outlining his understanding of the terms of their agreement. Pl. Ex. 8. The Letter of Intent stated the purchase price of the stock was $300,000, with $50,000 allocated to finance the move of Millennium into new offices, and $250,000 for the company purchase. The Letter of Intent also provided that "Contracts outlining specifics of the partnership will be negotiated and signed by the end of the month [May 1998]." Id. In response to the Letter of Intent, which he believed was inaccurate, Voyatzoglou drew up the Heads of Agreement. Voyatzoglou, Tr. I at 33. Though dated May 5, 1998, it was not fully executed until May 14, 1998. Pl. Ex. 9. The Heads of Agreement outlined the basic terms for the sale of stock and subsequent partnership and was intended to be subject to a final contract. Voyatzoglou testified that he considered the Heads of Agreement preliminary, and expected that the parties would enter into a final contract providing for final terms of the stock transfer, employment agreements, and bylaws. Tr. I. at 36, lines 23-25.

The Heads of Agreement required a final contract for the transfer of the shares of Millennium stock to the plaintiffs[7], the execution of employment contracts before the defendants

---

[7] Pl. Ex. 9, clause 11.

8

could draw salary[8], and the return of Voyatzoglou's investment if the parties did not enter into a final contract. [9]

After the parties signed the Heads of Agreement, they failed to enter into a final contract. Tr. I at 36, lines 23-25, 37. There is strong evidence that the defendants knew a final contract was needed. Tr. I at 155-56. The defendants prepared a final contract for the purchase and sale of the corporate stock of Millennium for the plaintiffs, which was effective by its terms on July 15, 1998. Pl. Ex. 23. Smith admitted that, although the defendants executed the contract, the plaintiffs had not signed a final contract. Smith, Tr. II, at 47-49; Pl. Ex. 23. Despite this acknowledgment, Smith testified that in her mind, the negotiations were just "fine tuning," Tr. I at 156-57, and that "it was my understanding we [the defendants] were allowed to take salaries" without a final contract. Tr. I at 154, lines 14-16.

Smith also testified to a growing concern that employment contracts had not been finalized after the Heads of Agreement was signed. "I submitted to him the employment contracts the beginning of May . . . either May 5 or May 13. I received the contract with the new date of July 15 on it . . . This concerned me because I knew we had already been taking salaries because personally we were out of money." Tr. I at 156, lines 11-22. On May 28 and 31, 1998, Smith and Hambley sent e-mails to Voyatzoglou, acknowledging that the parties were still making changes to the proposed final contracts, and that their attorney was still reviewing them. Pl. Ex. 10, 11. As late as July 18, 1998, the proposed final contract had not been signed, and the details of the employment contracts were being finalized. E-mail from defendants to

---

[8] Pl. Ex. 9, clause 5.

[9] Pl. Ex. 9, clause 11.

9

Voyatzoglou, Pl. Ex. 13. Despite their contention that the Heads of Agreement contained the parties' final intent, the conduct of the defendants as reflected by their e-mail activity and in Smith's testimony established their knowledge that a final contract was needed for the sale of stock, that they were not entitled to take salaries until that sale, and that Voyatzoglou was entitled to the return of his investment if a final agreement was not executed.

The defendants used the $175,000 in capital from Voyatzoglou for business and personal expenses. Smith, Tr. I at 146, lines 18-22, at 156, lines 11-22. Despite the failure to enter into a final agreement, the defendants acknowledged drawing "salaries" from Millennium of at least $30,000 each between January 1998 and August 1998. Defendants' 1998 joint tax returns, Pl. Ex 4. Disregarding the requirement for employment contracts and a final contract of sale, the defendants executed Employment Agreements with Millennium dated July 15, 1998, calling for salaries of $75,000 from July 15, 1998 through December 31, 1998, as well as reimbursement of expenses. Pl. Ex. 21. Hambley signed Smith's contract as a director of Millennium, and attested as a witness. Smith did the same for Hambley.

The Heads of Agreement further provided that if the parties failed to enter into a final contract, the defendants were required to return the investment to Voyatzoglou. On August 6, 1998, Voyatzoglou requested the return of his investment. Smith, Tr. I at 162, lines 3-5, 10-11. Despite this request, Smith testified that "it wasn't possible to give him all the money back out of the company and keep the company operating" and that it would require a "new investor in order to get his money back." Tr. I at 162, lines 8-14. Smith acknowledged that the defendants could not fulfill the term of the Heads of Agreement requiring the defendants to return Voyatzoglou's investment if a final contract could not be executed. Voyatzoglou's undisputed

10

testimony was that by August 1998, only $30,000 remained of the $175,000 he had forwarded to the defendants and they could not explain where the money had gone. Tr. I at 52-53.

D.     The Defendants Induced Voyatzoglou to Make Payments
       Into the Defendants' Personal Accounts and Improperly
       Used the Money for Personal Expenses

On May 10, 1998, after the defendants told him new offices were needed immediately, Voyatzoglou informed them that he would transfer $50,000 into Millennium's Business Account as soon as the Heads of Agreement was executed. Pl. Ex. 7; Tr. I at 155-157. Smith suggested to Voyatzoglou that he should transfer the funds to the defendants' personal account so that the funds could remain in United States dollars, and avoid the Thai Baht fluctuations which would occur if he deposited the funds into Millennium's account at Standard Charter Bank in Thailand (the "Millennium Account"). Pl. Ex. 7. Voyatzoglou transferred the money to the defendant's personal bank account in Thailand because of this advice. Tr. I at 43-45.   He believed the defendants would be the custodians of the funds, but the funds would be considered Millennium capital, and transferred to the Millennium Account to pay expenses. Tr. I at 30.

Smith testified at her deposition on May 24, 2000, before the bank records for the Millennium Account became available, that the defendants moved all of the capital Voyatzoglou provided from the defendant's personal account through the Millennium Account to pay expenses and that the bank records would demonstrate this. Smith Deposition, Tr. at 51. The records for the Millennium Account showed otherwise. The records showed that a substantial amount of the money remained solely in the defendants' personal account. Pl. Ex. 17, 18. At trial, Smith testified that her deposition testimony had been incorrect and that much of the

11

money had not been transferred to the Millennium Account. Tr. I at 182, lines 20-24, at 184-85. According to Voyatzoglou, the defendants' transferred only $74,790 of the $175,000 from the personal account to the Millennium Account. Tr. I at 69-74. The Court's review of the bank records revealed several transfers of $5,000 each from the Millennium Account to what appears to be Hambley's personal account in Florida. See Pl. Ex. 18, at 12, 14, 19, 23, 25, and 30. The records also demonstrated that there were numerous cash withdrawals for which the defendants failed to provide receipts. Voyatzoglou testified that, based on his review of the records, approximately $99,719.72 appeared to be used for the defendant's personal use and $74,900 was transferred to the Millennium Account, accounting for $174,509.73 of the $175,000 he provided. Tr. I at 79-81, Pl. Ex. 19. While Smith disagreed with the exchange rate he used, she did not contest the underlying contention that tens of thousands of dollars remained in the defendants' personal account. Tr. II at 66, lines 8-21. Smith admitted defendants used the monies in part to pay personal expenses and some bills in the United States. Tr. I at 181, lines 1-3, at 183. The Court finds that the defendants induced plaintiffs to deposit his investment in Millennium into their personal account and then used much of those funds for their unexplained personal expenses.

## ANALYSIS

I. The Defendants Are Not Collaterally Estopped From Contesting This Complaint.

In the First Claim For Relief, the plaintiffs seek a determination that the defendants are collaterally estopped from contesting the allegations set forth in the Complaint in this proceeding as a result of their defaults in State Court Action. In order to establish the bar of collateral estoppel, the plaintiffs must establish the following four elements: (1) the issue

12

previously decided is identical with the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. Schultz v. Williams, 44 F.3d 48, 53-54 (2d Cir. 1994); Dear v. Board of Elections in City of New York, 2003 WL 22077679, *7-8 (E.D.N.Y. 2003).

The defendants admitted in their Answer that they did not answer the allegations contained in counts I through IX and paragraphs 36 through 105 of the complaint in the State Court Action. Answer, ¶11. The defendants did not admit the allegation in the Complaint that the defendants failed to appear for the state court hearing on July 14, 1999 in which the plaintiffs moved to strike their answer to the complaint in the State Court Action. The Complaint alleged that the State Court granted the plaintiffs' motion and directed counsel to submit a proposed order. However, the defendants denied this. In this case, the plaintiffs did not present any evidence, such as a transcript of the hearing, which demonstrated that the state court had granted their motion to strike the defendant's answer. The state court hearing on the motion to strike occurred after the bankruptcy was filed and the automatic stay of Section 362 was in place. Finally, plaintiffs admit the state court judge did not sign an order granting the relief of striking the state court answer, much less a default judgment. Therefore, the Court holds that there was no adjudication on the merits in the State Court Action, and defendants are not collaterally estopped from defending the Complaint.

13

II.     The Plaintiffs' Proof of claim is Valid and Dischargeable
        Unless It Falls Within An Exception to Discharge.

In the Second Claim For Relief, the plaintiffs alternatively seek an Order

fixing the claim in the full claim amount. Compl, ¶34. Under Section 502 of the

bankruptcy code, "a claim or interest, proof of which is filed under section 501 of this

title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. §502. The

defendants did not object and therefore the proof of claim is deemed allowed. In re G.

Marine Diesel Corp. 155 B.R. 851, 853 (Bankr. E.D.N.Y 1993); In re Greene, 71 B.R.

104, 106 (Bankr.S.D.N.Y. 1987)(allowance of properly filed proof of claim "compels the

objecting party to go forward and produce sufficient evidence to rebut the claimant's

prima facie case"). The supporting documentation attached to the proof of claim,

including the State Court Complaint and the Heads of Agreement were sufficient to

demonstrate the prima facie validity of the claim.

The defendants also admitted the claim was valid. In the Complaint, the

plaintiffs alleged they were creditors of the defendant by virtue of the  timely filed proof

of claim. Compl., ¶ 6.  The defendants admitted the allegations that plaintiffs are

creditors of theirs and timely filed a proof of claim. Answer, ¶ 1.  Therefore, the

defendants, having failed to file a motion objecting to the claim of the plaintiffs and

having admitted that the claim was timely filed and the plaintiffs are creditors of the

estate have not rebutted the presumption of validity. The claim is  valid in the full claim

amount of $700,000 plus interest, costs and attorneys' fees.

14

The defendants received a discharge under Bankruptcy Code Section 727.

A discharge under Section 727 of the Bankruptcy Code relieves a debtor from all pre-petition liabilities, subject to a few exceptions. 11 U.S.C. §727; In re Dobravel, 287 B.R. 3, 11-12. (Bankr. S.D.N.Y. 2002). The claim would therefore be discharged, unless the claim is excepted from discharge under Section 523 of the Bankruptcy Code.

III.  The Claim is Excepted From Discharge Under Code Section 523(a)(2)(A)

In the Third Claim For Relief, the plaintiffs allege that the claim consists of debts for money which the defendants obtained through false pretenses, false representations, or actual fraud and the claim is excepted from discharge pursuant to Section 523(a)(2) of the Bankruptcy Code.[10] Compl. ¶¶ 36-37. The terms "false pretenses," "false representations," and "actual fraud" are similar in meaning, but the use of the subjunctive "or" demonstrates they embody somewhat different concepts. See Dobravel, 287 B.R. at 12; Farraj v. Soliz, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996). The plaintiffs have the burden of demonstrating nondischargeability under this section by a preponderance of the evidence. Id.

A.  The Defendants Obtained Money Through False Pretenses.
    The Claim is Nondischargeable Under Code Section 523(a)(2)(A).

Under Code Section 523(a)(2)(A), the term "false pretenses" is defined as "conscious deceptive or misleading conduct calculated to obtain, or deprive, another of property." Kovler, 249 B.R. at 261. It is the practice of any "scam, scheme, subterfuge, artifice,

---

[10] Section 523(a)(2)(A) of the Bankruptcy Code provides a debtor is not discharged from any debt for money, property, or services obtained through three methods. The first method is debt for money, property, or services obtained through false pretenses. The second is debt for money or property, or services obtained through false representations. The third is debt for money, property, or services obtained through actual fraud. 11 U.S.C. § 523(a)(2)(A).

15

deceit, or chicanery in the accomplishment of an unlawful objective" on behalf of the defendant. Id. A false pretense has also been held to be an implied misrepresentation or conduct intended to create a false impression. In re Bozzano, 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994). A false pretense is promoted willingly and knowingly by a defendant and is not the result of unintentional conduct or an unintentional misrepresentation. Kovler, 249 B.R. at 261. Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute. In re Soliz, 201 B.R. 363, 369 (Bankr.S.D.N.Y. 1996).

In order to establish a debt is non dischargeable as a debt for money obtained by false pretenses, the plaintiffs must establish (1) an implied misrepresentation or conduct by the defendants; (2) promoted knowingly and willingly by the defendants; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiffs; (4) which wrongfully induced the plaintiffs to advance money, property, or credit to the defendant. Dobrayel, 287 B.R. at 12. The plaintiffs have demonstrated by a preponderance of the evidence that the defendants obtained the monies which constitute the debt owed to the plaintiffs through false pretenses, by knowingly inducing a false and misleading impression on the plaintiffs' behalf which wrongful induced Voyatzoglou to turn over funds. The defendants knowingly created the false and misleading impression by misrepresenting that (1) they had exclusive rights to the Y2K Program; (2) they had numerous customers already signed up; (3) they had expended $250,000 in expenditures which would be demonstrated through financial records, which they did not provide; and (4) all of the funds invested would be used as capital through the Millennium Account. These misrepresentations caused the plaintiffs to transfer the money into the defendants' personal accounts. The debt to which the claim refers to was a debt created through

16

false pretenses, and is nondischargeable under Section 523(a)(2)(A).

      B.      The Defendants Obtained Money Through False Representations.
               The Claim is Nondischargeable Under Code Section 523(a)(2)(A).

      A Court can find a false representation if the plaintiffs present proof by a

preponderance of the evidence that the defendants (1) made a false or misleading statement; (2)

with the intent to deceive; and (3) in order for the plaintiffs to turn over money or property to the

defendants. Dobrayel, 287 B.R. at 12 citing BLACK'S LAW DICTIONARY at 619 (7th ed.

1999). The defendants made false or misleading statements regarding (1) their exclusive

agreement for the Y2K Program, (2) the existence of customers, and (3) the intention to use the

investment for capital for Millennium. The evidence at trial reflected that when the defendants

made these statements, the defendants had run low on funds and had little or no available credit.

      One court has recognized the challenge in presenting evidence which bears

directly on the element of intent to deceive, as one will rarely admit to such intent. In re Sentry,

42 B.R. 456, 459 (Bankr. S.D.N.Y. 1984).   However, it is well established that intent to deceive

may be established through circumstantial evidence and inferred from the totality of the evidence

presented. In re Shaheen, 111 B.R. 48, 53 (Bankr.S.D.N.Y. 1990)( "intent to deceive may be

inferred when the totality of the circumstances presents a picture of deceptive conduct by the

debtor, which indicates that he did intend to deceive and cheat the [creditor]"); In re Kimzey,

761 F.2d 421, 424 (7th Cir. 1985)(an intent to deceive can be logically inferred from a

defendant's false representations which the debtor must know will induce another to give over

money). Here, the plaintiffs have met their burden of demonstrating an intent to deceive on the

part of the defendants. Sentry, 42 B.R at 459. The defendants' actions from the beginning of

17

negotiations with Voyatzoglou through the failure to provide financial information as the Heads of Agreement required constituted a pattern of knowing and deceptive conduct. The Court finds from the totality of the circumstances presented that the defendants intended to deceive the plaintiffs by making false statements. The debt is nondischargeable as a debt for money or property obtained by a false representation Code Section 523(a)(2)(A).

C.    The Defendants Obtained Monies Through Actual Fraud. The
      Claim Is Nondischargeable Under Code Section 523(a)(2)(A)

To prove the nondischargeability of a debt for money or property obtained under actual fraud under Code Section 523(a)(2)(A), the plaintiffs must establish six elements by a preponderance of the evidence. In re Boice, 149 B.R. 40, 43-44 (Bankr. S.D.N.Y.1992); see also Dobrayel, 287 B.R. at 12; In re Shaheen, 111 B.R. 48, 51 (Bankr.S.D.N.Y. 1990). First, the plaintiff must show that the defendants obtained money or property. Plaintiffs have easily satisfied this element, as it is undisputed that the defendants obtained monies in the amount of $175,000 from Voyatzoglou. Compl., ¶ 10, Answer, ¶4. Second, the plaintiffs must establish that the defendants obtained the money or property through a knowing and false representation, false pretenses, or actual fraud. The evidence at trial established the defendants obtained the money through knowing false representations, false pretenses and actual fraud. The defendants knowingly misrepresented that they had the exclusive right in Thailand to ConSyGen's Y2K Program. They falsely stated that Millennium had signed customers for the Y2K Program. The defendants each drew a salary and paid personal expenses without an employment contract in violation of the Heads of Agreement. The defendants falsely told Voyatzoglou that they would transfer his investment into the Millennium Account to pay business expenses, and instead used a

18

portion of the money to pay personal expenses. Finally, the defendants failed to return the money to Voyatzoglou when they failed to enter into a final contract, in violation of the Heads of Agreement.

Third, the plaintiffs must show that they have relied upon the defendants' representation(s) and that this reliance was reasonable. Reasonableness is a low hurdle for the creditor to meet, and is intended as an obstacle only for creditors acting in bad faith. Shaheen,111 B.R. at 53. Reasonableness must be determined by evaluating all the facts and circumstances. Id. "'[R]easonableness' requires that representations must be found to be of such a character that a reasonably prudent person would rely on them. Such a standard fosters a responsible and careful use of solicited financial statements and discourages the 'spurious use' of such statements." Iverson at 225. Here, Voyatzoglou reasonably relied on the debtors' misrepresentations. The defendants failed to provide financial records which would have revealed their expenditures, their established customers, and the lack of an exclusivity agreement. The defendants also induced plaintiffs to make the initial advance quickly, to permit the defendants to move to a new office.

Fourth, the plaintiffs must establish that the defendants knew or should have known that the representations were false when made. The evidence presented established that the defendants knew that they did not have the exclusive right to distribute the Y2K Program and that when they solicited the plaintiffs' investment, Millennium had no signed customers for the Y2K Program. The defendants falsely told Voyatzoglou that they would transfer his investment into the Millennium Account to pay business expenses, and instead used a portion of the money to pay personal expenses.

19

Fifth, the plaintiffs must establish that the debtors made the representation(s) with the intent to deceive. Examining the totality of the circumstances, the plaintiffs have met their burden of demonstrating an intent to deceive on the part of the defendants. Sentry, 42 B.R at 459. The defendants caused the plaintiffs to believe Millennium needed an immediate infusion of cash for its business, yet used the funds in large part for personal expenses, drawing salaries and unilaterally signing employment agreements when they knew that the Heads of Agreement did not contemplate such actions until entry into a final contract. The defendants knowingly misrepresented the existence of customers and the nature of their deal with ConSyGen. From the totality of these deceptive acts, the Court finds that the defendants intended to deceive the plaintiffs.

Sixth, the plaintiffs must establish that they have been injured by the representation. In re Boice, 149 B.R. at 44-45. The evidence established that the plaintiffs advanced $175,000.00, and Smith acknowledged those funds were not returned.

III.    The Claim Is Based On A Debt For Monies Obtained by a Materially False Written Statement Respecting the defendants' Financial Condition and Is Excepted from Discharge under Code Section 523(a)(2)(B).

The plaintiffs also sought a determination of nondischargeability under section 523(a)(2)(B).[11] The plaintiffs must prove five elements to establish the nondischargeability of its Claim against defendants under Code Section 523(a)(2)(B). The first element is the use of a

---

[11]    Section 523(a)(2)(B) excepts from discharge a debt for:

> money . . . , to the extent obtained by use of a statement in writing
> (1) that is materially false; (2) respecting the debtor's . . . financial
> condition; (3) on which the creditor to whom the debtor is liable for
> such money . . . reasonably relied; and that (4) the debtor caused to be
> made or published with intent to deceive.

20

statement in writing by the defendant. Oral statements relating to a debtor's financial condition thereby remain dischargeable. In re Bogdanovich, 292 F.3d 104, 111 (2d Cir. 2002). The plaintiffs need not prove that the defendants completed the writing constituting the false statement in its entirety. Id. It is sufficient that the defendants either wrote, signed, or adopted such statement to find that the documents were "written" by them. In this case, the writings include the Solicitation Letter, numerous e-mails, and the Heads of Agreement.

The second element which the plaintiffs must establish is that the writing the defendants used was materially false. For a financial statement to qualify as being "materially false," it must be "one which paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Boice, 149 B.R. at 45. The information must not only be substantially inaccurate, but it must also be information which would have affected the creditor's decision making process. Id. The misrepresentation of ownership of assets and the failure to divulge the true ownership interests in the listed property is 'material falsity' for purposes of Section 523(a)(2)(B). Boice, 149 B.R. 45-46; See Scarsdale Nat'l Bank & Trustee Co. v. Switzer (In re Switzer), 55 B.R. 991, 995 (Bankr. S.D.N.Y. 1986). The e-mails and Solicitation Letter made false representations regarding the existence of a customer base and the exclusive use of the Y2K Program. These were material misrepresentations.

The third element which the plaintiffs must establish is that the materially false writing concerns the defendants' or an insider's financial condition. In determining whether a statement relates to a debtor's financial condition, courts agree the term is not limited to formal financial statements. Bogdanovich. at 112. A statement concerning the ownership of assets

21

clearly qualifies as a statement regarding financial condition. Engler v. Van Steinburg (In re Van Steinburg), 744 F.2d 1060, 1060-61 (4th Cir. 1984)(holding that a debtor's assertion that he owned property free and clear of liens is a statement respecting his financial condition). The false statements relate to the financial condition of Millennium as the Y2K program and the customers would have given it value. The false statement that the investment would be passed into Millennium's Accounts also is a statement regarding financial condition.

The fourth element which plaintiffs must establish is that the plaintiffs reasonably relied on the materially false written statement. The test as to "reasonable reliance" focuses on whether the statement is of such a nature that a reasonably prudent person would rely upon it. Boice at 46. Examples of unreasonable reliance on a materially false financial statement include situations where the creditor knows or has reason to know that the financial statement is false; where the financial statement is so deficient that it fails to portray a realistic picture of the debtor's financial status; where the creditor's own investigation indicates that the financial statement may be false; or where the creditor, under certain circumstances, failed to verify the information contained in the statement. Id. at 47.

The evidence at trial amply established that the plaintiffs' reliance upon the defendants' written statements was reasonable. A mutual friend introduced the plaintiffs to the defendants. The defendant Smith was an attorney and the defendants had an attorney in Thailand. These factors reasonably could have caused Voyatzoglou to rely on the defendants' written statements. But Voyatzoglou took additional steps to protect himself and his investment. Voyatzoglou met with representatives of ConSyGen regarding the product and how it worked. Voyatzoglou met in Thailand with the defendants and with employees of Millennium.

22

Voyatzoglou drafted the Heads of Agreement, which required the return of his investment if the parties did not enter into a final contract. He did not make the final payment after defendants failed to provide written financial information. The Court finds that under these circumstances, the plaintiffs' reliance upon the defendants' written statements was reasonable.

The fifth element which the plaintiffs must establish is that the defendants caused the statement to be made or published with an intent to deceive. Examining the totality of the circumstances, the plaintiffs have met their burden of demonstrating an intent to deceive on the part of the defendants. Sentry, 42 B.R at 459. The defendants misrepresentations in the written statements – false claims regarding signed contract providing a customer base and regarding the exclusivity of their relationship with ConSyGen – were, by their very nature, evidence of an intent to deceive. The defendants caused the plaintiffs to believe Millennium needed an immediate infusion of cash for its business, yet used the funds in large part for personal expenses, drawing salaries and unilaterally signing employment agreements when they knew that the Heads of Agreement did not contemplate such actions until a formal contract had been finalized. The Court finds the debt is nondischargeable under Section (a)(2)(B) of the Bankruptcy Code.

IV.    The Defendants Embezzled the Money and Property of the Plaintiffs.
       The Claim is Excepted from Discharge under Section 523(a)(4).

In the Fourth Claim For Relief, the plaintiffs allege that the claim consists of claims against the defendants for money and property obtained by fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, and should be excepted from discharge pursuant to section 523(a)(4) of the Bankruptcy Code. Compl., ¶¶ 39-40. A plaintiff attempting

23

to except a debt from discharge under this section must prove each element by a preponderance of the evidence. In re Bonnanzio, 91 F.3d 296, 300 (2d Cir., 1996).

With respect to the allegations of fraud or defalcation while acting in a fiduciary capacity, an essential element which the plaintiffs must establish is whether the relationship between the defendants and the plaintiffs constituted a fiduciary relationship. Id. In determining this issue, this Court must look to both state and federal law. In Re Moskowitz, 310 B.R. 21 (Bankr. E.D.N.Y. 2004). The scope of the concept of a fiduciary is a question of federal law; state law determines whether a trust obligation exists. Id. at 30 (citations omitted). Several factors come into play in determining whether a trust relationship exists. First, the trust relationship must exist prior to the act creating the debt. Second, the act creating the debt must have been done during the course of the relationship. Third, the debt must be based on an express, technical or statutory trust. Id. Courts have found a trust relationship does not exist where the basis for the assertion of a trust is a contractual relationship only. Id. at 30-31.

Here, no trust relationship existed between the plaintiffs and the defendants before the creation of the debt. No trust relationship pursuant to statutory or common law has been alleged. The only relationship that existed was a contractual relationship based on the Heads of Agreement. The plaintiffs and the defendants did not enter into a final contract. Therefore, there was no fiduciary relationship, and the debt cannot be found nondischargeable on that basis under that Code Section 523(a)(4).

Section 523(a)(4) also excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the "appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was

24

entrusted to the debtor's care, and therefore was an embezzlement." 4 L. King, COLLIER ON BANKRUPTCY ¶ 523.10 [2] at 523-77 (15th Ed. rev.1998). Whether the actions of the defendants in this case constituted a larceny or an embezzlement within the meaning of Section 523(a)(4) is a matter of federal law. Great American Insurance Co. v. Graziano, 35 B.R. 589 (Bankr.E.D.N.Y.1983).

There are five elements plaintiffs must establish by a preponderance of the evidence to establish the defendants committed a larceny: (1) the wrongful taking (2) of property (3) of another (4) without the owner's consent (5) with intent to convert the property. Graziano, 35 B.R. at 594; COLLIER ON BANKRUPTCY, supra ¶ 523.10[2] at 523- 76.   The Court finds that the actions of the defendants did not constitute a larceny, because the original taking of the money by the defendants was not unlawful. Graziano, 35 B.R. at 593-94.

There are also five elements plaintiffs must establish by a preponderance of the evidence to establish the defendants committed an embezzlement: (1) the entrustment to the debtor of (2) property (3) of another (4) which the debtor appropriates for his or her own use (5) with intent to defraud. In re Bevilacqua, 53 B.R. 331, 333-34 (Bankr. S.D.N.Y.1985). A debtor need not have been a fiduciary to commit embezzlement under Section 523(a)(4). In re Bevilacqua, 53 B.R. at 334; Moreno v. Schwartz (In re Schwartz), 36 B.R. 355, 358 (Bankr. E.D.N.Y. 1984).

The evidence presented at trial established that the actions of the defendants in this case constituted an embezzlement. The original taking of the property was lawful, as the monies came into the defendants' personal accounts with the consent of the owner. COLLIER ON BANKRUPTCY, supra ¶ 523.10[2] at 523-76 (citing Black's Law Dictionary 522 (6th

25

Ed.1990)). Voyatzoglou entrusted the property to the defendants with the expectation it would be used for Millennium. The Court finds the totality of the circumstances demonstrate that the defendants had an intent to defraud Voyatzoglou of his property. Their misrepresentations caused him to invest in Millennium. The defendants used this investment in part to pay themselves salaries and pay personal expenses in violation of the Heads of Agreement. They failed to provide financial information which caused the breakdown of negotiations. The defendants engaged in embezzlement and the debt is excepted from discharge under 523(a)(4).

VI.    The Claim Constitutes a Debt for Willful and Malicious Injury
       and Is Excepted From Discharge Under Code Section 523(a)(6).

In the Fifth Claim For Relief, the plaintiffs allege that the claim consists of debt for willful and malicious injury by the defendants to the plaintiffs or their property, and the claim should be excepted from discharge pursuant to Section 523(a)(6) of the Bankruptcy Code. The first element of the cause of action is that the injury must be willful on the part of the defendants. The word willful modifies the word injury, "indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed2d 90 (1998). The Court has found the defendants deliberately and knowingly took the funds.

The second element which the plaintiffs must establish is that the defendants caused the injury maliciously. This element can be satisfied by either actual or constructive malice. Navistar Financial Corp. v. Stelluti (In re Stelluti), 94 F.3d 84 (2d Cir. 1996). A malicious injury is a wrongful injury, caused without just cause or excuse but does not require "personal hatred, spite, or ill-will." In re Scheller, 265 B.R. 39, 54-55 (Bankr. S.D.N.Y. 2001).

26

Maliciousness will be found where the "debtor has breached a duty to the plaintiff founded in contract, statute or tort law, willfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of discharge." In re Blankfort, 217 B.R. 138, 144 (Bankr. S.D.N.Y. 1998). Malice "is implied when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another." United Orient Bank v. Green, 215 B.R. 916, 928 (S.D.N.Y.1997). The defendants had a contractual duty under the Heads of Agreement to return the funds when they failed to enter into a final contract. The defendants' failure to return the money has injured the plaintiffs. The Court finds the defendants caused a willful and malicious injury and the debt is excepted from discharge under Section 523(a)(6).

VII.    The Entire Claim Is Nondischargeable Including Treble
        Damages for Fraud, Attorneys' Fees and Costs.

Having determined that the debt is nondischargeable under Bankruptcy Code Sections 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6), the Court must determine whether the entire amount of the claim is nondischargeable, including the claim for treble damages, attorneys' fees and costs. The plaintiffs brought the State Court Action in Florida. Under Florida law, proof of embezzlement by clear and convincing evidence gives rise to a claim for treble damages, costs and attorneys fees. In re Britt, 200 B.R. 409, 411 (Bankr. M.D. Fla. 1996); Fla. Stat. Ann. §772.11 (West 2005).[12] The plaintiffs have demonstrated the embezzlement,

---

[12]    Fla. Stat. §772.11 provides: Any person who proves by clear and convincing evidence that he has been injured in any fashion by reason of any violation of the provisions of ss. 812.012-812.037 has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to minimum damages in the amount of $200, and reasonable attorneys' fees and Court costs in the trial and appellate courts.

27

fraud, and false pretenses by clear and convincing evidence, and is entitled to compensatory damages, treble damages, costs and attorneys fees under Florida law. The Supreme Court has determined that "[w]hen construed in the context of the statute as a whole, then, § 523(a)(2)(A) is best read to prohibit the discharge of any liability arising from a debtor's fraudulent acquisition of money, property, etc., including an award of treble damages for the fraud." Cohen v. de la Cruz, 523 U.S. 213, 220, 118 S.Ct. 1212, 1217 (1998). "The meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge …." indicate that all debt arising from that fraud is nondischargeable. Id. at 221. Thus, any debt for "money, property, services, or . . . credit, to the extent obtained by fraud encompasses any liability arising from money . . . fraudulently obtained, including treble damages, attorneys' fees, and other relief that may exceed the value obtained by the debtor" is nondischargeable. Id. at 223. Courts have interpreted this holding to apply to nondischargeable claims under Sections 523(a)(4) and 523(a)(6) as well. See, e.g., In re Scheller, 265 B.R. 39, 55 (Bankr. S.D.N.Y. 2001). The entire claim amount in this case is based on the defendants' embezzlement and fraudulent actions. Therefore, the entire claim is nondischargeable.

### CONCLUSION

The defendants are not collaterally estopped from contesting the allegations. The plaintiffs' claim is valid in the full claim amount. The claim consists of debts for money obtained by the defendants from the plaintiffs through false pretenses, false representations, or actual fraud, and is excepted from discharge pursuant to Bankruptcy Code Section 523(a)(2)(A).

---

Sections 812.012-812.037 include embezzlement, fraud, false pretenses, embezzlement, and other theft related actions.

28

The claim consists of debts for money obtained through the defendants use of materially false written statements made with the intent to deceive the plaintiffs and on which the plaintiffs reasonably relied and is nondischargeable pursuant to Bankruptcy Code Section 523(a)(2)(B). The claim consists of debts arising from the defendants' embezzlement of plaintiffs' money and is nondischargeable pursuant to Bankruptcy Code Section 523(a)(4). Finally, the claim consists of debts arising from the defendants' willful and malicious injury of the plaintiffs and thus is nondischargeable pursuant to Bankruptcy Code Section 523(a)(6).

IT IS SO ORDERED.

Dated: Brooklyn, New York
August 23, 2005

**s/ DENNIS E. MILTON**

DENNIS E. MILTON
United States Bankruptcy Judge

29

# Exhibit E
## APPELLATE DOCKETS

**Florida State Courts**  | Courts | (http://www.flcourts.org/) | Opinions | (http://www.flcourts.org/) | New Query | (../SearchDCA/SearchDCA) | Help | (ds_

Florida Third District Court of Appeal Docket

Case Docket

Case Number: 3D15-1600

Non-Final Civil Other Notice from Dade County

MIAMI BEVERLY LLC, et al., vs. CITY OF MIAMI,

Lower Tribunal Case(s):14-27781

Right-click to copy shortcut directly to this page (/DCAResults/CaseByYear?
CaseYear=2015&CaseNumber=1600&Court=3)

List of Abbreviations | Printer Friendly View

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 07/14/2015 | Notice of Transmittal--NOA | | Miami-Dade Clerk | |
| 07/14/2015 | Notice of Appeal Filed | | Keith D. Silverstein 86820 | |
| 07/14/2015 | Acknowledgment Letter | | | Acknowledgment of new case with attachments. ** The $300 filing fee for appeal is due. |
| 07/22/2015 | Order to pay filing fee-civil w/atty (OR14B) | 08/01/2015 | | This is to notify counsel for appellant that the filing and prosecution of a notice of appeal in this Court is not acceptable without compliance with the Florida Rules of Appellate Procedure. Therefore, this appeal will be dismissed unless the required three hundred ($300.00) dollar fee is paid to the Clerk of the Court on or before August 1, 2015. |
| 07/31/2015 | Case Filing Fee | | | FILING FEE FOR NOTICE OF APPEAL. |
| 08/04/2015 | Notice of Appearance | | John A. Greco 991236 | |
| 08/04/2015 | Notice | | John A. Greco 991236 | of email designation. |
| 09/03/2015 | Motion To Dismiss | | John A. Greco 991236 | or in the alternative, motion to expedite appeal |
| 09/08/2015 | Motion to expedite granted (OG08) | | | Upon consideration, appellee's motion to expedite the appeal is granted. The appellants are ordered to file the initial brief within ten (10) days from the date of this order. Appellee's answer brief shall be filed within ten (10) days thereafter. Appellants' reply brief, if any, shall be filed within five (5) days after receipt of the answer brief. |
| 09/18/2015 | Initial Brief on Merits | | Keith D. Silverstein 86820 | |
| 09/18/2015 | Appendix | | Keith D. Silverstein 86820 | |
| 09/28/2015 | Appellee's Answer Brief | | John A. Greco 991236 | |
| 09/28/2015 | Appendix | | John A. Greco 991236 | 1 of 2 |
| 09/28/2015 | Appendix | | John A. Greco 991236 | 2 of 2 |
| 10/28/2015 | Affirmed - Per Curiam Affirmed | | | |
| 11/13/2015 | Mandate | | | |

List of Abbreviations | Printer Friendly View

This site is best viewed using Chrome, Firefox, Edge, or Internet Explorer version 11.0.50 or higher.

**Florida State Courts**  Courts (http://www.flcourts.org/)  Opinions  (http://www.flcourts.org/)  New Query  (../SearchDCA/SearchDCA)  Help  (ds_

Florida Third District Court of Appeal Docket

Case Docket

Case Number: 3D15-2547

Final Civil Other Notice from Dade County

MIAMI BEVERLY LLC, et al., vs. CITY OF MIAMI

Lower Tribunal Case(s):14-27781

Right-click to copy shortcut directly to this page (/DCAResults/CaseByYear?
CaseYear=2015&CaseNumber=2547&Court=3)

List of Abbreviations     Printer Friendly View

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 11/05/2015 | Notice of Appeal Filed | | Keith D. Silverstein 86820 | PRIOR CASE: 15-1600 |
| 11/05/2015 | Notice of Transmittal--NOA | | Miami-Dade Clerk | |
| 11/05/2015 | Acknowledgment Letter | | | Acknowledgment of new case with attachments. ** The $300 filing fee for appeal is due. |
| 11/12/2015 | Order to pay filing fee-civil w/atty (OR14B) | 11/22/2015 | | This is to notify counsel for appellants that the filing and prosecution of a notice of appeal in this Court is not acceptable without compliance with the Florida Rules of Appellate Procedure. Therefore, this appeal will be dismissed unless the required three hundred ($300.00) dollar fee is paid to the Clerk of the Court on or before November 22, 2015. |
| 11/24/2015 | Notice of Appearance | | John A. Greco 991236 | |
| 11/24/2015 | Notice | | John A. Greco 991236 | of designation of email address |
| 12/21/2015 | Dismissal for Failure to Comply (DA11H) | | | Upon the Court's own motion, it is ordered that this appeal from the Circuit Court for Miami-Dade County, Florida is dismissed for failure to comply with this Court's order dated November 12, 2015, and with the Florida Rules of Appellate Procedure. |
| 12/21/2015 | Dismissed - Order by Judge | | | |
| 01/11/2016 | West Publishing | | | |
| 01/11/2016 | Disp w/o mandate | | | |
| 01/13/2016 | Record on Appeal | | | 6 VOLUMES. |

List of Abbreviations     Printer Friendly View

This site is best viewed using Chrome, Firefox, Edge, or Internet Explorer version 11.0.50 or higher.

Florida Third District Court of Appeal Docket

Case Docket

Case Number: 3D16-683

Final Civil Other Notice from Dade County

MIAMI BEVERLY LLC, et al., vs. CITY OF MIAMI,

Lower Tribunal Case(s):14-27781

Right-click to copy shortcut directly to this page (/DCAResults/CaseByYear?
CaseYear=2016&CaseNumber=683&Court=3)

List of Abbreviations    Printer Friendly View

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 03/28/2016 | Notice of Appeal Filed | | Renee M. Smith 128228 | NOT CERTIFIED, NO ORDER ATTACHED. Prior cases: 15-2547, 15-1600 |
| 03/28/2016 | Acknowledgment Letter | | | Acknowledgment of new case with attachments. **The $300 filing fee for an appeal is due. |
| 03/29/2016 | Notice of Appeal Filed | | Miami-Dade Clerk | CERTIFIED. |
| 03/29/2016 | Notice of Transmittal--NOA | | Miami-Dade Clerk | |
| 03/29/2016 | AA TO FILE ORDER APPEALED (OR34) | | | Appellants are ordered to file within ten (10) days from the date of this order a conformed copy of the order or orders designated in the notice of appeal. See Fla. R. App. P. 9.110(d). |
| 03/29/2016 | Order to pay filing fee-civil w/atty (OR14B) | | | This is to notify counsel for appellants that the filing and prosecution of a notice of appeal in this Court is not acceptable without compliance with the Florida Rules of Appellate Procedure. Therefore, this appeal will be dismissed unless the required three hundred ($300.00) dollar fee is paid to the Clerk of the Court on or before April 8, 2016. |
| 03/31/2016 | order appealed | | | |
| 04/01/2016 | Case Filing Fee | | | FILING FEE FOR NOTICE OF APPEAL. |
| 04/01/2016 | Initial Brief on Merits | | Renee M. Smith 128228 | |
| 04/01/2016 | Appendix | | Renee M. Smith 128228 | |
| 04/06/2016 | Notice of Appearance | | John A. Greco 991236 | |
| 04/06/2016 | Notice | | John A. Greco 991236 | OF DESIGNATION OF EMAIL ADDRESS |
| 04/15/2016 | Mot. for Extension of time to file Answer Brief | | John A. Greco 991236 | |
| 04/20/2016 | Extension granted to file answer brief (OG04) | 05/18/2016 | | Appellee¿s motion for an extension of time to file the answer brief is granted to and including May 18, 2016. |
| 05/12/2016 | Mot. for Extension of time to file Answer Brief | | Kerri L. Mcnulty 16171 | |
| 05/12/2016 | Notice of Appearance | | Kerri L. Mcnulty 16171 | |
| 05/12/2016 | Notice | | Kerri L. Mcnulty 16171 | OF DESIGNATION OF EMAIL |
| 05/16/2016 | RESPONSE | | Renee M. Smith 128228 | to motion for eot to file answer brief |
| 05/17/2016 | Extension granted to file answer brief (OG04) | 07/02/2016 | | Appellee¿s motion for extension of time to file answer brief is granted to and including July 2, 2016. |
| 06/01/2016 | Record on Appeal | | | 8 VOLUMES. |
| 07/05/2016 | Appellee's Answer Brief | | Kerri L. Mcnulty 16171 | |
| 07/25/2016 | Appellant's Reply Brief | | Renee M. Smith 128228 | |
| 08/05/2016 | Motion To Expedite | | Kerri L. Mcnulty 16171 | review and disposition. |
| 08/11/2016 | Motion To Strike | | Renee M. Smith 128228 | portions of AE's motion for expedited review |

| 08/17/2016 | RESPONSE | | Kerri L. Mcnulty 16171 | to aa motion to strike |
|---|---|---|---|---|
| 08/24/2016 | Affirmed - Per Curiam Affirmed | | | |
| 08/24/2016 | Miscellaneous Motion Denied (OD999) | | | Appellee's motion to expedite review and disposition and appellants' motion to strike portions of appellee's motion for expedited review are denied as moot. |
| 09/08/2016 | Miscellaneous Motion | | Renee M. Smith 128228 | for written opinion. |
| 09/21/2016 | Miscellaneous Motion Denied (OD999) | | | Upon consideration, appellants¿ motion for written opinion is hereby denied. WELLS, FERNANDEZ and SCALES, JJ., concur. |
| 10/11/2016 | Mandate | | | |
| 10/11/2016 | West Publishing | | | |

List of Abbreviations    Printer Friendly View

This site is best viewed using Chrome, Firefox, Edge, or Internet Explorer version 11.0.50 or higher.

**Florida State Courts**    Courts (http://www.flcourts.org/)    Opinions (http://www.flcourts.org/)    New Query (../SearchDCA/SearchDCA)    Help (ds_

Florida Third District Court of Appeal Docket

Case Docket

Case Number: 3D17-549

Non-Final Civil Other Notice from Dade County

MIAMI BEVERLY LLC, et al., vs. CITY OF MIAMI,

Lower Tribunal Case(s):14-27781

Right-click to copy shortcut directly to this page (/DCAResults/CaseByYear?
CaseYear=2017&CaseNumber=549&Court=3)

List of Abbreviations    Printer Friendly View

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 03/14/2017 | Notice of Appeal Filed | | Renee M. Smith 128228 | Prior cases: 16-683, 15-2547, 15-1600 |
| 03/14/2017 | Acknowledgment Letter | | | Acknowledgment of new case with attachments. |
| 03/14/2017 | Notice of Transmittal--NOA | | Miami-Dade Clerk | |
| 03/21/2017 | Order to pay filing fee-civil w/atty (OR14B) | | | This is to notify counsel for appellants that the filing and prosecution of a notice of appeal in this Court is not acceptable without compliance with the Florida Rules of Appellate Procedure. Therefore, this appeal will be dismissed unless the required three hundred ($300.00) dollar fee is paid to the Clerk of the Court on or before March 31, 2017. |
| 03/24/2017 | Initial Brief on Merits | | Renee M. Smith 128228 | |
| 03/24/2017 | Appendix | | Renee M. Smith 128228 | |
| 03/27/2017 | Case Filing Fee | | | FILING FEE FOR NOTICE OF APPEAL. |
| 04/10/2017 | Notice of Appearance | | Kerri L. Mcnulty 16171 | |
| 04/10/2017 | Notice | | Kerri L. Mcnulty 16171 | of designation of e-mail address |
| 04/10/2017 | Notice | | Kerri L. Mcnulty 16171 | of designation of email address |
| 04/13/2017 | Notice of Agreed Extension of Time | | Kerri L. Mcnulty 16171 | |
| 04/17/2017 | Recognizing Agreed Extension of Time | | | AB-45 days to 6/2/17 |
| 06/01/2017 | Notice | | Kerri L. Mcnulty 16171 | of unavailability |
| 06/02/2017 | Notice of Agreed Extension of Time | | Kerri L. Mcnulty 16171 | |
| 06/07/2017 | Extension granted to file answer brief NFE (OG04A) | 06/23/2017 | | Appellee¿s notice of agreed extension of time to file the answer brief is treated as a motion for an extension of time to file the answer brief, and the motion is granted to and including June 23, 2017, with no further extensions allowed. If said brief is not timely filed in accordance with this order, appellee(s) will be precluded from filing an answer brief and/or presenting oral argument to the court in this cause. |
| 06/23/2017 | Appellee's Answer Brief | | Kerri L. Mcnulty 16171 | |
| 06/23/2017 | Appendix | | Kerri L. Mcnulty 16171 | |
| 09/06/2017 | Affirmed - Authored Opinion | | | |
| 09/22/2017 | Mandate | | | |
| 09/22/2017 | West Publishing | | | |

List of Abbreviations    Printer Friendly View

This site is best viewed using Chrome, Firefox, Edge, or Internet Explorer version 11.0.50 or higher.

Florida Third District Court of Appeal Docket

Case Docket

Case Number: 3D17-1014

Non-Final Civil Other Notice from Dade County

MIAMI BEVERLY LLC, et al., vs. CITY OF MIAMI

Lower Tribunal Case(s):14-27781

Right-click to copy shortcut directly to this page (/DCAResults/CaseByYear?
CaseYear=2017&CaseNumber=1014&Court=3)

List of Abbreviations | Printer Friendly View

| Date Docketed | Description | Date Due | Filed By | Notes |
|---|---|---|---|---|
| 05/04/2017 | Notice of Appeal Filed | | Renee M. Smith 128228 | PRIOR CASES: 17-549, 16-683, 15-2547, 15-1600 |
| 05/04/2017 | Acknowledgment Letter | | | Acknowledgment of new case with attachments. ** The $300 filing fee for an appeal is due. |
| 05/04/2017 | Notice of Transmittal--NOA | | Miami-Dade Clerk | |
| 05/11/2017 | Order to pay filing fee-civil w/atty (OR14B) | 05/21/2017 | | This is to notify counsel for appellants that the filing and prosecution of a notice of appeal in this Court is not acceptable without compliance with the Florida Rules of Appellate Procedure. Therefore, this appeal will be dismissed unless the required three hundred ($300.00) dollar fee is paid to the Clerk of the Court on or before May 21, 2017. |
| 05/17/2017 | Appendix | | | |
| 05/18/2017 | Case Filing Fee | | | FILING FEE FOR NOTICE OF APPEAL. |
| 05/18/2017 | Initial Brief on Merits | | Renee M. Smith 128228 | |
| 06/09/2017 | Motion To Dismiss | | Kerri L. Mcnulty 16171 | |
| 07/20/2017 | MISCELLANEOUS ORDER (OR999) | 08/09/2017 | | Appellants are ordered to show cause within twenty (20) days from the date of this order as to why this appeal should not be dismissed as to the City for failure to name the proper party in the appeal. |
| 08/09/2017 | Initial Brief on Merits | | Renee M. Smith 128228 | |
| 08/10/2017 | RESPONSE | | Renee M. Smith 128228 | to order to show cause dated July 20, 2017 |
| 08/23/2017 | MISCELLANEOUS ORDER (OR999) | 09/02/2017 | | Upon consideration, appellee's motion to dismiss is hereby denied without prejudice. Appellants are directed to file an amended Notice of Appeal naming all proper parties within ten (10) days from the date of this order. |
| 09/18/2017 | Motion To Dismiss | | Kerri L. Mcnulty 16171 | |
| 09/18/2017 | Amended Notice of Appeal | | Renee M. Smith 128228 | STRICKEN - See Order dated 10/5/17 |
| 09/19/2017 | Miscellaneous Motion | | Renee M. Smith 128228 | to permit filing of amended notice of appeal after expiration of time. |
| 09/20/2017 | RESPONSE | | Kerri L. Mcnulty 16171 | to Appellants' Motion to Permit Filing of Amended Notice of Appeal After Expiration of Time |
| 10/05/2017 | Motion to Dismiss Granted (OG32) | | | Following review of appellee's response, appellants' motion to permit filing of amended notice of appeal after expiration of time is hereby denied. Appellants' amended notice of appeal filed September 18, 2017 is hereby stricken for failing to comply with this Court's August 23, 2017 order. ORDERED that appellee's motion to dismiss appeal is granted, and this appeal from the Circuit Court for Miami-Dade County, Florida is hereby dismissed with prejudice. |
| 10/05/2017 | Dismissed - Order by Judge | | | |
| 10/25/2017 | West Publishing | | | |
| 10/25/2017 | Disp w/o mandate | | | |

List of Abbreviations | Printer Friendly View

# Exhibit F

**ELECTRICAL BOX**















