UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

| | |
|---|---|
| Miami Beverly, LLC, | Case No. 18-14506-BKC-LMI |
| | Chapter 11 (Lead Case) |
| | |
| | Jointly Administered |
| 1336 NW 60, LLC | Case No. 18-14509-BKC-LMI |
| Reverend, LLC | Case No. 18-14510-BKC-LMI |
| 13300 Alexandria Dr. Holdings, LLC | Case No. 18-14511-BKC-LMI |
| The Holdings at City, LLC | Case No. 18-14512-BKC-LMI |

     Debtor.
_____/

**EXIGENT MOTION TO MAINTAIN PRE-PETITION
INTEGRATED CASH MANAGEMENT PRACTICES**

Linda Leali, the court-appointed Receiver (the "**Receiver**") in the matter styled *City of Miami v. Miami Beverly LLC, et al.* (Case No. 2014-027781-CA-01) (the "**Receivership Case**") in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (the "**State Court**"), by counsel, hereby files this *Exigent Motion to Maintain Pre-Petition Integrated Cash Management Practices* (the "**Motion**") seeking entry of an order pursuant to 11 U.S.C. § 105, 345, 363 and 503, Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") authorizing *nunc pro tunc* to the Petition Date,[1] Receiver's continued utilization of certain Cash Management Practices[2] in the above captioned consolidated chapter 11 cases (the "**Bankruptcy Case**") of Miami Beverly, LLC, 1336 NW 60, LLC, Reverend, LLC, 13300 Alexandria Dr. Holdings, LLC, and The Holdings at City, LLC (collectively, the "**Debtor**"). In support of this Motion, Receiver states the following:

---

[1] *See infra* paragraph 8.
[2] *See infra* paragraph 9.

1

1. The Court has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core matter pursuant to 28 U.S.C. § 157(b)(2). Predicates for the relief requested herein are 11 U.S.C. § 105, 345, 363, 364, 503(b), 1107, and 1108.

## BACKGROUND

2. On October 29, 2014, the City of Miami filed a *Complaint for Injunctive Relief and Money Damages* against Defendants, on behalf of itself and the citizens of the City of Miami in order to enforce its City Code and protect the tenants residing within the Defendants' properties (the "**Receivership Properties**").

3. Thereafter, the City of Miami sought entry of a final judgment from the State Court. An Order Granting Default Final Judgment was entered on June 4, 2015 and a Final Judgment was entered on December 24, 2015 (collectively, the "**Final Judgment**").

4. In connection therewith, the City of Miami sought appointment of a Receiver over the Receivership Properties. At that time, the Receivership Properties had been plagued by years of gross mismanagement.

5. Based upon the evidence provided to the State Court at a hearing held June 4, 2015, the State Court determined that the Receivership Properties were in serious disrepair and threatened the health, safety, and welfare of the community.

6. On account of the State Court's June 4, 2015 determinations, by orders dated June 4, 2015 and June 10, 2015 (together, the "**Receivership Order**"), the State Court appointed Receiver as receiver regarding the Receivership Properties. Among other things, the Receivership Order authorized Receiver to manage the Receivership Properties and to seek to correct the various code violations.

7. Despite the hurtles erected by the Defendants, during a three year receivership of 147 units across several buildings owned by six companies, Receiver has been able to substantially improve the Receivership Properties and has increased the rent roll from rental deposits of $3,150.00 for the period June 10 through June 30, 2015, to rental deposits of $31,311.00 for the month of July 2015, and to rental deposits of $48,281.00 for the month of February, 2018.

8. On April 18, 2018, the City of Miami set its Final Judgment for foreclosure sale. On April 17, 2018 (the "**Petition Date**"), Debtor commenced this chapter 11 bankruptcy case. Prior to this Motion, Debtor has, in fact, consented to Receiver remaining in possession of Debtor's assets and books and records.

**Cash Management Practices**

9. In connection with her oversight of the Receivership, Receiver has implemented and relies on the cash management protocol described herein (collectively, the "**Cash Management Practices**").

10. First, Receiver employs Capital Rental Agency, Inc. ("**Capital**") to assist with various duties normally associated with managing real estate, including preparing budgets, renting units, responding to tenant inquiries, managing tenant relationships, collecting and accounting for monthly rents, paying and accounting for monthly expenses, assisting in effectuating eviction, and performing any repairs necessary to operate, maintaining and preserving the Receivership Properties and any other related services Receiver may request.

11. Terms of Capital's relationship with Receiver and the Receivership Properties is governed by a *Management Agreement/Contract for Services* (the "**Management Agreement**"). As per the Management Agreement, in exchange for their services, originally Receiver paid to Capital, an amount equal to 10% of gross monthly rent collections, plus expenses (the "**Capital**

Compensation"). Through an agreed order with the Debtor entered over the course of the Receivership, the Capital Compensation was increased to 20% of gross monthly rent collections, plus expenses. However, Capital has agreed to reduce the Capital Compensation in this Bankruptcy Case to 15% of gross monthly rent collections, plus expenses.

12. Second, Receiver maintains two bank accounts at Biscayne Bank (together, the "**Receivership Bank Accounts**") in connection with the Receivership Properties. Historically, because of the close relationship between Capital and Biscayne Bank, Receiver has been able to avoid fees in connection with the Receivership Bank Accounts and her current implementation regarding same.

13. One of the Receivership Bank Accounts is used exclusively for holding payments of the final month's rent paid by tenants at the time of lease execution ("**Advance Rent**") for all buildings comprising the Receivership Properties. Advance Rent held in this account is tracked on a building-by-building basis.

14. Additionally, one of the Receivership Bank Accounts is used as an operating account (the "**Operating Account**"). Apart from Advance Rent, all other funds and expenses pertaining to all Receivership Properties, including any independent contractors and Receiver and Receiver's attorney's fees, come in to and out of the Operating Account. All transfers to and out of the Operating Account are tracked on a building-by-building basis.

15. Third, because expenses for all buildings comprising the Receivership Properties are drawn from the Operating Account, incoming funds from some buildings' operations are used to cover expenses of others (the "**Inter-Property Transactions**"). All Inter-Property Transactions are tracked on a building-by-building basis.

16. Fourth, in the ordinary course of business, Receiver uses a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other

business forms and correspondence in the name of Receiver (collectively, the "**Business Forms**"). Given that the Business Forms were used by Receiver and in Receiver's name pre-petition, they do not include references to the Debtor's current status as debtors in possession. Most parties doing business with the Receiver will undoubtedly be aware of the Debtor's status as debtors in possession as a result of the publicity surrounding this Bankruptcy Case and the notice of commencement of this Bankruptcy Case that has been or will soon be provided to parties in interest. As is the case with the existing Cash Management Practices, generally, requiring the Receiver to change their existing Business Forms would unnecessarily distract the Receiver from her efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

## **RELIEF REQUESTED**

17. By this Motion, the Receiver requests entry of interim and final orders: (1) authorizing the Receiver to continue using their existing Cash Management Practices, Receivership Bank Accounts, and Business Forms, in each case subject to changes that they may make thereto in their sole discretion; (2) waiving any applicable investment and deposit requirements imposed by 11 U.S.C. § 345(b) or otherwise; and (3) authorizing the Receiver to continue their Inter-Property Transactions in the ordinary course of business.

18. The Debtors also request that the Court schedule a final hearing on the Motion within seventy-five (75) days of the entry of any Interim Order.

**I.    This Court Should Authorize Continued Use of Existing Cash Management Practices in the Ordinary Course of Business**

19. The Cash Management Practices and applicable procedures employed by the Receiver constitute customary and essential business practices. The Cash Management Practices afford the Receiver and Debtor significant benefits, including, among other things, the ability to:

(1) centrally control Receivership funds; (2) ensure the availability of funds when necessary; and (3) minimize administrative expenses by facilitating a more efficient movement of funds and monitoring of balance and presentment information. Arguendo, it is needlessly expensive for Receiver to establish new cash management practices. Receiver therefore requests permission to continue their existing Cash Management Practices on an interim basis for seventy-five (75) days and, ultimately, on a final basis.

20. Moreover, given that the services provided by the Capital are essential to operations of the Receivership Properties, approval of the Cash Management Practices necessarily entails the Receiver's continued utilization of the Capital's services under the Management Agreement. A loss or interruption of Capital's services — even on a temporary basis — could immediately undermine operations of the Receivership Properties, adversely and permanently impacting same. This could result in irreparable damage to the Receiver's ability to operate the Receivership Properties during this critical stage of this Bankruptcy Case. Accordingly, Capital and the services Capital provides with respect to managing the Receivership Properties is an integral part of the Cash Management Practices. [3]

21. Allowing the existing Cash Management Practices to remain in place will facilitate a smoother transition into chapter 11 and will aid the Debtors' restructuring efforts. Notably, the Cash Management Practices include the necessary accounting controls to enable the Debtors, as well as creditors and the Court, if necessary, to trace amounts through the system and ensure that all transactions are adequately documented and readily ascertainable. Continuation of the Company's existing Cash Management Practices and related Receivership Bank Accounts ensures the ongoing concern of the Debtor and Receiver's operations regarding same.

---

[3] Upon information and belief, Debtor agrees that continuing the Receiver's stewardship, with Capital as the management company, is in the best interest of all concerned.

22. In order to effectuate the purposes of this Motion, Receiver requests that Biscayne Bank be authorized and directed to: (1) continue administering the Receivership Bank Accounts in the usual and ordinary course of business in accordance with the Receiver's instructions and pursuant to pre-existing agreements; (2) pay any and all checks, drafts, wires, or electronic funds transfers presented, issued, or drawn on the Receivership Bank Accounts on account of any claims arising pre-petition or post-petition, so long as sufficient funds are available in such Receivership Bank Accounts; (3) honor Receiver's directions with respect to the opening or closing of any bank account; (4) accept and hold, or invest, Receiver's funds in accordance with Receiver's instructions; and (5) continue paying to Capital, any fees associated with services provided under the Management Agreement or otherwise.

23. Receiver proposes that Biscayne Bank be allowed to rely on any order entered granting this Motion and on Receiver's representations and instructions as to the payments and transfers that may be honored or dishonored in accordance with the terms of pre-existing agreements. Receiver further propose that Biscayne Bank not be liable to any party on account of: (1) following the Receiver's instructions or representations as to any order of this Court; and (2) honoring any checks, drafts, wires, or electronic funds transfers presented in a good faith belief that this Court has authorized the honoring of such checks, drafts, wires, or electronic funds transfers.

24. 11 U.S.C. § 363(c)(1) authorizes the debtors in possession to "use property of the estate in the ordinary course of business without notice or a hearing." The purpose of 11 U.S.C. § 363(c)(1) is to provide debtors in possession with flexibility to engage in ordinary course transactions required to operate their businesses, without unneeded oversight by its creditors or the Court. *See, e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *In re Enron Corp.*, No. 01-16034 (AJG), 2003 WL 1562202, at *15 (Bankr.

S.D.N.Y. Mar. 21, 2003); *Chaney v. Official Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).

25. Receiver's ability to continue their Cash Management Practices and engaging in related routine transactions falls within the parameters of 11 U.S.C. § 363(c). *See Amdura Nat'l Distribution Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996); *Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (holding that a debtor's request for authority to continue using its existing cash management system is consistent 11 U.S.C. § 363(c)(1)).

26. To the extent that continuing the existing Cash Management Practices is beyond the ordinary course of the Debtor's business, such use is permitted by 11 U.S.C. § 363(b)(1) and 105(a). 11 U.S.C. § 363(b)(1) provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 105(a) further provides that the Court may "issue any order . . . that is necessary or appropriate to carry out the provisions of [title 11]."

27. As another court has previously stated, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Where there is a valid business justification for using property outside the ordinary course of business, the law presumes that, "in making a business decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

28. Under the circumstances, and in light of the Receiver's belief that continuation of the Cash Management Practices is in the best interests of Debtor's estate, the Receiver requests the Court authorize continued use of the Cash Management Practices.

**II.    This Court Should Authorize Continued Use of the Receivership Bank Accounts and the Business Forms on an Interim Basis**

29. The *Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees* (Jan. 7, 2018) (the "**U.S. Trustee Guidelines**"), among other restrictions and requirements, prohibit disbursements other than by numbered checks, which checks must bear the applicable debtor's case name and case number, a "debtor in possession" designation, and an indication of the account type. However, rigid adherence to the U.S. Trustee Guidelines would require, among other things, closure of prepetition Receivership Bank Accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtors in Possession" designation on them. Thus, enforcement of the U.S. Trustee Guidelines in these Chapter 11 Cases would disrupt Receiver's operations, impose burdensome expenses on the estates, and unnecessarily distract from the reorganization efforts.

30. In the ordinary course of business, the Receiver may also use other various Business Forms, including, but not limited to, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence. To minimize expenses, Receiver seeks authority to continue using the Business Forms, substantially in the forms existing immediately before the Petition Date and without any reference in such forms to the Debtor's status as debtors in possession. As with the Receivership Bank Accounts, requiring Receiver to change existing Business Forms would unnecessarily distract from restructuring efforts and impose needless expense.

9

31. Here, authorizing continued use of both the Receivership Bank Accounts and the Business Forms will make the transition into chapter 11 smoother, less costly, and more orderly. Accordingly, the Receiver requests this Court exercise its equitable powers under 11 U.S.C. § 105(a) to waive compliance with the U.S. Trustee Guidelines and to authorize the Receiver to continue using existing Receivership Bank Accounts and existing Business Forms in the ordinary course of business on an interim basis for a period of seventy-five (75) days and, ultimately, on a final basis. Notwithstanding this waiver, the Receiver will make reasonable best efforts to include a reference to their status as debtors in possession on the Business Forms.

### III. This Court Should Authorize the Receiver to Honor Certain Prepetition Obligations Related to the Cash Management Practices

32. In connection with the Cash Management Practices, the Debtors may incur fees and other charges in connection with bank services, dishonored or returned checks, and other obligations under the Bank Account Agreements (collectively, the "**Bank Account Claims**").[4]

33. As with the Cash Management Practices, payment of the Bank Account Claims will minimize disruption to the Receiver's operations and is therefore in the best interests of the estate. Absent payment of the Bank Account Claims, Biscayne Bank might assert setoff rights against the funds in the Receivership Bank Accounts on account of the Bank Account Claims, freeze the Receivership Bank Accounts, and/or refuse to provide services to the Receiver. The payment of Bank Account Claims will not prejudice unsecured creditors given that, as noted above, the Biscayne Bank may have setoff rights with respect to the Bank Account Claims.

34. In addition, as discussed more fully above, the Management Agreement provides that Capital be paid certain fees in exchange for the services they provide regarding the

---

[4] As mentioned above, because of the close relationship between Capital and Biscayne Bank, Receiver has historically had these sorts of charges waived. Accordingly, this Motion contemplates this relief out of an abundance of caution.

Receivership Properties (the "**Management Fees**"). Receiver's operations are dependent upon Capital providing management services with respect to the Receivership Properties, and any disruption to that arrangement could prove ruinous to the Receivership Properties.

35. Accordingly, pursuant to 11 U.S.C. § 105(a) and 363(b), Receiver seeks authority, in their sole discretion, to continue to pay and/or reimburse the Biscayne Bank in the ordinary course of business for any Bank Account Claims and allow payment of any outstanding Management Fees from the Operating Account. For the avoidance of doubt, there are no pre-petition amount owed.

### IV. The Court Should Authorize the Debtors to Engage in the Inter-Property Transactions in the Ordinary Course of Business

36. Receiver routinely engages in the Inter-Property Transactions in the ordinary course of business, and submit that the post-petition continuation of Inter-Property Transactions would be within the ordinary course of business. However, in an abundance of caution, Receiver seeks authority to enter into such Inter-Property Transactions in the ordinary course of business. If Receiver is permitted to continue entering into the Inter-Property Transactions in the ordinary course, Receiver will continue to maintain records of Inter-Property Transactions, including records of intercompany accounts receivable and accounts payable on a per property basis. [5]

37. As noted above, pursuant to 11 U.S.C. § 363(b)(1), debtors in possession are authorized to use property of the estate other than in the ordinary course of business after notice and a hearing. Inter-Property Transactions facilitate the Receiver's day-to-day operations, as well as the day-to-day operations of the non-Debtor affiliates, which are responsible for managing the Debtors' affairs. Thus, Receiver submits that such relief under 11 U.S.C. § 363(b)(1) is

---

[5] To be clear, rents are collected from the tenants from the several building and deposited in the Operating Account. The funds are comingled and the expenses are paid from the Operating Account.

appropriate, as continued entrance into Inter-Property Transactions is well within Receiver's sound business judgment.

> **V. Cause Exists to Waive the Investment and Deposit Restrictions Imposed by 11 U.S.C. § 345 and the U.S. Trustee Guidelines Regarding Authorized Depositories on an Interim and Final Basis**

38.  11 U.S.C. § 345(a) authorizes deposits or investments of estate money in a manner that will "yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," 11 U.S.C. § 345(b) provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of an adequate corporate surety, "unless the court for cause orders otherwise."

39.  To help Receiver comply with 11 U.S.C. § 345, the U.S. Trustee has promulgated the U.S. Trustee Guidelines as well as a list of authorized depositories (the "**Authorized Depositories**") at which Debtors may maintain bank accounts. Under the U.S. Trustee Guidelines, debtors in possession must, among other things, close prepetition bank accounts and open new "debtor in possession" operating, payroll, and tax accounts at an Authorized Depository.

40.  As noted above, however, courts may waive compliance with 11 U.S.C. § 345(b) and ultimately the U.S. Trustee Guidelines, for "cause." In evaluating whether "cause" exists, courts have considered a number of factors, including, among others, the sophistication and size of a debtor's business, the amounts of the investments involved, bank ratings, the complexity of the case, the debtor's safeguards for the funds, the debtor's ability to reorganize in the face of failure of one or more of the financial institutions, the benefit to the debtor of a waiver of the 11

U.S.C. § 345(b) requirements, the potential harm to the estate, and the reasonableness of such a waiver under the circumstances. *See In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

41.   Congress has cautioned that the investment and deposit requirements of 11 U.S.C. § 345 may be "wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, [but such requirements] can work to needlessly handcuff larger, more sophisticated debtors." H.R. Rep. 103-835, 103d Cong., 2d Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994). Thus, Congress added the waiver clause in 11 U.S.C. § 345(b) of the Bankruptcy Code "to allow the courts to approve investments other than those permitted by section 345(b) for just cause." *Id.*

42.   Receiver does not maintain any investment accounts. Biscayne Bank is not on the U.S. Trustee's list of Authorized Bank Depositories. Because the Receivership Bank Accounts at Biscayne Bank are vital to Receiver's Cash Management Practices, Receiver submits that requiring the Receiver to transfer to another bank would be crippling to the Receiver's operations, which must seamlessly operate across multiple Receivership Properties. Thus, Receiver submits cause exists to waive strict compliance with the U.S. Trustee's Guidelines on an interim basis.[6]

43.   Receiver further request they be authorized, on an interim basis for seventy-five (75) days, in their sole discretion, to close Bank Accounts and open new bank accounts on notice to parties, if such action becomes necessary for any reason. In connection therewith, Receiver requests the applicable banks be authorized and directed to honor the Receiver's directions with respect to the opening or closing of any bank account. Receiver further requests that any and all accounts opened by Receiver after the Petition Date at any bank be deemed a Receivership Bank

---

[6] Receiver reserves the right to seek further extension of any interim order.

Account (as if it had been opened prior to the Petition Date) and that all banks at which such accounts are opened similarly be subject to rights and obligations of any order on this Motion.

44. For the reasons set forth above, Receiver submits the relief requested in this Motion is in the best interests of Receiver, Debtor, Debtor's estate, creditors, stakeholders, and other parties in interest, and therefore should be granted.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID IMMEDIATE AND IRREPARABLE HARM

45. Rule 6003 of the Bankruptcy Rules provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Bankruptcy Rule 6003 permits entry of retention orders on interim basis to avoid irreparable harm). Courts have interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, they have instructed that irreparable harm "is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting N.Y. Pathological & X-Ray Labs., Inc. v. INS, 523 F.2d 79, 81 (2d Cir. 1975)). Further, the "harm must be shown to be actual and imminent, not remote or speculative." *Id.* at 214; *see also Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). Receiver submits that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

46. Receiver also requests this Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their businesses without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

WHEREFORE, for reasons outlined above, Receiver respectfully requests entry of interim and final orders: (1) granting this Motion *nunc pro tunc* to the Petition Date; (2) authorizing the Receiver to continue using their existing Cash Management Practices, Receivership Bank Accounts, and Business Forms, in each case subject to changes that they may make thereto in their sole discretion; (3) waiving any applicable investment and deposit requirements imposed by 11 U.S.C. § 345(b) or otherwise; (4) waiving the stay under Bankruptcy Rule 6004(h); (5) authorizing the Receiver to continue their Inter-Property Transactions in the ordinary course of business; (6) scheduling a final hearing on this Motion within seventy-five (75) days of the entry of any interim order; and (7) granting any further or additional relief this Court deems necessary or appropriate.

Respectfully submitted on May 31, 2018.

> Messana, P.A.
> *Counsel for Linda Leali, Receiver*
> 401 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, Florida 33301
> Telephone:  (954) 712-7400
> Facsimile:   (954) 712-7401
> Email:  tmessana@messana-law.com
>
> /s/ Thomas M. Messana
> Thomas M. Messana
> Florida Bar No. 0991422
> Chris Broussard
> Florida Bar No. 0095894