**UNITED STATES BANKRUPCTY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI, FLORIDA**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | CASE NO. 18-14506-BKC-LMI |
| MIAMI BEVERLY, LLC | Chapter 11 (Lead Case) |
| | |
| | Jointly Administered |
| | |
| 1336 NW 60, LLC | CASE NO.  18-14509-BKC-LMI |
| REVEREND, LLC | CASE NO.  18-14510-BKC-LMI |
| 13300 ALEXANDRIA DR HOLDINGS, LLC | CASE NO.  18-14511-BKC-LMI |
| THE HOLDINGS AT CITY, LLC | CASE NO.  18-14512-BKC-LMI |
| | |
| Debtors. | |

_____/

**EMERGENCY**
**MOTION FOR SUBSTANTIVE CONSOLIDATION OF DEBTOR ENTITIES**
**AND AFFILIATED NON-DEBTOR ENTITY**

City of Miami, Florida, a Municipal Corporation ("Creditor"), as a creditor and party in interest in the above-captioned Chapter 11 case, hereby files this emergency motion for substantive consolidation of the debtor entities (Miami Beverly, LLC; 1336 NW 60, LLC; Reverend, LLC; 13300 Alexandria DR Holdings, LLC; and the Holdings at City, LLC) and affiliated non-debtor entity (The Holdings at City II, LLC). The emergency nature of this request is due to the impending release of the non-debtor entity from the receivership that manages the debtor and non-debtor's apartment buildings. As more fully explained below, substantive consolidation of the entities is warranted because (1) there is substantial identity between the entities to be consolidated and (2) consolidation is necessary to avoid some harm or realize some benefit.

# BACKGROUND

## A.  The State Court Proceedings and Receivership.

The debtor and non-debtor entities are limited liability companies organized under the laws of the State of Florida, with their principal place of business in Englewood Cliffs, New Jersey. They share the same physical address, manager (Denise Vaknin), and legal and equitable beneficial interest holders (Abe and Denise Vaknin). (Ex. 1). The entities own multi-unit apartment buildings in Miami, Florida. The debtor entities own eight properties. The non-debtor entity owns one property.

In October 2014, the creditor filed a complaint for injunctive relief and money damages against the debtor and non-debtor entities in state court, on behalf of itself and the citizens of the City of Miami. The creditor sought to enforce its City Code regarding unpermitted work, unsafe conditions, and other violations. The creditor also sought to protect the tenants residing within the entities' properties. The debtor and non-debtor entities kept their apartment buildings in deplorable conditions by, among other things, allowing raw sewage to leak into occupied apartment units.

The state court eventually entered a final judgment in favor of the creditor. In connection with that judgment, the creditor sought the appointment of a receiver over the debtor and non-debtor's properties. The creditor maintained that the properties had been plagued by years of gross mismanagement.

After an evidentiary hearing, the state court determined that the properties were in serious disrepair and threatened the health, safety, and welfare of the community. The court entered several receivership orders and appointed a receiver. Among other things,

the receivership orders authorized the receiver to manage the properties and correct the code violations. (Ex. 2).

During the three-year receivership of the nearly 150 units, the receiver has substantially improved the properties, although one building remains uninhabitable due to a roof collapse during the debtor's ownership. The receiver has also increased the rent roll from rental deposits of $3,150.00 for the period June 10 through June 30, 2015, to rental deposits of $31,311.00 for the month of July 2015, to rental deposits of $48,281.00 for the month of February 2018, and to rental deposits of $57,108.16 for August 2018.

Since June 2015, the receiver has maintained the debtor and non-debtor's properties by pooling the resources of all the properties to keep them afloat. The non-debtor's property is crucial to this function. It accounts for nearly 22% of total monthly revenue. The other eight properties produce little net income or are cash flow negative.

The receiver maintains two bank accounts. One account is used exclusively for holding payments of advance rent paid by tenants at the time of lease execution for all buildings comprising the receivership properties. Advance rent in this account is tracked on a building-by-building basis. The other account is used as an operating account. Apart from advance rent, all other funds and expenses pertaining to the receivership properties come in to, and out of, this account. All transfers to, and out of, the account are tracked on a building-by-building basis.

**B. This Bankruptcy Case.**

Earlier this year, the creditor sought to sell the properties at a sheriff's sale due to the entities failure to comply with the injunction and money judgement entered by the state court. On the eve of the foreclosure sale (April 17, 2018), the debtor petitioned for

chapter 11 bankruptcy in this Court. The receiver then filed an amended motion, under 11 U.S.C. § 543(d)(1), to excuse her from compliance with the turnover requested and establish her powers and duties nunc pro tunc to the petition date. (D.E. #: 46). The receiver also filed an exigent motion to maintain the pre-petition integrated case management program. (D.E. #: 72).

This Court eventually entered an agreed order granting, in part, the amended motion under 11 U.S.C. § 543(d)(1) to excuse the receiver from compliance with the turnover requirements and establish powers and duties of the receiver nunc pro tunc to the petition date. (D.E. #: 78). This order allows the receiver to "act as a fiduciary and exercise the same duties as she has been exercising since she was appointed as Receiver in the Receivership Case under the terms and conditions of the order appointing her as Receiver, except to the extent the Bankruptcy Code or this Order modifies such duties, nunc pro tunc from April 17, 2018 (the 'Petition Date')." (D.E. #: 78, p. 2). However, the order does "not apply to any Receivership Properties that are not owned by any of the Debtors, and any such real properties shall not fall under the jurisdiction of this Court, absent further Court order." (D.E. #: 78, p. 6).[1]

This Court also entered an interim order granting, in part, the exigent motion to maintain the pre-petition integrated cash management program. (D.E. #: 85). This included (I) authorizing continued use of existing cash management practices, bank accounts, and business forms, (II) waiving investment and deposit requirements, and (III) authorizing continuance of inter-property transactions nunc pro tunc to the petition date.

---

[1] This motion essentially seeks to extend the reach of that order to the non-debtor entity, who, based on the order's terms, is excluded.

This Court retained "jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order." (D.E. #: 85, p. 6).

### C. The State Court's Order Releasing the Non-Debtor Entity from the Receivership.

Before this bankruptcy case, the debtor and non-debtor entities moved for release of "complaint properties" from the receivership. After the debtor entities initiated this bankruptcy case, the non-debtor entity filed an argument narrowing the motion to its property alone. The creditor and the receiver filed responses opposing that argument. Although the creditor acknowledged that there are no current code violations on the property owned by the non-debtor entity, the creditor opposed the motion for three essential reasons: (a) the non-debtor is jointly and severally liable for outstanding fees owed to the receivership; (b) the ability (or lack thereof) of the receivership to function without the non-debtor entity's property; and (c) the interdependent nature of the debtor entities and the non-debtor entity. (Ex. 3). Among other things, the receiver's response noted that the orders appointing the receiver rendered each entity jointly and severally liable for payment of fees to her and her counsel, and that outstanding fees total $14,070.00 for the receiver and $38,794.50 for her counsel. (Ex. 4).

On September 19, 2018, the state court entered an order releasing the non-debtor entity from the receivership. The court determined the following:

1. Defendant's, The Holdings at City II LLC, property located at 1558 NW 1st Ave Miami, Florida 33136 is deemed compliant and no longer poses a risk to the public.

2. Property located at 1558 NW 1st Ave Miami, Florida 33136 shall be released to Defendant, The Holdings at City II LLC, custody and control no later than fourteen (14) days from this Order.

3. Receiver shall submit an accounting to the Defendant, The Holdings at City II LLC, within seven (7) days of this order as to amounts satisfying all outstanding receivership fees and costs without setoff, including fees and costs of the Receiver's counsel.

4. Defendant, The Holdings at City II LLC shall pay any and all outstanding fees or costs due the Receivership related to oversight of the Civil Court's Receivership created per Court Order dated June 10, 2015 within ten (10) days of this Order.

5. Receiver will file with the Court confirmation of payment on or before the fourteenth (14) day and effectuate release and turnover of custody and control of 1558 NW 1st Ave Miami, Florida 33136 to The Holdings at City II LLC.

(Ex. 5). This emergency motion for substantive consolidation followed.

## ANALYSIS

As the debtor entities are already subject to this Court's jurisdiction, and subject to the receivership under this Court's orders, the creditor requests substantive consolidation of the debtor entities and the non-debtor entity. "[U]nder the principle of substantive consolidation, the assets of two or more related entities may be pooled together and the liabilities of these entities may then be satisfied from this common pool of assets." In re S & G Fin. Servs. of S. Fla., Inc., 451 B.R. 573, 579 (Bankr. S.D. Fla. 2011) (citing Eastgroup Properties v. Southern Motel Ass'n, Ltd., 935 F.2d 245, 248 (11th Cir. 1991)). Although no provision in the Bankruptcy code specifically authorizes substantive consolidation of separate entities into a single bankruptcy case, bankruptcy courts have the authority to substantively consolidate bankruptcy cases based on their general equitable powers. Eastgroup Properties, 935 F.2d 245 at 248; In re S & G Fin. Servs., 451 B.R. at 579; see also 11 U.S.C. § 105.[2]

---

[2] Section 105(a) of the Bankruptcy Code provides:

In this jurisdiction, the party moving for substantive consolidation must satisfy a two-prong test to establish a prima facie case for substantive consolidation: (1) the movant must show that there is substantial identity between the entities to be consolidated; and (2) that consolidation is necessary to avoid some harm or realize some benefit. Eastgroup Properties, 935 F.2d at 249; In re S & G Fin. Servs., 451 B.R. at 583. "Piercing the corporate veil under an alter-ego theory is not a prerequisite to the utilization of the bankruptcy law remedy of substantive consolidation." Id. at 583. To determine whether the party seeking consolidation has met its initial burden, bankruptcy courts typically look to seven factors:

   a)   The degree of difficulty in segregating and ascertaining individual assets and liability;

   b)   The presence or absence of consolidated financial statements;

   c)   The profitability of consolidation at a single physical location;

   d)   The commingling of assets and business functions;

   e)   The unity of interests and ownership between the various corporate entities;

   f)   The existence of parent and inter-corporate guarantees on loans; and

   g)   The transfer of assets without formal observance of corporate formalities.

Id. at 584 (citing In re Vecco Constr. Indus., 4 B.R. 407, 410 (Bankr. E.D. Va. 1980)).

---

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

This list is not exclusive. <u>Eastgroup Properties</u>, 935 F.2d at 250; <u>In re S & G Fin.</u> <u>Servs.</u>, 451 B.R. at 584. And no single factor is likely to be "determinative of the court's inquiry." <u>Eastgroup Properties</u>, 935 F.2d at 250. "In sum, 'the remedy of substantive consolidation is appropriate . . . when it has been shown that the possibility of economic prejudice which would result with continuing corporate separateness outweighed the minimal prejudice that substantive consolidation might cause.'" <u>In re S & G Fin. Servs.</u>, 451 B.R. at 584 (quoting <u>In re Murray Indus.</u>, 119 B.R. 820, 829 (Bankr. M.D. Fla. 1990)).[3]

### A. There is substantial identity between the entities to be consolidated.

Regarding the first prong, there is a substantial identity between the debtor entities and the affiliated non-debtor entity. The debtor and non-debtor entities are all limited liability companies organized under the laws of the State of Florida, with their principal place of business in Englewood Cliffs, New Jersey. They share the same physical address, manager (Denise Vaknin), and legal and equitable beneficial interest holders (Abe and Denise Vaknin). One of their legal and equitable interest holders is the manager. The entities also exist for the same purpose: owning and operating multi-unit apartment buildings in Miami, Florida. Thus, there is a unity of interests and ownership.

As the injunction proceedings in state court establish, the debtor entities and the non-debtor entity have long been treated as a whole, not in part or individually. The

---

[3] "[D]ue to the nature of substantive consolidation of debtor and non-debtor entities, notice must be provided to all creditors, and such creditors must have an opportunity to be heard." <u>In re S & G Fin. Servs.</u>, 451 B.R. at 585. Once the movant has made a prima facie case for substantive consolidation, the burden then shifts to an objecting creditor "to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation." <u>Eastgroup Properties</u>, 935 F.2d at 249.

receivership demonstrates as much. For over three years, the receiver has maintained the debtor and non-debtor's properties by pooling the resources of all the properties to keep them afloat. The receiver maintains two bank accounts—one is used exclusively for holding payments of advance rent and the other is used as an operating account. In sum, the entities operate under an integrated case management program. Moreover, the non-debtor entity has never filed any claim in this Court against the debtor entities based on its funds being used in the receivership. In other words, the entities have long since operated, and creditors have long since dealt with the entities, as a single, integrated economic unit.

If there is any doubt on this point, it should be resolved with the knowledge that the receivership is at serious risk without the non-debtor's property. The non-debtor's property accounts for nearly 22% of total monthly revenue. The other eight properties produce little net income or are cash flow negative. Simply put, the non-debtor's property acts as the heart of the receivership—and no body can function without a heart. These circumstances demonstrate a degree of difficulty in segregating and ascertaining individual assets and liability, the commingling of assets and business functions, among other factors relevant to this inquiry.

Because several of the <u>Vecco</u> factors exist here, the creditor has met the first prong of the analysis—substantial identity between the entities to be consolidated. <u>See In re S & G Fin. Servs.</u>, 451 B.R. at 584 (debtor and non-debtor entities shared a single officer, director and manager, were 100% owned by same individual, comingled assets and business functions, and freely transferred assets between each other without observing corporate formalities).

**B. Consolidation is necessary to avoid some harm or realize some benefit.**

Turning to the second prong, consolidation is necessary to avoid some harm or realize some benefit. The receivership, as previously mentioned, may not function without the non-debtor's property. And this receivership has produced great results. During the three-year receivership of the nearly 150 units, the receiver has substantially improved the properties—which were originally found in deplorable conditions, including the presence of raw sewage leaking into occupied apartment units. The receiver has also increased the rent roll from rental deposits of $3,150.00 for the period June 10 through June 30, 2015, to rental deposits of $31,311.00 for the month of July 2015, to rental deposits of $48,281.00 for the month of February 2018, and to rental deposits of $57,108.16 for August 2018. The receiver accomplished these impressive results by pooling the resources of all the properties. The non-debtor's property was crucial to this operation. As already mentioned, it accounts for nearly 22% of total monthly revenue. The other eight properties produce little net income or are cash flow negative. Further, the entities have not only long operated as a single, integrated economic unit; creditors have also dealt with them as such.

Thus, the possibility of economic prejudice which would result with continuing corporate separateness outweighs the minimal prejudice that substantive consolidation might cause. See In re S & G Fin. Servs., 451 B.R. at 584-85 ("[T]here is certainly a benefit in allowing creditors to reach assets that would otherwise be unavailable to them, but have an arguable right to access. [T]he Trustee makes a plausible case for showing that the benefit which would be conferred upon creditors is greater than the potential

harm to the non-debtor entities which are alleged to be nothing more than sham entities created to improperly shield the Debtor's assets from creditors.").

## CONCLUSION

For these reasons, the creditor respectfully requests entry of an order for substantive consolidation of the debtor entities and the affiliated non-debtor entity.

City of Miami, a Municipal Corporation
Creditor
444 SW 2 Avenue, Suite 945
Miami, Florida 33130
Telephone:  305-416-1800
Facsimile: 305-416-1801

By:   __/s/ Barnaby Min_____
    Barnaby Min, Esq.
    Deputy City Attorney
    Email: bmin@miamigov.com
    Email: rsdooley@miamigov.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished to those individuals listed to receive e-mail notice/service for this case, via the Notice of Electronic Filing or US Mail this 25th day of September 2018.

Abraham Vaknin*
c/o Gary M. Murphree, Esq.
7385 Southwest 87 Avenue #100
Miami, FL  33173

Linda Leali, Custodian c/o Thomas M. Messana
Messana, P.A.
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301

Gaynisha Williams, Nathanael Mars, Lakeisha Chatfield,
Tamara Chatfield, Shannon Daniels* c/o Rebecca Parsons Schram, Esq.
Legal Services of Greater Miami, Inc.
4343 West Flagler Street, Suite 100
Miami, FL  33134

Miami Development & Holdings, LLC* c/o Michael S. Hoffman, Esq.
Hoffman, Larin & Agnetti, P.A.
909 North Miami Beach Boulevard, #201 North Miami, FL 33162

Gaynisha Williams, Nathanael Mars, Lakeisha Chatfield,
Tamara Chatfield, Shannon Daniels* c/o Joanne Gelfand, Esq.
Luis Casas, Esq.
Akerman LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL  33131

Miami Beverly, LLC* 1336 NW 60, LLC
Reverend, LLC
13300 Alexandria Dr. Holdings, LLC The Holdings at City, LLC
c/o Ido J. Alexander, Esq. and Zach B. Shelomith, Esq. Leiderman Shelomith Alexander
2699 Stirling Road, C-401
Fort Lauderdale, FL  33312-6598

Miami-Dade County Property Tax Collector c/o Alexis Gonzalez
200 NW 2nd Avenue Suite 430
Miami, FL 33128-1733

Office of the U.S. Trustee*
51 Southwest 1st Avenue Suite 1204
Miami, FL 33130-1614

Phoenix Realtors, LLC c/o Andres Parra
6625 Miami Lakes Drive Suite 382
Miami, FL  33014

The Holdings at City II, LLC
99 Roberts Road
Englewood Cliffs, NJ 07632

The Holdings at City II, LLC c/o its Registered Agent Norman Moodie
10410 SW 231 Terrace
Miami, FL  33190

The Holdings at City II, LLC c/o Denise Vaknin,
MGRM 99 Roberts Road
Englewood Cliffs, NJ 07632

Exhibit "**1**"



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Limited Liability Company
THE HOLDINGS AT CITY II, LLC

### Filing Information

| | |
|---|---|
| **Document Number** | L10000048456 |
| **FEI/EIN Number** | 27-2524085 |
| **Date Filed** | 05/05/2010 |
| **Effective Date** | 05/03/2010 |
| **State** | FL |
| **Status** | ACTIVE |

### Principal Address

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

### Mailing Address

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

### Registered Agent Name & Address

Moodie, Norman
10410 SW 231 Ter.
MIAMI, FL 33190

Name Changed: 02/26/2017

Address Changed: 02/26/2017

### Authorized Person(s) Detail

**Name & Address**

Title MGRM

VAKNIN, DENISE
99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2016 | 04/01/2016 |
| 2017 | 02/26/2017 |
| 2018 | 04/30/2018 |



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Limited Liability Company
THE HOLDINGS AT CITY, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L10000042216 |
| **FEI/EIN Number** | 27-2524085 |
| **Date Filed** | 04/20/2010 |
| **Effective Date** | 04/16/2010 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

**Mailing Address**

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

**Registered Agent Name & Address**

Moodie, Norman
10410 SW 231 Ter.
MIAMI, FL 33190

Name Changed: 02/26/2017

Address Changed: 02/26/2017

**Authorized Person(s) Detail**

**Name & Address**

Title MGRM

VAKNIN, DENISE
99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2016 | 03/28/2016 |
| 2017 | 02/26/2017 |
| 2018 | 04/30/2018 |



Department of State  /  Division of Corporations  /  Search Records  /  Detail By Document Number  /

## Detail by Entity Name

Florida Limited Liability Company
REVEREND, LLC

### Filing Information

| | |
|---|---|
| **Document Number** | L10000028841 |
| **FEI/EIN Number** | 27-2524085 |
| **Date Filed** | 03/16/2010 |
| **Effective Date** | 03/15/2010 |
| **State** | FL |
| **Status** | ACTIVE |

### Principal Address

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

### Mailing Address

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

### Registered Agent Name & Address

Moodie, Norman
10410 SW 231 Ter
MIAMI, FL 33190

Name Changed: 02/26/2017

Address Changed: 02/26/2017

### Authorized Person(s) Detail

**Name & Address**

Title MGRM

VAKNIN, DENISE
99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

### Annual Reports

| Report Year | Filed Date |
|---|---|
| 2016 | 03/28/2016 |
| 2017 | 02/26/2017 |
| 2018 | 04/30/2018 |



Department of State / Division of Corporations / Search Records / Detail By Document Number /

# Detail by Entity Name

Florida Limited Liability Company

13300 ALEXANDRIA DR. HOLDINGS, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L10000131744 |
| **FEI/EIN Number** | 27-2524085 |
| **Date Filed** | 12/28/2010 |
| **Effective Date** | 12/24/2010 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 11/17/2016 |

**Principal Address**

1250 NW 62ND STREET, Apt 1
MIAMI, FL 33147

Changed: 01/18/2015

**Mailing Address**

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

Changed: 11/26/2012

**Registered Agent Name & Address**

Moodie, Norman
10410 SW 231 Ter.
MIAMI, FL 33190

Name Changed: 02/26/2017

Address Changed: 02/26/2017

**Authorized Person(s) Detail**

**Name & Address**

Title MGRM

VAKNIN, DENISE
99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632



## Detail by Entity Name

Florida Limited Liability Company

1336 NW 60 LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L11000141875 |
| **FEI/EIN Number** | 38-3865951 |
| **Date Filed** | 12/19/2011 |
| **Effective Date** | 12/19/2011 |
| **State** | FL |
| **Status** | ACTIVE |

**Principal Address**

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

**Mailing Address**

99 ROBERTS ROAD
ENGLEWOOD CLIFFS, NJ 07632

**Registered Agent Name & Address**

Moodie, Norman
10410 SW 231 Ter.
MIAMI, FL 33190

Name Changed: 02/26/2017

Address Changed: 02/26/2017

**Authorized Person(s) Detail**

**Name & Address**

Title MGRB

Vaknin, Denise
99 roberts rd
Englewood Cliffs, NJ 07632

**Annual Reports**

| Report Year | Filed Date |
|---|---|
| 2016 | 03/28/2016 |
| 2017 | 02/26/2017 |
| 2018 | 04/30/2018 |



Department of State / Division of Corporations / Search Records / Detail By Document Number /

## Detail by Entity Name

Florida Limited Liability Company
MIAMI BEVERLY, LLC

**Filing Information**

| | |
|---|---|
| **Document Number** | L09000066684 |
| **FEI/EIN Number** | 27-2524085 |
| **Date Filed** | 07/10/2009 |
| **State** | FL |
| **Status** | ACTIVE |
| **Last Event** | REINSTATEMENT |
| **Event Date Filed** | 10/18/2016 |

**Principal Address**

99 ROBERTS RD
ENGLEWOOD CLIFFS, NJ 07632

Changed: 03/06/2012

**Mailing Address**

99 ROBERTS RD
ENGLEWOOD CLIFFS, NJ 07632

Changed: 03/06/2012

**Registered Agent Name & Address**

Moodie, Norman
10410 SW 231 Ter.
MIAMI, FL 33190

Name Changed: 02/26/2017

Address Changed: 02/26/2017

**Authorized Person(s) Detail**

**Name & Address**

Title MGMR

VAKNIN, DENISE
99 ROBERT ROAD
ENGLEWOOD CLIFFS, NJ 07632

# Exhibit "2"

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CITY OF MIAMI,

        Plaintiff,

vs.

MIAMI BEVERLY LLC;
1336 NW 60 LLC;
REVEREND LLC;
13300 ALEXANDRIA DRIVE HOLDINGS LLC;
THE HOLDINGS AT CITY LLC;
THE HOLDINGS AT CITY II LLC

        Defendants.

_____/

CIRCUIT CIVIL DIVISION

CASE NO.:  14-27781 CA 01 (23)

### ORDER APPOINTING RECEIVER

THIS CAUSE having come before the Court for hearing June 4, 2015 on the Plaintiff's

Motion for Appointment of Receiver, and the Court having reviewed the file, heard the

testimony, and being otherwise duly advised in the premises, it is hereby:

ORDERED AND ADJUDGED as follows:

1.     The Plaintiff's Motion for Appointment of a Receiver is GRANTED.  It is undisputed

that the properties that are the subject of this cause are in serious disrepair and threaten the

health, safety and welfare of the community.  Additionally, there are large monetary sums owed

to the Plaintiff as a result of outstanding liens due to, among other things, code violations, and

the continual accrual of per diem penalties.    A receiver is necessary to properly manage and

prevent the continued deterioration of these properties (thereby also protecting the community)

and to maximize their income producing potential. These properties require regular, ongoing

management and/or maintenance services in order to retain and possibly increase their value,

1

including without limitation retaining existing tenants, attracting new tenants, and completing necessary measures intended to allow full realization of their value, and to correct all code violations.

2.     Linda Leali, Esq., [hereinafter "Receiver"], 777 Brickell Avenue, Ste. 1210, Miami, Florida 33131, is appointed Receiver of the properties commonly described as follows:

     a.  1341 NW 60th Street, Miami, Florida;
     b.  1335 NW 60th Street, Miami, Florida;
     c.  6820 NW 17th Avenue, Miami, Florida;
     d.  1710 NW 1st Court, Miami, Florida;
     e.  1730 NW 1st Court, Miami, Florida;
     f.  1558 NW 1st Avenue, Miami, Florida;
     g.  1231 NW 61st Street, Miami, Florida;
     h.  6040 NW 12th Avenue, Miami, Florida; and
     i.  1250 NW 62nd Street, Miami, Florida.

[hereinafter collectively referred to as the "Property"[1]].

Receiver has agreed to an hourly rate of $300.00 for her services and $125.00 for her administrative staff, and shall be entitled to same for work reasonably and properly performed.

3.     Within two (2) days from the date of this order, Receiver shall post a bond in the amount of $30,000.00, to secure her performance as such, and file her Oath of Receiver wherein she agrees to undertake the faithful performance of her receivership duties and obligations.

4.     Once the bond is posted and the Oath is filed, Receiver shall immediately ensure that the Property is appropriately insured, and shall take immediate possession and control of the Property, together with all improvements thereon, revenues, income, profits, deposits, existing accounts, cash on hand, contracts of purchase and sale, leases, permits, certificates and books and records pertaining to such Property. The Receiver shall act in accordance with and shall have all of the usual, necessary and incidental powers of a receiver afforded by Florida Law,

---

[1] Note: "Property" can also refer to a specific property and not all the properties together, depending on the context.

(subject to limitations set forth in this order) to maintain, operate and preserve the Property including the powers and authority enumerated in this Order.

5.     Upon the entry of this Order, Defendants are ordered to cooperate with the Receiver in the transition of the administration and management of the Property and within three (3) days of this Order Date shall disclose and provide copies to the Receiver of all of the following pertaining to the Property (to the extent that such items are in its possession, custody or control):

  a. All keys.

  b. All records pertaining to occupancy including by way of illustration but not limitation, all leases, rent rolls, credit card billings, and cash receipt journals;

  c. Any tenant or occupant ledgers;

  d. The petty cash fund, if any;

  e. A current aged account receivables or delinquency report;

  f. An aged listing of all trade payables and other payables;

  g. A copy of any records relating to operating expenses for the Property;

  h. A list of utilities and utility accounts;

  i. Year-end 2014 operating statement with general ledgers and year-to-date 2015 operating statement with general ledgers;

  j. All on-site employee payroll records and employee files and applications;

  k. An inventory of all equipment, furniture, vehicles, and supplies for the Property;

  l. All existing service contracts;

  m. All franchise, management and/or operating agreements, including all amendments;

  o. All pending bids for contractor work;

  p. The Declaration page of all insurance policies on the Property and their terms, evidence of coverage and contact information for any insurance agent;

  q. All vendor insurance certificates;

  r. Surveys, floor plans and drawings, to the extent Defendants have any;

  s. Documents identifying and summarizing all pending litigation (excluding this action);

  t. All electronic documents, related to the operation of the Property, including but not limited to, all records concerning the profits, finances, issues and operation and management of the Property, accounts with any financial institutions, vendors, suppliers, merchants, and tenants, Defendants' tax identification numbers;

  u. Any permits and approvals;

  v. All tenant security deposits and any other security deposits from any potential buyers;

  w. All listing agreements for the Property;

x.    All information and documents regarding any remaining warranty items from contractors, sub-contractors, or manufacturers from construction of the buildings on the Property and a list of all contractors and sub-contractors who constructed the buildings on the Property; and

y.    Such other records pertaining to the management of the Property as may be reasonably determined to be necessary by the Receiver.

6.    Defendants and any third parties receiving notice of this Order shall also surrender to the Receiver and account for all monies that they currently or may later possess (and/or that is or becomes subject to their control) from revenue, profits, rents and/or income collected from the operation of the Property, including any money held in accounts maintained by Defendants at any financial institution related to the Property.

7.    Defendants and its property managers, affiliates, operators, employees, and agents are prohibited from removing any personal property belonging to the Property or diverting any Property income or rents.

8.    Defendants shall fully cooperate with the Receiver in adding the Receiver as additional insured and the Receiver as a loss payee on all insurance relating to the operation and management of the Property including, but not limited to, fire, extended coverage, property damage, liability, fidelity, errors and omissions, and workers' compensation, automobile liability and umbrella liability coverage related to the Property. Defendants and their property managers, employees, and agents are prohibited from cancelling, reducing, or modifying any and all insurance coverage in existence with respect to the Property.  In the alternative, the Receiver may, in her reasonable discretion replace the insurance relating to the operation and management of the Property.

9.    Immediately upon the posting of the bond and the filing of her Oath, and continuing until expiration or termination of the receivership, the Receiver shall perform all of the following that

from time to time applies and/or is necessary to preserve and protect the Property and community, and is vested with the authority, powers and duties delineated below:

a. To maintain, secure, manage, operate, repair, and preserve the Property;

b. To change any and all locks to the Property (if deemed appropriate by Receiver) and, if appropriate, limit access to some or all of the Property;

c. To assume control over the Property and to collect and receive all Income from the Property;

d. To prepare and maintain complete books, records, and financial reports of the Property, including, but not limited to, operating statements, income statements, balance statements, and all other statements prepared for the Property in a form acceptable to the Court;

e. To hire, or discharge, on-site employees or independent contractors without any liability to the Parties;

f. To establish pay rates for any on-site employees;

g. To review existing workers' compensation, disability, general liability and "all risks" hazard insurance and to purchase such insurance, including automobile liability coverage and umbrella coverage, in an amount determined appropriate by the Receiver to protect the Property, and name the Plaintiff, the Receiver, any Property manager and Defendants as additional insureds, as the Receiver deems appropriate for the Property's preservation and protection;

h. To maintain a separate account with a federally insured banking institution or a savings association with offices in the State of Florida in the name of the Receiver, from which the Receiver shall disburse all authorized payments as provided in this Order;

i. To receive and endorse checks pertaining to the Property either in the Receiver's name or Defendants' name;

j. To pay all appropriate real estate taxes, personal Property taxes, sales or use taxes, any other taxes or assessments against the Property under Defendants' tax identification number;

k. To prepare and file any tax returns stemming from the Property and the operation of the Property as may be required by law (including gross receipts, sales and use or other tax returns). The Receiver shall not be responsible for the preparation and filing of any income tax returns for the Defendants, but shall, within thirty (30) days of receipt of a written request to do so, provide Defendants with information relating to the operation of the Property arising from and after the date of her appointment as Receiver in order to permit Defendants to file its/their income tax returns. Defendants shall provide to the Receiver any information needed to file any tax returns for the Property;

l. To contest, protest, or appeal any ad valorem tax or assessment, real estate tax, personal Property tax, or other tax or assessment pertaining to the Property, should she deem it appropriate. Any refund or reimbursement of taxes whether paid by the Receiver or Defendants shall be deemed Income;

m. To operate the Property under any existing name or trade name (or new name, if the Receiver deems appropriate to do so);

n. To open and review mail directed to Defendants and their representatives pertaining to the Property;

o. To seek assistance of law enforcement officials as necessary to preserve the peace and protect the Property;

p. To continue, manage, operate, lease, market, and negotiate, modify, cancel, or enter into listing agreements and contracts to lease the Property;

q. To enforce, amend, terminate any existing contract(s) not required for the operation of the Property;

r. To reject any unexpired contract(s) entered into by Defendants, and/or its authorized agent, that are not required for the operation of the Property;

s. To execute, cancel, modify, renegotiate, or abrogate all service, maintenance or other contracts relating to the operation of the Property;

t. To make payments and disbursements, in the ordinary course of business, as may be needed and proper for the preservation of the Property;

u. To maintain appropriate insurance, continue any current policies in place, and purchase further insurance as the Receiver deems appropriate, as defined below, and shall name the Plaintiff, any property manager and Defendants, as additional insureds, and Plaintiff as loss payee;

v. To enter into leases and do all things necessary to continue normal property operation;

w. To modify existing contracts in the ordinary course of the business of the Property;

x. To pay all utilities, expenses and other obligations secured by, or which may give rise to liens, and all other outstanding obligations to suppliers and servicers in the ordinary course of business, including, obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership;

y. To make repairs necessary for the maintenance of the Property, in order to preserve the Property in the ordinary course of business, provided, however, that the Receiver shall not make any improvements, repairs and/or remediations having a cost of $2,500.00 or more on any given individual rental unit without first obtaining approval from the Court;

z. In the event the cost of improvements, repairs and/or remediations to individual rental units cost $2,500 or more, to engage contractors and skilled trades on a competitive bid basis, and to execute such contracts for such purposes as the Receiver deems appropriate, but ***must first seek court approval***;

aa. To borrow funds for purposes relating to the operation of the Property. However, the Receiver shall not borrow funds without first providing the Plaintiff and Defendants with advance written notice and a reasonable opportunity to elect to advance funds required by the Receiver, and ***must first seek court approval***;

bb. To take all steps necessary to comply with all requirements, regulations and laws applicable to the Property, and to deal with all regulatory authorities in connection with the same;

cc. To employ, if necessary, bookkeeping, accounting, legal and clerical services deemed necessary for the proper management of the Property, but *must first seek court approval* and justify the work required and the charges/fees/wages incurred as a result;

dd. To employ a manager or managing company to perform the planning, scheduling and supervising of all on-site services as directed by the Receiver, including but not limited to, managing tenant rosters, on-site collection of rents, coordinating any and all inspections and repairs, scheduling and supervising the activities of all other on-site vendors, managing and coordinating communications with the Receiver and other pertinent parties, and any other pertinent on-site services requested by the Receiver, but *must first seek court approval for rates and fees charged for specific services*; and

ee. To institute, prosecute, defend, compromise, and/or intervene in, or become a party to, such actions or proceedings in state or federal courts which may, in the Receiver's opinion, be necessary for the protection, maintenance and preservation of the Property, for the carrying out of the terms of any order of the Court affecting the Property, to collect rents and other amounts now or hereafter becoming due, to evict and/or remove tenants or other persons or entities from the Property, and/or to defend against any action brought against the Receiver acting in such capacity. This also applies to administrative proceedings, arbitrations, or other proceedings that involve the Property.

10. Notwithstanding the foregoing, the Receiver and the Receivership estate shall not be liable for the payment of taxes of any kind, assessments, goods, or services provided to Defendants or the Property or utility charges prior to the date of this Order.

11. Any individual or entity receiving a copy of this Order is hereby enjoined and restrained from discontinuing service to the Receiver or the Property based upon the non-payment of such taxes, assessments, goods or services or utilities prior to the date of this Order and from attempting to collect taxes, assessments, invoices, and utility charges from Receiver predating the date of this Order. Each utility company or entity providing service to the Property shall forthwith transfer any deposits which it holds to the exclusive control of the Receiver and shall be prohibited from demanding that Receiver deposit additional funds in advance to maintain or secure such service.

12. The Receiver is directed to prepare and file within thirty (30) days of the date of this Order and on the tenth day of each month thereafter, so long as the Receivership is in force, a

report as is required by Fla.R.Civ.Pr. 1.620, under oath, setting forth and reporting all changes in assets in her charge or claims against the assets that have occurred during the preceding month. [The first report due July 10, 2015, shall be for the period ending June 30, 2015]. The Receiver shall file such reports with the Clerk of this Court and shall serve a copy of each report upon counsel for Plaintiff, the Defendants, and the Court. The Report must clearly and separately account for the different properties within the Property.

13.     Without limiting or expanding the foregoing, the Receiver is authorized to exercise all powers generally available and shall be subject to all the duties of a Receiver under the laws of the State of Florida that may be incidental to the management and operation of the Property, as described in this Order. The Receiver shall have any additional powers that are provided by law and that the Court may from time to time direct or confirm.

14.     The Receiver shall, during the pendency of this action, have the right to apply to this Court for further instructions or directions.

15.     The authority granted to the Receiver is self-executing, unless the action requires approval. The Receiver is authorized to act on behalf of and in Defendants' name (or the Receiver's name), as the Receiver deems appropriate without further order of this Court and without personal recourse against the Receiver (subject to the general provisions, below).

16.     In the event that the revenue from the Property is not sufficient to pay the expenses of the preservation, operation, maintenance or restoration of the Property in accordance with the terms of this Order, and to pay the Receiver, Plaintiff is hereby specifically authorized to advance, at Plaintiff's sole discretion, said sums to the Receiver as are necessary for the payment of same, and the Receiver may issue Receiver Certificates upon terms, including interest rate, approved by order of the Court, to reflect and secure said advancements.

17.     All advances to the Receiver by Plaintiff for the benefit of the Property excluding fees and costs of the Receiver, but including any advances for working capital or improvements shall be deemed protective advances.  Any such protective advance shall be fully secured by a first priority mortgage lien and security interest against the Property. All such funds advanced, including interest on advances, shall be deemed a prior lien before the repayment of any and all other claims against the Property (except for taxes and assessments having first priority as a matter of law) or proceeds of either of them.

18.     Each month the Receiver, her attorneys, accountants and bookkeepers, shall be authorized to receive compensation for the time they have devoted to this Receivership.  The Receiver shall submit to the parties an account of the fees and other charges incurred and revenues received.  The parties shall have ten (10) days thereafter to file any objection to the compensation requested.  If no objections are filed, the Receiver is authorized to make payment to herself, and her attorneys, accountants and bookkeepers for the services for the applicable period from any source received by the Receiver as assets of this Receivership without further order of this Court.  Any timely objection shall be brought on for an expedited hearing for a resolution by this Court.  The Receiver's fees and expenses incurred by the Receiver in the proper performance of her duties hereunder, shall be paid to the extent funds are available, first from the revenues derived from the operation or liquidation of the Property, and if these are not sufficient, then from the proceeds of receiver certificates, as set forth above.

19.     Nothing in this Order shall require the Receiver to advance funds other than from Income or from other funds made available to the Receiver pursuant to the terms of this Order without a bond or security for payment satisfactory to the Receiver.

20.     The Receiver shall not be liable for any claim, obligation, liability, action, cause of action, cost or expense of Defendants or the Property arising out of or relating to events or

circumstances occurring prior to the entry of this Order, including without limitation, any contingent or unliquidated obligations and any liability from the performance of services rendered by third parties on behalf of Defendants and any liability to which Defendants are currently or may ultimately be exposed under any applicable laws pertaining to the ownership, use or operation of the Property (collectively all of the foregoing is referred to as "Pre-Receivership Liabilities"). The Receiver shall not be obligated to advance any funds to pay any Pre-Receivership Liabilities.

21.    The Receiver and the Receiver's attorneys and agents: (i) may rely on any and all outstanding court orders, judgments, decrees and rules of law, and shall not be liable to anyone for their own good faith compliance with any such order, judgment, or decree or rule of law; (ii) may rely on, and shall be protected in any action upon, any resolution, certificate, statement, opinion, report, notice, consent, or other document believed by them to be genuine and to have been signed or presented by the proper parties; (iii) shall not be liable to anyone for their good faith compliance with their duties and responsibilities as receiver, or as attorney or agent for the Receiver; and (iv) shall not be liable to anyone for their acts or omissions, except upon a finding by this Court that such acts or omissions were outside the scope of their duties or were grossly negligent. Except for matters set forth in subsection (iv), persons dealing with the Receiver shall only look to the Receivership assets to satisfy any liability, and neither the Receiver nor her attorneys or agents shall have any personal liability to satisfy any such obligation.

22.    No person or entity shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting a suit or action provided, however, that no prior Court order is required to file a motion in this action arising from the Receiver's gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with this Order or any other order of this Court in this action.

23.    The Receiver and her employees, agents and attorneys shall have no personal liability in connection with any liabilities, obligations, liens, or amounts owed to any of Defendants' creditors because of her duties as Receiver. Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be solely determined in accordance with Florida law.

24.    The Receiver and her employees, agents, and attorneys shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with this Court's orders.

25.    Defendants, all Property managers of Defendants and all those in active participation or concert with them who receive notice of this Order, and all those having claims against the Property, who receive notice of this Order, are enjoined from and shall not:

    a.  Commit Waste. Commit or permit any waste on all or any part of the Property, or suffer, commit or permit any act on all or any part of the Property in violation of the law, or remove, transfer, encumber, or otherwise dispose of any of the Property.

    b.  Collect Income. Demand, collect, receive, discount, or in any other way divert or use any of the Income.

    c.  Terminate Any Utility Service. Terminate or withhold any electric, gas, water, sewer, telephone, or other utility service supplying the Property, require any utility deposit or otherwise interfere with the continued operations of the Property.

    d.  Interfere with the Receiver. Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Property.

    e.  Transfer (without Court approval) or Encumber (other than to refinance) the Property. Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage (except to refinance), create a security interest in, encumber (except to refinance), conceal, or in any manner whatsoever deal in or dispose of the whole or any part of the Property including, but not limited to, the Income without prior court order.

    f.  Impair the Preservation of the Property. Do any act which will, or which will tend to impair, defeat, divert, prevent, or prejudice the preservation of the Property, including the Income, or the preservation of Plaintiff's interests in the Property and the Income.

26.     The Receiver shall faithfully perform and discharge the Receiver's duties in accordance with this order.

27.     The Court finds there is no just reason for delay and therefore enters this Order as a final order.

28.     The Court shall retain jurisdiction over this action, the Property, and the parties for the purpose of giving such other relief upon proper showing as is consistent with this Order and substantial justice.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 06/10/15.

BARBARA ARECES
CIRCUIT COURT JUDGE

> No Further Judicial Action Required on **THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter. The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

Exhibit "**3**"

Filing # 77983241 E-Filed 09/17/2018 01:21:01 PM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 2014-27781 CA 23

CITY OF MIAMI, a Florida Municipal
Corporation,

          Plaintiff,

    vs.

THE HOLDINGS AT CITY II, LLC.,

        Defendant(s).

_____/

**<u>CITY OF MIAMI'S
WRITTEN RESPONSE AND ARGUMENT
TO DEFENDANT, THE HOLDINGS AT
CITY II, LLC., MOTION TO RELEASE
COMPLIANT PROPERTY</u>**

      The Plaintiff, CITY OF MIAMI ("CITY"), files this Response to Defendant, The Holding

at City II, LLC.s' ("CITY II"), Motion to Close Violations and states:

**<u>FACTS OF THE CASE</u>**

      1.  Originally this motion was filed and included the other Defendants' in this case, but

now it only pertains to CITY II, The Holdings at City II, LLC., which owns the property located

at 1558 NW 1 Avenue, Miami, Florida.

      2.  When the CITY moved to sell the other Defendants' properties at a Sheriff's sale for

their continual failure to comply with the injunction as well as the money judgment awarded by

this Court, the other Defendants' sought the protection of Federal bankruptcy court in case 2018-

14506 BKC LMI in early 2018.

      3.  The other Defendants chose to shield themselves from this Court's ordered money

judgment by filing the Chapter 11 bankruptcy case voluntarily. This Court entered a stay order on

April 18, 2018, based upon the filing.

4.   At the beginning of this case, June 10, 2015, this Court entered an order appointing Linda Leali, Esq., as the Court-Appointed Receiver ("Receiver"). A copy of that order is attached as Exhibit A.

5.   In the Order, the Court grants the Receiver the power "to maintain, operate and preserve the Property including the powers and authority enumerated in this Order." *See* paragraph 4.

6.   The Receiver has maintained the property to the best of her ability by pooling the resources of all the properties to keep them afloat. The CITY II owner has provided no capital for day to day management and spent approximately eighteen (18) months refusing to cooperate with the Receiver or this Court's orders.

7.   The properties operated as a collection whole cannot sufficiently fund the costs of the Receiver and her counsel and their current outstanding fees total $51,216.07. Exhibit B.

8.   Paragraph 25(d) of the Receivership Order provides any party may not, "Directly or indirectly interfere in any many with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Property."

9.   On August 17, 2018, the CITY II filed their "Argument in Support of the 4th Amended Motion for Release of Compliant Properties" and have adjusted their motion only to pertain to CITY II and the testimony taken at the evidentiary hearing late last year before the Court. The basis of the motion is that since the other properties are in bankruptcy and the CITY II property has closed in code violations, it may be released from this Court's and the Receiver's control.

**<u>ARGUMENT</u>**

All of the properties that have been a part of this case are owned by the same person. In filing this motion, they have decided to use the shield of Bankruptcy court as a sword against the Receiver to gut her ability to maintain and manage the properties. This should not stand.

From the very beginning of this case, CITY II and the other defendants have been obstinate, defiant, flouted the Court's orders, appealed the Court's order at every opportunity and even had the temerity to violate this Court's order by personally suing the Receiver. The Injunction and Receivership Orders in this case requires both the payment of the money judgment, the compliance of the properties, the managing of the properties and the payment of the fees and costs incurred by the Receiver.

The parties agree that there are no current pending code violations on the property owned by CITY II. However, this is not the extent of their obligation to this Court. CITY II argued to this Court that under paragraph 11 of the "Agreed Order on Defendants' Amended Motion to Close Violations" which was signed October 24, 2016, allows this Court to release their property and pay any costs or fees of the Receiver later. That is patently false. Paragraph 11 states, "This Court reserves jurisdiction to consider whether and on what conditions the Properties or Property shall be released to the Defendants upon the successful correction of all code violation."

The Receiver testified at the hearing before this Court on December 4, 2017, that the CITY II property provides $9,470.00 per month in rent which amounts to almost 20% of the available operating costs for the Receivership as a whole. See Transcript Page 39, Lines 4 – 10. Exhibit C. If tomorrow the Bankruptcy Defendants' voluntarily withdrew their petition, this case would head directly back to this Court and the Receiver would be incapable of operating the combined properties as a whole. Today, CITY II owner's bankruptcy counsel has asked to set off the auction and sale of the properties until December of 2018, even though the Bankruptcy Court has already made in clear the sale, whether by contract or auction, is to be completed by the end of October. The property owner refusal to abide by timelines and continued obfuscation has continued.

These properties have been run since June of 2015 as a single entity and have only survived as such as the property owner has refused to assist in any way with or pay continually pay the fees

1039662

and costs of the Receiver. The Receiver and her counsel are owed over $50,000.00 as of today and somewhere over $30,000.00 prior to the bankruptcy filing. Now, once again, the owner is trying to escape their judgment day. CITY II cannot walk away from this Injunction while the Receiver is still owed monies. CITY II also cannot attempt to burden the Receiver fees on the CITY as that is well settled law under Barredo v. Skyfreight, Inc., 430 So.2d 718 (Fla. 3d DCA 1990).

Any determination of factors for release of a property in this injunction, should at a minimum, require the Receivership to be paid up to date. CITY II is jointly liable for any of these fees as are any of the other Defendants' who are currently under a stay order. At no point should this Court rely on any argument that such matters are being dealt with in Bankruptcy Court as who knows for how little or how much the sale will be and whether it will even cover those fees. Furthermore, no consideration should be given to the idea that they will pay once the CITY II property is sold. CITY II ownership has not acted in general good faith for more than three and one half years and should not, at this time, be given any benefit of the doubt.

A second factor to be considered should be ability of the Receivership to function. The same Receivership that was appointed by this Court is also the party managing the stay properties in Bankruptcy. Any release of the CITY II property would be a violation of Paragraph 25 of this Court's Receivership order as outlined above.

Lastly, all the properties have been prosecuted in this injunction as whole, not in part and not individually at any point and time. As it held at the beginning of the case, it is still true today, the interests, health, safety and welfare of these properties are interdependent. The Defendant owner created that problem through their abject neglect overs years and years and they should not be able to attempt to benefit using Federal and State courts against each other.

1039662

WHEREFORE, the CITY respectfully request that this Court deny this Motion to release

the property owned by CITY II for the reason stated above and find for any other relief deemed

necessary and appropriate.  Should this Court grant CITY II's motion, CITY respectfully request

a stay pending appeal be entered as allowed for under Fla. R. C. P. 9.130.


Respectfully submitted,

RACHEL S. GLORIOSO DOOLEY,
Senior Assistant City Attorney
Attorneys for **City of Miami**
444 S.W. 2nd Avenue, Suite 945
Miami, FL  33130-1910
Tel.: (305) 416-1800
Fax: (305) 416-1801
Email: rsdooley@miamigov.com
Secondary Email: smfernandez@miamigov.com

By:   /s/*Rachel S. Glorioso Dooley*
     Rachel S. Glorioso Dooley,
     Senior Assistant City Attorney
     Florida Bar No. 121983

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished to those individuals listed below by e-mail generated by My Florida Courts E-Filing Portal this 17th day of September 2018.

By:   /s/*Rachel S. Glorioso Dooley*
Rachel S. Glorioso Dooley,
Senior Assistant City Attorney
Florida Bar No. 121983

## SERVICE LIST

Renee M. Smith, Esq.
Attorney for Defendants
renee@smithtitleservices.com

Linda Leali, Esq.
Court Appointed Receiver
lleali@lealilaw.com

Thomas Messana, Esq.
Attorney for the Receiver
tmessana@messana-law.com

1039662

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CITY OF MIAMI,                                    CIRCUIT CIVIL DIVISION

        Plaintiff,                               CASE NO.: 14-27781 CA 01 (23)

vs.

MIAMI BEVERLY LLC;
1336 NW 60 LLC;
REVEREND LLC;
13300 ALEXANDRIA DRIVE HOLDINGS LLC;
THE HOLDINGS AT CITY LLC;
THE HOLDINGS AT CITY II LLC

        Defendants.

_____/

## ORDER APPOINTING RECEIVER

THIS CAUSE having come before the Court for hearing June 4, 2015 on the Plaintiff's

Motion for Appointment of Receiver, and the Court having reviewed the file, heard the

testimony, and being otherwise duly advised in the premises, it is hereby:

ORDERED AND ADJUDGED as follows:

1.    The Plaintiff's Motion for Appointment of a Receiver is GRANTED.  It is undisputed

that the properties that are the subject of this cause are in serious disrepair and threaten the

health, safety and welfare of the community.  Additionally, there are large monetary sums owed

to the Plaintiff as a result of outstanding liens due to, among other things, code violations, and

the continual accrual of per diem penalties.   A receiver is necessary to properly manage and

prevent the continued deterioration of these properties (thereby also protecting the community)

and to maximize their income producing potential. These properties require regular, ongoing

management and/or maintenance services in order to retain and possibly increase their value,

1


EXHIBIT
A

including without limitation retaining existing tenants, attracting new tenants, and completing necessary measures intended to allow full realization of their value, and to correct all code violations.

2.     Linda Leali, Esq., [hereinafter "Receiver"], 777 Brickell Avenue, Ste. 1210, Miami, Florida 33131, is appointed Receiver of the properties commonly described as follows:

     a.  1341 NW 60th Street, Miami, Florida;
     b.  1335 NW 60th Street, Miami, Florida;
     c.  6820 NW 17th Avenue, Miami, Florida;
     d.  1710 NW 1st Court, Miami, Florida;
     e.  1730 NW 1st Court, Miami, Florida;
     f.   1558 NW 1st Avenue, Miami, Florida;
     g.  1231 NW 61st Street, Miami, Florida;
     h.  6040 NW 12th Avenue, Miami, Florida; and
     i.   1250 NW 62nd Street, Miami, Florida.

[hereinafter collectively referred to as the "Property"[1]].

Receiver has agreed to an hourly rate of $300.00 for her services and $125.00 for her administrative staff, and shall be entitled to same for work reasonably and properly performed.

3.     Within two (2) days from the date of this order, Receiver shall post a bond in the amount of $30,000.00, to secure her performance as such, and file her Oath of Receiver wherein she agrees to undertake the faithful performance of her receivership duties and obligations.

4.     Once the bond is posted and the Oath is filed, Receiver shall immediately ensure that the Property is appropriately insured, and shall take immediate possession and control of the Property, together with all improvements thereon, revenues, income, profits, deposits, existing accounts, cash on hand, contracts of purchase and sale, leases, permits, certificates and books and records pertaining to such Property.  The Receiver shall act in accordance with and shall have all of the usual, necessary and incidental powers of a receiver afforded by Florida Law,

---

[1] Note: "Property" can also refer to a specific property and not all the properties together, depending on the context.

(subject to limitations set forth in this order) to maintain, operate and preserve the Property including the powers and authority enumerated in this Order.

5.      Upon the entry of this Order, Defendants are ordered to cooperate with the Receiver in the transition of the administration and management of the Property and within three (3) days of this Order Date shall disclose and provide copies to the Receiver of all of the following pertaining to the Property (to the extent that such items are in its possession, custody or control):

a.      All keys.

b.      All records pertaining to occupancy including by way of illustration but not limitation, all leases, rent rolls, credit card billings, and cash receipt journals;

c.      Any tenant or occupant ledgers;

d.      The petty cash fund, if any;

e.      A current aged account receivables or delinquency report;

f.      An aged listing of all trade payables and other payables;

g.      A copy of any records relating to operating expenses for the Property;

h.      A list of utilities and utility accounts;

i.      Year-end 2014 operating statement with general ledgers and year-to-date 2015 operating statement with general ledgers;

j.      All on-site employee payroll records and employee files and applications;

k.      An inventory of all equipment, furniture, vehicles, and supplies for the Property;

l.      All existing service contracts;

m.      All franchise, management and/or operating agreements, including all amendments;

o.      All pending bids for contractor work;

p.      The Declaration page of all insurance policies on the Property and their terms, evidence of coverage and contact information for any insurance agent;

q.      All vendor insurance certificates;

r.      Surveys, floor plans and drawings, to the extent Defendants have any;

s.      Documents identifying and summarizing all pending litigation (excluding this action);

t.      All electronic documents, related to the operation of the Property, including but not limited to, all records concerning the profits, finances, issues and operation and management of the Property, accounts with any financial institutions, vendors, suppliers, merchants, and tenants, Defendants' tax identification numbers;

u.      Any permits and approvals;

v.      All tenant security deposits and any other security deposits from any potential buyers;

w.      All listing agreements for the Property;

> x.     All information and documents regarding any remaining warranty items from contractors, sub-contractors, or manufacturers from construction of the buildings on the Property and a list of all contractors and sub-contractors who constructed the buildings on the Property; and
>
> y.     Such other records pertaining to the management of the Property as may be reasonably determined to be necessary by the Receiver.

6.     Defendants and any third parties receiving notice of this Order shall also surrender to the Receiver and account for all monies that they currently or may later possess (and/or that is or becomes subject to their control) from revenue, profits, rents and/or income collected from the operation of the Property, including any money held in accounts maintained by Defendants at any financial institution related to the Property.

7.     Defendants and its property managers, affiliates, operators, employees, and agents are prohibited from removing any personal property belonging to the Property or diverting any Property income or rents.

8.     Defendants shall fully cooperate with the Receiver in adding the Receiver as additional insured and the Receiver as a loss payee on all insurance relating to the operation and management of the Property including, but not limited to, fire, extended coverage, property damage, liability, fidelity, errors and omissions, and workers' compensation, automobile liability and umbrella liability coverage related to the Property. Defendants and their property managers, employees, and agents are prohibited from cancelling, reducing, or modifying any and all insurance coverage in existence with respect to the Property.  In the alternative, the Receiver may, in her reasonable discretion replace the insurance relating to the operation and management of the Property.

9.     Immediately upon the posting of the bond and the filing of her Oath, and continuing until expiration or termination of the receivership, the Receiver shall perform all of the following that

from time to time applies and/or is necessary to preserve and protect the Property and community, and is vested with the authority, powers and duties delineated below:

a. To maintain, secure, manage, operate, repair, and preserve the Property;
b. To change any and all locks to the Property (if deemed appropriate by Receiver) and, if appropriate, limit access to some or all of the Property;
c. To assume control over the Property and to collect and receive all Income from the Property;
d. To prepare and maintain complete books, records, and financial reports of the Property, including, but not limited to, operating statements, income statements, balance statements, and all other statements prepared for the Property in a form acceptable to the Court;
e. To hire, or discharge, on-site employees or independent contractors without any liability to the Parties;
f. To establish pay rates for any on-site employees;
g. To review existing workers' compensation, disability, general liability and "all risks" hazard insurance and to purchase such insurance, including automobile liability coverage and umbrella coverage, in an amount determined appropriate by the Receiver to protect the Property, and name the Plaintiff, the Receiver, any Property manager and Defendants as additional insureds, as the Receiver deems appropriate for the Property's preservation and protection;
h. To maintain a separate account with a federally insured banking institution or a savings association with offices in the State of Florida in the name of the Receiver, from which the Receiver shall disburse all authorized payments as provided in this Order;
i. To receive and endorse checks pertaining to the Property either in the Receiver's name or Defendants' name;
j. To pay all appropriate real estate taxes, personal Property taxes, sales or use taxes, any other taxes or assessments against the Property under Defendants' tax identification number;
k. To prepare and file any tax returns stemming from the Property and the operation of the Property as may be required by law (including gross receipts, sales and use or other tax returns). The Receiver shall not be responsible for the preparation and filing of any income tax returns for the Defendants, but shall, within thirty (30) days of receipt of a written request to do so, provide Defendants with information relating to the operation of the Property arising from and after the date of her appointment as Receiver in order to permit Defendants to file its/their income tax returns. Defendants shall provide to the Receiver any information needed to file any tax returns for the Property;
l. To contest, protest, or appeal any ad valorem tax or assessment, real estate tax, personal Property tax, or other tax or assessment pertaining to the Property, should she deem it appropriate. Any refund or reimbursement of taxes whether paid by the Receiver or Defendants shall be deemed Income;
m. To operate the Property under any existing name or trade name (or new name, if the Receiver deems appropriate to do so);

n. To open and review mail directed to Defendants and their representatives pertaining to the Property;

o. To seek assistance of law enforcement officials as necessary to preserve the peace and protect the Property;

p. To continue, manage, operate, lease, market, and negotiate, modify, cancel, or enter into listing agreements and contracts to lease the Property;

q. To enforce, amend, terminate any existing contract(s) not required for the operation of the Property;

r. To reject any unexpired contract(s) entered into by Defendants, and/or its authorized agent, that are not required for the operation of the Property;

s. To execute, cancel, modify, renegotiate, or abrogate all service, maintenance or other contracts relating to the operation of the Property;

t. To make payments and disbursements, in the ordinary course of business, as may be needed and proper for the preservation of the Property;

u. To maintain appropriate insurance, continue any current policies in place, and purchase further insurance as the Receiver deems appropriate, as defined below, and shall name the Plaintiff, any property manager and Defendants, as additional insureds, and Plaintiff as loss payee;

v. To enter into leases and do all things necessary to continue normal property operation;

w. To modify existing contracts in the ordinary course of the business of the Property;

x. To pay all utilities, expenses and other obligations secured by, or which may give rise to liens, and all other outstanding obligations to suppliers and servicers in the ordinary course of business, including, obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership;

y. To make repairs necessary for the maintenance of the Property, in order to preserve the Property in the ordinary course of business, provided, however, that the Receiver shall not make any improvements, repairs and/or remediations having a cost of $2,500.00 or more on any given individual rental unit without first obtaining approval from the Court;

z. In the event the cost of improvements, repairs and/or remediations to individual rental units cost $2,500 or more, to engage contractors and skilled trades on a competitive bid basis, and to execute such contracts for such purposes as the Receiver deems appropriate, but *must first seek court approval*;

aa. To borrow funds for purposes relating to the operation of the Property. However, the Receiver shall not borrow funds without first providing the Plaintiff and Defendants with advance written notice and a reasonable opportunity to elect to advance funds required by the Receiver, and *must first seek court approval*;

bb. To take all steps necessary to comply with all requirements, regulations and laws applicable to the Property, and to deal with all regulatory authorities in connection with the same;

cc. To employ, if necessary, bookkeeping, accounting, legal and clerical services deemed necessary for the proper management of the Property, but *must first seek court approval* and justify the work required and the charges/fees/wages incurred as a result;

dd. To employ a manager or managing company to perform the planning, scheduling and supervising of all on-site services as directed by the Receiver, including but not limited to, managing tenant rosters, on-site collection of rents, coordinating any and all inspections and repairs, scheduling and supervising the activities of all other on-site vendors, managing and coordinating communications with the Receiver and other pertinent parties, and any other pertinent on-site services requested by the Receiver, but *must first seek court approval for rates and fees charged for specific services*; and

ee. To institute, prosecute, defend, compromise, and/or intervene in, or become a party to, such actions or proceedings in state or federal courts which may, in the Receiver's opinion, be necessary for the protection, maintenance and preservation of the Property, for the carrying out of the terms of any order of the Court affecting the Property, to collect rents and other amounts now or hereafter becoming due, to evict and/or remove tenants or other persons or entities from the Property, and/or to defend against any action brought against the Receiver acting in such capacity. This also applies to administrative proceedings, arbitrations, or other proceedings that involve the Property.

10.    Notwithstanding the foregoing, the Receiver and the Receivership estate shall not be liable for the payment of taxes of any kind, assessments, goods, or services provided to Defendants or the Property or utility charges prior to the date of this Order.

11.    Any individual or entity receiving a copy of this Order is hereby enjoined and restrained from discontinuing service to the Receiver or the Property based upon the non-payment of such taxes, assessments, goods or services or utilities prior to the date of this Order and from attempting to collect taxes, assessments, invoices, and utility charges from Receiver predating the date of this Order. Each utility company or entity providing service to the Property shall forthwith transfer any deposits which it holds to the exclusive control of the Receiver and shall be prohibited from demanding that Receiver deposit additional funds in advance to maintain or secure such service.

12.    The Receiver is directed to prepare and file within thirty (30) days of the date of this Order and on the tenth day of each month thereafter, so long as the Receivership is in force, a

report as is required by Fla.R.Civ.Pr. 1.620, under oath, setting forth and reporting all changes in assets in her charge or claims against the assets that have occurred during the preceding month. [The first report due July 10, 2015, shall be for the period ending June 30, 2015]. The Receiver shall file such reports with the Clerk of this Court and shall serve a copy of each report upon counsel for Plaintiff, the Defendants, and the Court. The Report must clearly and separately account for the different properties within the Property.

13.     Without limiting or expanding the foregoing, the Receiver is authorized to exercise all powers generally available and shall be subject to all the duties of a Receiver under the laws of the State of Florida that may be incidental to the management and operation of the Property, as described in this Order. The Receiver shall have any additional powers that are provided by law and that the Court may from time to time direct or confirm.

14.     The Receiver shall, during the pendency of this action, have the right to apply to this Court for further instructions or directions.

15.     The authority granted to the Receiver is self-executing, unless the action requires approval. The Receiver is authorized to act on behalf of and in Defendants' name (or the Receiver's name), as the Receiver deems appropriate without further order of this Court and without personal recourse against the Receiver (subject to the general provisions, below).

16.     In the event that the revenue from the Property is not sufficient to pay the expenses of the preservation, operation, maintenance or restoration of the Property in accordance with the terms of this Order, and to pay the Receiver, Plaintiff is hereby specifically authorized to advance, at Plaintiff's sole discretion, said sums to the Receiver as are necessary for the payment of same, and the Receiver may issue Receiver Certificates upon terms, including interest rate, approved by order of the Court, to reflect and secure said advancements.

17.     All advances to the Receiver by Plaintiff for the benefit of the Property excluding fees and costs of the Receiver, but including any advances for working capital or improvements shall be deemed protective advances. Any such protective advance shall be fully secured by a first priority mortgage lien and security interest against the Property. All such funds advanced, including interest on advances, shall be deemed a prior lien before the repayment of any and all other claims against the Property (except for taxes and assessments having first priority as a matter of law) or proceeds of either of them.

18.     Each month the Receiver, her attorneys, accountants and bookkeepers, shall be authorized to receive compensation for the time they have devoted to this Receivership. The Receiver shall submit to the parties an account of the fees and other charges incurred and revenues received. The parties shall have ten (10) days thereafter to file any objection to the compensation requested. If no objections are filed, the Receiver is authorized to make payment to herself, and her attorneys, accountants and bookkeepers for the services for the applicable period from any source received by the Receiver as assets of this Receivership without further order of this Court. Any timely objection shall be brought on for an expedited hearing for a resolution by this Court. The Receiver's fees and expenses incurred by the Receiver in the proper performance of her duties hereunder, shall be paid to the extent funds are available, first from the revenues derived from the operation or liquidation of the Property, and if these are not sufficient, then from the proceeds of receiver certificates, as set forth above.

19.     Nothing in this Order shall require the Receiver to advance funds other than from Income or from other funds made available to the Receiver pursuant to the terms of this Order without a bond or security for payment satisfactory to the Receiver.

20.     The Receiver shall not be liable for any claim, obligation, liability, action, cause of action, cost or expense of Defendants or the Property arising out of or relating to events or

circumstances occurring prior to the entry of this Order, including without limitation, any contingent or unliquidated obligations and any liability from the performance of services rendered by third parties on behalf of Defendants and any liability to which Defendants are currently or may ultimately be exposed under any applicable laws pertaining to the ownership, use or operation of the Property (collectively all of the foregoing is referred to as "Pre-Receivership Liabilities"). The Receiver shall not be obligated to advance any funds to pay any Pre-Receivership Liabilities.

21.    The Receiver and the Receiver's attorneys and agents: (i) may rely on any and all outstanding court orders, judgments, decrees and rules of law, and shall not be liable to anyone for their own good faith compliance with any such order, judgment, or decree or rule of law; (ii) may rely on, and shall be protected in any action upon, any resolution, certificate, statement, opinion, report, notice, consent, or other document believed by them to be genuine and to have been signed or presented by the proper parties; (iii) shall not be liable to anyone for their good faith compliance with their duties and responsibilities as receiver, or as attorney or agent for the Receiver; and (iv) shall not be liable to anyone for their acts or omissions, except upon a finding by this Court that such acts or omissions were outside the scope of their duties or were grossly negligent. Except for matters set forth in subsection (iv), persons dealing with the Receiver shall only look to the Receivership assets to satisfy any liability, and neither the Receiver nor her attorneys or agents shall have any personal liability to satisfy any such obligation.

22.    No person or entity shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting a suit or action provided, however, that no prior Court order is required to file a motion in this action arising from the Receiver's gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with this Order or any other order of this Court in this action.

23.    The Receiver and her employees, agents and attorneys shall have no personal liability in connection with any liabilities, obligations, liens, or amounts owed to any of Defendants' creditors because of her duties as Receiver.  Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be solely determined in accordance with Florida law.

24.    The Receiver and her employees, agents, and attorneys shall have no personal liability and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts, and/or the failure to comply with this Court's orders.

25.    Defendants, all Property managers of Defendants and all those in active participation or concert with them who receive notice of this Order, and all those having claims against the Property, who receive notice of this Order, are enjoined from and shall not:

    a.  Commit Waste.  Commit or permit any waste on all or any part of the Property, or suffer, commit or permit any act on all or any part of the Property in violation of the law, or remove, transfer, encumber, or otherwise dispose of any of the Property.

    b.  Collect Income.  Demand, collect, receive, discount, or in any other way divert or use any of the Income.

    c.  Terminate Any Utility Service.  Terminate or withhold any electric, gas, water, sewer, telephone, or other utility service supplying the Property, require any utility deposit or otherwise interfere with the continued operations of the Property.

    d.  Interfere with the Receiver.  Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order or the Receiver's possession of and operation or management of the Property.

    e.  Transfer (without Court approval) or Encumber (other than to refinance) the Property.  Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage (except to refinance), create a security interest in, encumber (except to refinance), conceal, or in any manner whatsoever deal in or dispose of the whole or any part of the Property including, but not limited to, the Income without prior court order.

    f.  Impair the Preservation of the Property.  Do any act which will, or which will tend to impair, defeat, divert, prevent, or prejudice the preservation of the Property, including the Income, or the preservation of Plaintiff's interests in the Property and the Income.

26.    The Receiver shall faithfully perform and discharge the Receiver's duties in accordance with this order.

27.    The Court finds there is no just reason for delay and therefore enters this Order as a final order.

28.    The Court shall retain jurisdiction over this action, the Property, and the parties for the purpose of giving such other relief upon proper showing as is consistent with this Order and substantial justice.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 06/10/15.


BARBARA ARECES
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter. The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

## Aged Payables Summary
### Type: All
### Days Past Due: All
### linda - Linda Leali

Page 1
9/4/2018
09:17 AM
genesis

| Vendor Code | Vendor Name | Amount Payable | Not Yet Due | 0-30 Days | 30-60 Days | 60-90 Days | Over 90 Days |
|---|---|---|---|---|---|---|---|
| lleali | Linda Leali | 9,630.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9,630.00 |
| messana | Messana, P.A. | 41,586.07 | 0.00 | 0.00 | 8,468.33 | 0.00 | 33,117.74 |
| | | 51,216.07 | 0.00 | 0.00 | 8,468.33 | 0.00 | 42,747.74 |

| Number | Totals By Account Name | Total |
|---|---|---|
| 7600 | Legal & Accounting | 51,216.07 |



## Page 1

1   IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
    IN AND FOR MIAMI-DADE COUNTY, FLORIDA
2
3               CASE NO.: 2014-27781-CA-01 (23)
4
5   CITY OF MIAMI,
6       PLAINTIFF,
7   vs.
8   MIAMI BEVERLY, LLC, et al,
9       DEFENDANTS.
10  _____/
11
                DADE COUNTY COURTHOUSE
12              73 WEST FLAGLER STREET, 2ND FLOOR
                MIAMI, FLORIDA 33130
13
14      The above-entitle matter came on for hearing before the
    HONORABLE BARBARA ARECES, Circuit Judge, on December 4, 2017,
15  at 1:30 p.m., pursuant to Notice.
16
17  APPEARANCES:
18      VICTORIA MENDEZ, CITY ATTORNEY
        BY: RACHEL S. GLORIOSO-DOOLEY, ASSISTANT CITY ATTORNEY,
19  On behalf of the Plaintiff.
20      RENEE M. SMITH, P.A.
        BY: RENEE M. SMITH, ESQ.,
21  On behalf of the Defendants.
22      MESSANA, P.A.
        BY: BRETT D. LIEBERMAN, ESQ., on behalf of the
23  Receiver.
24
25

## Page 2

1                   INDEX
2
3   WITNESS:
4   Linda Leali
5       Direct Examination        Page 8
        Cross Examination          Page 38
6       Redirect Examination       Page 46
        Recross Examination        Page 50
7
8                   EXHIBITS
9   Defendant's Exhibit A          Page 17
    Defendant's Exhibit B          Page 19
10
11
12
13
14
15
16
17
18
19
20          **EXHIBIT**
21
22              C
23
24
25

## Page 3

1   (Thereupon, the following proceedings were had:)
2       THE COURT: Good afternoon, everyone. Please be
3   seated.
4       All right. Motion for summary judgment?
5       MS. SMITH: No.
6       THE COURT: Yeah, that can't be right.
7       THE BAILIFF: Sorry, Judge.
8       THE COURT: So, finally, what is set for today,
9   because I know that there was an issue regarding fees,
10  and I think that we decided to keep the time and to have
11  it for something else?
12      MR. SMITH: The Defendants motion for release of
13  the complainant properties, and there's four properties
14  that we're asking for today, Your Honor.
15      THE COURT: Okay.
16      MS. DOOLEY: Which of the four properties, because
17  you filed several different ones?
18      MS. SMITH: Yeah, that's right.
19      MS. DOOLEY: Which are the four?
20      MS. SMITH: 1710, 1730, 1558 and 1341.
21      THE COURT: The last one, I'm sorry?
22      MS. SMITH: 1341. Those are the numerical numbers
23  of the buildings, Your Honor, assuming you assumed.
24      THE COURT: Okay. Whenever you're ready.
25      MS. SMITH: Renee Smith, for the Defendants, 1336

## Page 4

1   Northwest 60, LLC, the Holdings at City II, LLC, the
2   Holdings at City, LLC, and 13300 Alexandria Drive
3   Holdings, LLC.
4       We are here today requesting the release of
5   properties that are individually owned by these four
6   Defendants.
7       Basically, a year ago, Your Honor, you entered an
8   agreed order from the parties on October 24th, 2016,
9   which created the framework for our motion today, which
10  was the guidelines in which the Defendants were able to
11  access these properties, correct and comply with the
12  violations, and then seek from the Court to have them
13  released to the Defendants that own them.
14      And as part of that today, I would like to put
15  forward some evidence in support of our request to
16  release these four properties.
17      I would like to call Linda Leali, the Receiver.
18      THE COURT: Do you have an opening?
19      MS. DOOLEY: Yes, I would.
20      MR. LIEBERMAN: Your Honor, may I make an
21  appearance?
22      THE COURT: Yes, of course.
23      MR. LIEBERMAN: Thank you, Your Honor.
24      Brett Lieberman, Your Honor, counsel for the
25  Receiver, Linda Leali. Linda Leali is in the courtroom

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 5

1  today.
2      THE COURT: Thank you.
3      MS. DOOLEY: I was looking for my glasses. They
4  were on my head.
5      Rachel Dooley, on behalf of the City of Miami. I
6  just hit that age. I guess I'll have to text my mom,
7  who's more astute than I am, at 85.
8      Yes, we are here on the motion to release, and so
9  it's for those specific properties, one located at
10  1710, 1730, 1558 and 1341.
11      It will be the City's contention that as to 1710,
12  they still have lack of fire compliance. There is also
13  an open 40/50 year, and they have open-- I have to check
14  on that again, but there might be an open electrical
15  permit, but I just pulled that today.
16      As to 1730 and as to 1710, and the Holdings at
17  City, they still have an unsatisfied judgment, and they
18  have not paid the Receiver's fees as to that
19  corporation, and according to the Receiver's order and
20  the lack of legal order.
21      As to the 1730 property, they still have-- they
22  have some complied violations. They have failed to
23  satisfy the judgment received by the City in this case,
24  and they have failed to pay the City fines. They also
25  have an open CU/BTR, and an inspection that was done by

Page 6

1  the property manager for the Receiver found that a new
2  roof was needed on that one. There are still
3  outstanding violations, obviously, on that property.
4      As to 1558, the Holdings at City II, those
5  violations are closed on that one, and there's no
6  outstanding judgment on that. However, it is part of
7  the Receivership, and part of those monies from that
8  corporation, and that corporation's property, go to
9  paying for the Receiver. And also they have not
10  satisfied any payments when it comes to paying the
11  Receiver for the work they have done, as well as the
12  Receiver's attorneys. I believe it's about $85,000.
13      As to 1341, that is one where there are not enough
14  hurricane shutters. I'm sure you'll hear testimony as
15  to that. In fact, there isn't even a full set for that
16  or its sister building, which is 1335. They also have
17  another complied violation, but they have not either
18  paid that violation, nor have they satisfied the City's
19  judgment.
20      And part of the City's argument, just as an
21  opening, is that you'll find that this motion is
22  premature. I've cited cases in every one of my
23  responses to Counsel's motions, which, in fact, that
24  they need to satisfy the Receivership prior to the
25  release of any of these properties, because the

Page 7

1  Plaintiff and the Court were required to put in place a
2  Receiver due to the actions of the Defendants. The
3  Plaintiff should now not be stuck paying the cost of the
4  Receiver, because in the event that this Court would
5  consider releasing them, clearly, they would be allowed
6  to dispose of these properties as they wish, which
7  include selling them, and they have been marketing them
8  to sell them.
9      That asset would be dissipated from that
10  corporation, and there would be no ability to recover
11  the fees to pay the Receiver nor to satisfy the
12  judgment.
13      The City is moving forward on executing judgments
14  as we speak, but those are in process. Thank you.
15      THE COURT: Okay.
16      MS. SMITH: If I may just speak briefly, Your
17  Honor. Some of the City's concerns were resolved at our
18  prior hearing. We stipulated to payment of the
19  Receivership fees and to bring them current, as well as
20  we're working on finishing the agreed order, which was
21  kind of complicated, I would word, in order to address
22  any fees that would remain due if buildings were
23  released, i.e., the loan that we were discussing with
24  the Court, and that's part of an agreed order that's
25  pending.

Page 8

1      As a matter of fact, counsel gave me another
2  draft. He was in trial last week, so we were unable to
3  finish that for the Court.
4      And the other thing that I'd like to raise for the
5  Court's attention is that the agreed order specifically
6  that was entered and agreed to by the Plaintiff, as well
7  as the Defendants last year said, "This Court reserves
8  jurisdiction to consider whether and on what conditions
9  the property or properties shall be released to the
10  Defendants upon the successful correction of all code
11  violations."
12      A lot of what the City is now mentioning is, you
13  know, roof damage. Part of the issue with these
14  buildings is that they're living, breathing animals,
15  which is why the parties agreed to violations being the
16  kicker as to when they're complied with being returned,
17  because, if not, sinks break every day. I mean, we just
18  had a hurricane go through. These things are, you know,
19  the reality of property ownership. So we used an
20  objective standard a year ago for the Court to consider
21  when these buildings were complied with to be returned.
22  And on that basis, it's why we're moving today for these
23  four buildings.
24      At this time, I'd like to call Linda Leali.
25      THE COURT: Okay.

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 9

1  THEREUPON:
2          LINDA LEALI
3  (Having been duly sworn, was examined and testified as
4  follows:)
5          THE WITNESS: I do.
6          DIRECT EXAMINATION
7  BY MS. SMITH:
8      Q. Please state your name and professional address,
9  for the record.
10     A. Linda Leali, 777 Brickell Avenue, Suite 500, Miami,
11 Florida 33131.
12     Q. And you're the appointed Court Receiver for
13 properties located-- I'm just going to use the property
14 numbers. If you need me to read off the whole address, just
15 let me know-- 1710?
16         Just a, yes, for the record.
17     A. Yes.
18     Q. 1730?
19     A. Yes.
20     Q. 1558?
21     A. Yes.
22     Q. And 1341?
23     A. That's correct, yes.
24     Q. And you have been a Receiver over these properties
25 for how long, approximately?

Page 10

1      A. Since June of 2015.
2      Q. Okay. Are you aware of their current conditions as
3  we are here today?
4      A. Yes, I am.
5      Q. Okay. As it relates to the property located at
6  1558, do you know who the owner of that property is?
7      A. It has an LLC that owns it. I don't have that
8  exact name in front of me. I don't recall the exact name.
9          MS. SMITH: Your Honor, may I give her the
10 property tax records to refresh her memory as to who the
11 owner of that property is?
12         MS. DOOLEY: We'll stipulate it's The Holdings at
13 City II, right?
14         MS. SMITH: Okay.
15         THE COURT: Okay.
16     Q. (BY MS. SMITH): Are you aware of how many members
17 are part of that LLC?
18     A. No, I am not.
19     Q. Okay. Now, as to 1558, are there any violations on
20 that building that have not been complied with?
21     A. Well, I think there's a technical issue with
22 respect to complied. From my understanding, and obviously
23 I'm working with the property manager--
24         I'm sorry, Your Honor.
25         (Thereupon, a telephonic interruption was had, after

Page 11

1  which the proceedings continued.)
2          THE WITNESS: --There are no outstanding
3  identified violations with respect to that property.
4      There could potentially be outstanding fines, that I'm
5  not aware of, but we're talking about the 1558 building,
6  and I'm not aware of any.
7      Q. (BY MS. SMITH): Okay. So at this time, as we're
8  here today, you know of no uncomplied violations or open
9  fines that have not been paid?
10     A. That's correct.
11     Q. Is there a Certificate of Use and BTR on that
12 building?
13     A. Yes, there is.
14     Q. And how did that building receive its Certificate
15 of Use and BTR?
16     A. We applied for it to the City of Miami.
17     Q. The Receiver did?
18     A. That's correct.
19     Q. Now, do you understand the term, 40-year
20 certification?
21     A. I have a general understanding of it. I wouldn't
22 tell you that I have any real technical understanding, but I
23 do know about it, and what the requirements, generally
24 speaking, are. That's a structural inspection. It's an
25 electrical inspection, and that it occurs every 40 years,

Page 12

1  first 40 years, and then every ten years thereafter.
2      Q. Okay. And who requires this 40-year certification
3  process?
4      A. The City of Miami.
5      Q. Okay. And is it your understanding that they
6  inspect the building prior to giving the recertification or
7  if they receive any type of reports in order to recertify the
8  building?
9      A. So my understanding of the process is that the
10 owner of the building, or, in this case, the Receiver, we
11 hire an inspector and an engineer to go out and do a 40/50
12 year recertification inspection. If the building meets the
13 City of Miami's requirements, then the inspector will then
14 issue a report, and then that report is provided to the City
15 of Miami.
16         And then, at that point, it's my understanding that
17 the City of Miami's Building Department can review it. If
18 they have any issues with the report, they'll come back to
19 you and identify whatever the issues are, which we did have
20 happen at one of the buildings prior to the Receivership.
21     Q. Okay. So, in your opinion, as a professional
22 Receiver, if a building has a 40-year certification, it is in
23 compliance with the City's requirements for that property?
24     A. No, that's not my understanding at all. So the way
25 it works is, there's a 40/50 year recertification. That just

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 13

1  covers that which it covers, and I think that the City can
2  probably tell you a little bit better than me the distinction
3  between having a code violation versus having a 40/50 year
4  recertification inspection.
5       So, for example, you could have a code violation if
6  the garbage container is not correct, And there's lots of
7  different reasons why you could have code violations that
8  don't fall within the scope of a 40/50 year report.
9       Q. Well, let's come back to this property that we've
10 been talking about, 1558. To your knowledge, has the 40-year
11 certification been accepted by the City of Miami?
12      A. It's my understanding, from communications with
13 Norman Moody (phonetic), that the City has accepted it.
14      Q. Okay.
15      A. And it's not showing up in the City's inspections
16 as being an open item.
17      MS. SMITH: Okay. I would like to show her the
18 40-year certification. May I approach the witness, Your
19 Honor?
20      THE COURT: Sure.
21      Q. (BY MS. SMITH): Can you please read the address on
22 this 40-year certification?
23      A. Okay. So the address on the-- do you mean the
24 address as to--
25      Q. The property address.

Page 14

1       MS. DOOLEY: Can I see a copy of this?
2       MS. SMITH: Oh, sure.
3       THE WITNESS: It's 1558 Northwest 1st Avenue,
4  Building One.
5       Q. (BY MS. SMITH): Does this type of letter look
6  familiar to you?
7       A. I have seen copies of this type of letter in
8  connection with this case.
9       Q. And they're all similar 40-year certification
10 letters from the City?
11      A. I can't talk outside the scope of this particular
12 case, but it looks somewhat similar to what I saw a couple of
13 weeks ago.
14      Q. Okay. And what does the first line of this letter
15 refer to as on the building?
16      MS. DOOLEY: I'm going to object to her reading a
17 document that's not in evidence, nor is it a certified
18 document.
19      THE COURT: Sustained.
20      MS. SMITH: Okay. Your Honor, I'd like to admit
21 this letter into evidence.
22      MS. DOOLEY: Objection, it's not an authenticated
23 document from the City.
24      Q. (BY MS. SMITH): Okay. So, as we are here today,
25 you know of no uncomplied or open violations on 1558,

Page 15

1  correct?
2       A. I'm not aware of any, no.
3       Q. Okay. Are you familiar with the building located
4  at 1341 Northwest 60th Street?
5       A. Yes.
6       Q. Okay. To your knowledge, is there any uncomplied
7  violations on that building?
8       A. Again, it's a little unclear by violations, but I
9  can tell you that as an issue, with respect to the building,
10 there was an issue with-- okay, previously, there was a
11 requirement to put up hurricane shutters, and the City went
12 out and inspected the property. And I'm not sure exactly how
13 it played, because I wasn't there. Mr. Moody was there for
14 that inspection. So it's hard for me to discuss what
15 actually occurred. But what we do know is that when the
16 hurricane came around, we were unable to put up-- the
17 property manager was unable to put up hurricane shutters on
18 all of the buildings-- those two buildings, excuse me, that
19 had hurricane shutters, the 1335 the 1341 building, they're
20 adjacent buildings, and so we were unable to put them up,
21 because the shutters were not there.
22      Now, we were asked to go back specifically and
23 determine, you know, how many shutters do we have, and I had
24 a conversation the other day, and it's my understanding that
25 we didn't have even enough shutters for one building. So I'm

Page 16

1  not sure-- I know Norman was going back in and was going to
2  take a look at the situation. I haven't heard anything
3  since.
4       Q. Do you know how many shutters are required on that
5  building?
6       A. I don't know, off of the top of my head, but the
7  property management company does know.
8       Q. Okay. So you don't have actual knowledge that
9  there's not enough shutters for 1341? You're relying on
10 someone else's information?
11      A. Yes, absolutely. I did not personally go out and
12 count the shutters and count the windows, but I asked-- at my
13 direction, the property manager went out, after the last
14 hearing, and made a count, and we sent that information on to
15 you all as to how many shutters we had, and how many,
16 generally speaking, we thought we needed.
17      It's kind of difficult, because you have to
18 actually put them on to make sure that you have enough, but
19 we did do an estimate as to what we thought was necessary and
20 what was missing.
21      Q. Is there a violation on this property because of
22 these shutters?
23      A. If we don't have proper shutters, I would say-- I
24 don't know what you mean by violation. What do you mean by
25 that?

2c709e9b-ab44-4c20-b360-8fb66f7407a9

Page 17

1    Q. Has a Code Enforcement Officer come to the property
2  and written a violation because of hurricane shutters?
3    A. Well, no, not now. But the issue that we became
4  aware of is that we think not enough shutters were actually
5  acquired, because what happened was, the inspections were
6  done at two different times, and so we're suspecting--
7  although we were not there, again-- that a possibility
8  existed that just not enough were acquired.
9       From our perspective, the shutters were in one of
10 the apartments, and so that's all we do know about the
11 shutters.
12   Q. And in whose custody and control are the shutters
13 in?
14   A. They were in-- well, that's a great question,
15 because both, the Defendants and Capital Rental, had full
16 access to the units at that point in time. So we had
17 management of the building that had the shutters in it, but I
18 would say that the Defendants, through their representative,
19 had access, as well, under the access order.
20   Q. Now, as it relates to 1341, is there a Certificate
21 of Use?
22   A. Yes, there is.
23   Q. Okay. And how was that obtained?
24   A. I applied for the Certificate of Use.
25   Q. Is there a business tax receipt on this property?

Page 18

1    A. Yes, there is.
2    Q. And how was that received?
3    A. I applied for it, as well.
4    Q. Okay. Is there a 40-year certification on this
5  property?
6    A. We have a 40/50 year recertification report that
7  approves the property, and I know that it's been submitted to
8  the city. I believe it's been accepted. I haven't received
9  word that it was not.
10   MS. SMITH: Your Honor, I would like to admit into
11   evidence a certified copy of the 40-year certification
12   for 1341 Northwest 60th Street.
13   THE COURT: Any objection?
14   MS. DOOLEY: No.
15   THE COURT: Okay. Admitted.
16   THE CLERK: Defendant's Exhibit A into evidence.
17   Q. (BY MS. SMITH): Are you familiar with the property
18 located at 1730 Northwest 1st Court?
19   A. Yes.
20   Q. Okay. To your knowledge, is there any open or
21 uncomplied violations on this property?
22   A. The only issue that I'm aware of that the property
23 has at the present moment-- I mean, this is putting aside
24 whether there's any unpaid fines--
25   MS. DOOLEY: Is this 1730, I'm sorry?

Page 19

1    MS. SMITH: Yes, 1730.
2    THE WITNESS: Putting aside whether there's any
3  unpaid fines for open violations-- previously open
4  violations, the only issue that the building has right
5  now is that the roof is in poor condition.
6    Q. (BY MS. SMITH): Okay. Let's start with that
7  first. Well, let's go back. Is there a Certificate of Use
8  on this property?
9    A. Yes, there is.
10   Q. Okay. And how was that obtained?
11   A. I went out and I obtained it. One thing I didn't
12 mention before is that all of the buildings in Overtown
13 required, at the time, special dispensation from the City of
14 Miami, because there had been some zoning changes, and
15 because the buildings never had a Certificate of Use-- my
16 recollection is that the building never had a Certificate of
17 Use, or, maybe one of them had one, but they were well
18 expired, so we actually had to get the City of Miami to give
19 us a waiver. And maybe that's not the technical term, but
20 otherwise they wouldn't even qualify for a Certificate of
21 Use.
22   Q. Okay. But, at this time, 1730 has a Certificate of
23 Use?
24   A. That's right.
25   Q. Okay. And does it have a business tax receipt?

Page 20

1    A. Yes, it does.
2    Q. Again, how was that obtained?
3    A. I applied for it.
4    Q. To your knowledge, has this building received a
5  recertification for its 40-year certification?
6    A. There was a passing 40/50 year recertification
7  report.
8    MS. SMITH: I'd like to enter the 40-year
9    recertification on 1730 into evidence as Exhibit 2.
10   MS. DOOLEY: No objection.
11   THE CLERK: Defendant's Exhibit B into evidence.
12   THE WITNESS: And to be clear, any acceptance
13   letters that are coming to the City are not coming to me
14   directly. They're going to the owner. So I do
15   understand that there might have been a letter accepting
16   the report, but it did not come to me directly.
17   Q. (BY MS. SMITH): Can you tell me the date of this
18 letter for the 40-year recertification?
19   A. That letter is dated March 30th, 2017.
20   Q. And, again, we're going back quite a few months.
21 So, to the best of your recollection, was that around the
22 time that you received the Certificate of Use and BTRs on
23 this building?
24   A. Well, I believe I have a copy of when I got the CU,
25 so if I can take a look at it?

Page 21

1    Q. That's fine.
2    A. Okay. I'm not 100 percent sure, but I think I do.
3    So here it says that the Certificate of Use was issued on May
4    25th, 2017.
5    Q. So just shortly thereafter the 40-year
6    certification--
7    A. Yeah. And once I was aware that there was a 40/50
8    year certification, what we typically-- well, working with
9    Capital, what they told me they typically do before we have a
10   CU inspection is basically call people in to come look at
11   your house. We make sure everything looks good, and then we
12   call it out. So it's about a 30-day process between the
13   application of the CU. So if that's May 20th, we probably
14   applied some time at the end of April.
15   Q. And you mentioned that there's an issue with the
16   roof. When did it come to your awareness that there may be a
17   roof issue?
18   A. So this particular building has always had a roof
19   issue. I've seen old reports from the owner's
20   representatives that there were roof deficiencies. So it's
21   just progressively over time that we have been making roof
22   repairs. So recently it had a leak, and the roofer said,
23   "Look, I can't do--" this is paraphrasing here. I didn't have
24   the actual conversation, the property manager did, but said
25   that, "At this point in time, it needs to be replaced," and

Page 22

1    we've done an emergency repair, but really the roof needs to
2    be replaced.
3    Q. Did you ever get a permit for these repairs?
4    A. Which repair?
5    Q. The roof repairs.
6    A. The roofer would've asked for the permit if one was
7    required. I don't know off of the top of my head.
8    Q. To your knowledge, you never saw a permit for that?
9    A. I did not, right.
10   Q. Okay. Is there an open violation because of the
11   roof issue?
12   A. Have we been cited for it?
13   Q. Yeah.
14   A. Not to my knowledge.
15   Q. Okay. Are you familiar with the building 1710
16   Northwest 1st Court?
17   A. Yes, I am.
18   Q. Okay. To your knowledge, is there any uncomplied
19   violation?
20   A. No, I'm not aware of any.
21   Q. To your knowledge, did it receive its
22   recertification on the 40-year cert?
23   A. To my knowledge, it did. There was a passing 40/50
24   recertification report. I believe, after the last hearing,
25   Mr. Moody had a copy of the letter that he showed to me at

Page 23

1    that point in time. But, again, I didn't receive it directly
2    from the City.
3    Q. Okay. To your knowledge, is there a Certificate of
4    Use on this property?
5    A. Yes, there is.
6    Q. And how was that obtained?
7    A. I applied for it.
8    Q. Okay. I know I'm being repetitive, but we're just
9    walking it through. Thank you.
10   Is there a business tax receipt on this property?
11   A. Yes.
12   Q. And, again, that was applied for by your office?
13   A. I applied for it, as well.
14   Q. Okay. As we stand here today, on 1558, 1710, 1730
15   and 1341, you have applied for and received Certificates of
16   Use and BTRs?
17   A. On all four of those buildings, yes.
18   Q. On all four of those buildings, there's a 40-year
19   recertification that was accepted by the City, to your
20   knowledge?
21   A. Again, I know that there are passing 40/50 year
22   recertifications. I have not received the report, but it's
23   my understanding from monitoring what's going on via the
24   building inspection website that that has been accepted, and
25   based also on what I reviewed that Mr. Moody had.

Page 24

1    Q. As we're here today, there was no uncomplied
2    violations on any of these properties?
3    A. As far as an open--
4    Q. Any open violations?
5    A. It's possible that there are open violations that
6    were not paid.
7    Q. Let's go back. What are you aware of as we're
8    here-- don't speculate. What are you aware of-- as we are
9    here today, have you received any notice that there's open
10   violations on 1558?
11   A. Since I've been a Receiver, we've had-- sure, we've
12   had a couple of violations.
13   Q. No. As we are here today, do you have actual
14   knowledge of any open violations on any of these four
15   properties?
16   A. I can't go into specifics, but I'm pretty sure that
17   there are open violations because of nonpayment of the fees
18   and liens.
19   Q. Okay. But it's not a violation where a Code
20   Enforcement--
21   MS. DOOLEY: Objection, asked and answered.
22   Q. (BY MS. SMITH): Well, can you explain-- otherwise,
23   what you're saying is that there are unpaid fines?
24   A. That's right.
25   Q. Okay. But there's no code enforcement violation

6 (Pages 21 to 24)

Page 25

1  that needs to be physically corrected on the property?
2      A. As far as I'm aware, the buildings are presently in
3  compliance with Code--
4      MS. SMITH: Thank you. No further questions, Your
5  Honor.
6      THE WITNESS: --With the exception of what we've
7  already discussed with respect to the shutters and to
8  the extent that the roof is a code violation, then
9  that's also a problem.
10     Q. (BY MS. SMITH): Okay. Have you received notice
11 that there's a code violation for the shutters?
12     A. No.
13     Q. Have you received notice that there's a code
14 violation for the roof?
15     A. No.
16     MS. SMITH: No further questions.
17         CROSS EXAMINATION
18 BY MS. DOOLEY:
19     Q. Good afternoon.
20     A. Good afternoon.
21     Q. You were appointed as the Receiver in June of 2015,
22 is that correct?
23     A. That's correct.
24     Q. Okay. And at that time, there were numerous open
25 violations on all of the buildings, is that correct?

Page 26

1      A. That's correct.
2      Q. So all of the buildings are 1335 Northwest 60th
3  Street, 1341 Northwest 60th Street, 1558 Northwest 1st
4  Avenue, 1710 Northwest 1st Court, 1730 Northwest 1st Court,
5  6820 Northwest 17th Avenue, 6040 Northwest 12th Avenue, 1231
6  Northwest 61st Street, 1250 Northwest 62nd Street, is that
7  correct, nine properties?
8      A. That's correct.
9      Q. Six corporations, is that correct?
10     A. That sounds about right.
11     Q. 1336 Northwest 60th, LLC--
12     A. I'm not just Receiver over the entities.
13     Q. Right. The Holdings at City II, The Holdings at
14 City, 13300 Alexandria, Reverend, LLC, and Miami Beverly?
15 There are six corporations and nine properties, is that fair
16 to say?
17     A. It sounds reasonable.
18     Q. Okay. And at the time that you were appointed
19 Receiver, all were owned by the same person, is that correct?
20     A. I don't know the answer to that question.
21     Q. Okay. Now--
22     A. I don't have access to the corporate records.
23     Q. --There were many more violations present on these
24 properties than for which they were actually open code or
25 building cases, is that fair to say?

Page 27

1      A. That would be fair to say.
2      Q. Okay. And at the hearings, and in our discussions,
3  and, in fact, at hearings before the Court, the City was
4  not-- did not open up new cases to pile on more fines, is
5  that correct? Is that a fair statement, that the City did
6  not go out and start re-citing for everything on the
7  properties?
8      A. There were many items that the City did not cite
9  the properties for that were open items. I would say there
10 were-- especially with respect to garbage containers that the
11 City goes out and inspects, and if there was an issue, for
12 example, something was open that the City would cite for
13 that, but there were substantial issues that have not or were
14 not cited for.
15     Q. Right. So the fact that-- and as we have discussed
16 in Court before, that there isn't an open code case does not
17 mean that there's not a violation of the City Code on the
18 property, is that a fair statement?
19     A. Yes, I would guess that's a fair statement.
20     Q. And a violation is a violation, is that correct?
21     A. Yes.
22     Q. Okay. And let's talk about the 1730 property, the
23 roof. Was the roof in good shape when you took over the
24 Receivership?
25     A. No.

Page 28

1      Q. Was there a roof in need of repair when you took it
2  over?
3      A. Yes. Like I mentioned, we had repaired it from
4  time to time.
5      Q. And now it's in need of a new roof, is that
6  correct?
7      A. Yes, that's correct.
8      Q. Because it's continuing to deteriorate, is that
9  correct?
10     A. Yes, that's correct.
11     Q. And the party who allowed it to deteriorate was, in
12 fact, the Defendant, is that correct?
13     MS. SMITH: Objection.
14     THE COURT: Overruled.
15     THE WITNESS: I don't know, as far as prior to the
16 Receivership, the ownership structure, how long they
17 owned the property, but it's reasonable to believe that
18 what occurred, occurred ahead of the Receivership case.
19     Q. (BY MS. DOOLEY): Well, it didn't just fall apart
20 the day you got it, is that fair?
21     A. That's correct.
22     Q. And the condition of the properties, in fact, were
23 all in the shape they were in, obviously, prior to your
24 Receivership, is that correct?
25     A. The properties are in better condition now than

Page 29

1  they were prior to the Receivership.
2      Q. Well, when you took up management, they were in
3  extremely poor condition, is that correct?
4      A. That's correct.
5      Q. Okay. And we're here on four properties, but there
6  are really nine properties that are part of this
7  Receivership, is that correct?
8      A. Yes.
9      Q. And all nine of these properties go toward-- well,
10 not all nine of them. There's one property that's completely
11 empty, with a collapsed roof, is that correct?
12     A. The building has a defective roof, and it's the
13 6820 building.
14     Q. And that is uninhabitable, is that correct?
15     A. That's correct.
16     Q. And it's required to be fenced off and have
17 security on a 24 hours basis, is that correct?
18     A. That is correct.
19     Q. And the Receivership is required to pay for this
20 security so that people don't break in, and set it on fire,
21 and do all kinds of other things in there, is that correct?
22     A. That's correct.
23     Q. And there's no money coming from that building, is
24 that correct?
25     A. That's correct.

Page 30

1      Q. And you're still responsible for-- you know, not
2  upkeep on it, but who's paying the taxes on these?
3      A. We pay the taxes-- the Receivership paid the taxes
4  this year.
5      Q. But there's no money coming out of, let's say, the
6  6820 building, which was in the condition that you found it,
7  that the Defendant left in, is that correct, uninhabitable
8  and closed down, is that correct?
9      A. That's correct.
10     Q. Okay. So there is no money from that building, and
11 that's the Reverend, LLC building, yes?
12     A. Yes, that building is owned by Reverend, LLC.
13     Q. And, of course, has there been-- there's extensive
14 money that's needed to repair that building, yes?
15     A. That's my understanding.
16     Q. And has the Defendant done any repairs to that
17 building since June of 2015?
18     A. No.
19     Q. Okay. Have you signed for any permits that you're
20 aware of?
21     A. Not coming through the Defendants, no, not to my
22 recollection.
23     Q. Okay. Have you put in for any permits on that
24 building?
25     A. I don't recall. I didn't review-- it's been over

Page 31

1  two years, and it's possible that I did. It's been-- I
2  didn't expect to discuss that building today.
3      Q. Okay. And all of the permits are supposed to come
4  through you, is that correct?
5      A. That's correct.
6      Q. And have all of the permits come through you, or
7  has the Defendant, on other buildings, applied for permits
8  without your consent?
9      A. So there have been two recent instances in early
10 October where the Defendant-- October 2017, where the
11 Defendants applied for permits. My recollection is that it
12 was for electrical work, and the Defendants' representative
13 signed on the permit as owner.
14     Q. Who would that be? Who's the Defendants'
15 representative?
16     A. It was Mr. Norman Moody.
17     Q. Okay. And not you?
18     A. No. I wasn't actually-- my recollection is that I
19 wasn't even aware that there was a permit issued, and I
20 discovered it on my own.
21     Q. Right. Do you recall what building that was for?
22     A. One of the buildings was 1335, and I don't recall
23 the second building.
24     Q. Now, have also repairs occurred without permits and
25 without your knowledge on the buildings throughout the term

Page 32

1  of your Receivership?
2      A. Yeah, there has been.
3      Q. And these, without your knowledge or permission,
4  were activities that occurred at the hands of the Defendants,
5  is that correct?
6      A. That's correct.
7      Q. So then it would be fair to say that for you, as a
8  Receiver, many times it's difficult for you to gain control
9  of what has happened to some buildings, and what hasn't
10 happened to some buildings, because of the actions of the
11 Defendant?
12     A. It is a situation where there are multiple people
13 trying to work together. In that regard, I work to try to
14 stay on top of the situation. When I learned of the
15 circumstance with respect to work that was-- electrical work
16 that was done, that required a permit, that I have indicated
17 that no access could be allowed, except, for example,
18 inspections without a general contractor or electrician
19 overseeing that particular job.
20     Q. Right. Let's talk about the 1335 building. It's
21 not part of this motion, but it is part of the Receivership,
22 and it is the sister building to the 1341 building, is that
23 correct.
24     A. That's correct.
25     Q. The sister building, meaning that they're exactly

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 33

1  identical opposites, they face each other, is that correct?
2  They're the exact same building right next to each other.
3      A.  Yes, that's correct.
4      Q.  And they're the ones that don't have enough
5  shutters, is that correct?
6      A.  They're one of the two buildings.
7      Q.  Okay.  I'm just going to be as plain as possible.
8  There were not enough shutters for Hurricane Irma, yes?
9      A.  That's correct.
10     Q.  Okay.  But there was enough shutters for one
11 building, yes?
12     A.  No.  It was my understanding in going back and
13 looking at the situation afterward that I spoke with the
14 property manager last week, and he said, "In fact, there was
15 not even enough for one full building when we went to put the
16 shutters up."
17     Q.  And commercial/residential properties are required
18 to have shutters, is that correct, if they don't have impact
19 windows?
20     A.  So what happened in this particular circumstance--
21 and some of this was pre Receivership-- is that for some
22 reason or another, the windows were required to be replaced,
23 and they were-- it was unpermitted work, and so what
24 happened-- and, again, I'm going back a while-- my
25 recollection was that the City went out and did the

Page 34

1  inspection, and said that these windows that were put in were
2  not correct.  They were not in accordance with Code, and Code
3  required-- the new windows that had been put in were not in
4  compliance with Code, and in order to be in compliance with
5  Code, they had to be hurricane impact windows or windows with
6  shutters.  And in this particular circumstance, in order to
7  close out the permit, it had to be one or the other, and the
8  owners determined that it was less expensive to go with
9  hurricane impact-- excuse me, hurricane shutters.
10     Q.  Okay.  Do you know when those hurricane shutters
11 may have been purchased?
12     A.  I do not.
13     Q.  Was it before or after your Receivership?
14     A.  It was after the receivership.
15     Q.  Were you there during an inspection for the
16 windows?
17     A.  No, I was not.
18     Q.  Do you know who was there?
19     A.  I believe Mr. Moody was there.
20     Q.  Okay.  So the Defendants were there.
21     Now, these 1335 and 1341 buildings-- the sister
22 buildings-- they actually had their approvals done on
23 different dates?
24     A.  That's correct.
25     Q.  So they didn't do them on the same day?

Page 35

1      A.  Yes.  My recollection is that it was maybe a month
2  or two months between approvals.
3      Q.  Okay.  So it would be no problem for the Defendant
4  to attempt to switch shutters from one building to the other
5  to qualify with different inspectors?
6          MS. SMITH:  I object, Your Honor.  This is
7      guessing.
8          MS. DOOLEY:  If she knows.
9          THE COURT:  She can answer, that's fine.
10         THE WITNESS:  I would think it would be a
11     possibility, yes.
12         Q.  (BY MS. DOOLEY):  Okay.  Now, you've issued bills
13 as a receiver, is that correct?
14     A.  That's correct.
15     Q.  And every month you issue your report, and, also,
16 you do billing, is that correct?
17     A.  So monthly I file the reports by clockwork.  I
18 would say, one or two times that I would do a bill for 60
19 days rather than 30 days, but, yes, on a regular basis fee
20 statements are filed with the Court.
21     Q.  Okay.  And you were forced to retain counsel in
22 this case, is that correct?
23     A.  I determined to seek authority to retain counsel.
24     Q.  Right.  And it was approved by this Court, yes?
25     A.  That's right.

Page 36

1      Q.  And they also had fees, is that correct?
2      A.  That's correct.
3      Q.  And do you also report those, as well?
4      A.  Yes, I do.
5      Q.  Okay.  And setting aside the fees that were
6  required to be paid by order of the court for a contempt
7  hearing, how much have you been paid of the Receiver fees for
8  managing these properties?
9      A.  I don't know the answer to that sitting here.
10     Q.  Okay.  Do you have an outstanding balance?
11     A.  I do.
12     Q.  What is your outstanding balance, ballpark?
13     A.  Yes.
14     Q.  It doesn't have to be perfect.
15     A.  So through the end of October, I think that we
16 agreed to have 84,000 as being the outstanding balance for
17 fees and expenses.
18     Q.  Does that include you and your attorney?
19     A.  Yes.
20     Q.  Okay.  And when did you come to this agreement?
21     A.  At the hearing, I believe it was November 9th.
22     Q.  And so have you been paid by the Defendants this
23 outstanding balance?
24     A.  Not the entirety, no.  I think there's a
25 possibility that I received some fees since that date, but I

9  (Pages 33 to 36)

Page 37

1  don't have a recollection specifically.
2      Q. How much maybe have you received?
3      A. 4,000 or 5,000, maybe 6,000. I don't recall.
4      Q. Okay. So there's well in excess of, one would say,
5  $70,000 still owed, and you're still accruing costs and fees
6  every month?
7      A. Right. We've also accrued fees for November. And
8  my expectation is, based on the last order that we entered,
9  that that probably could escalate a bit, given the additional
10  work that's going to be required in order to comply with the
11  most recent order that we're entering into.
12      Q. Okay. And other than getting money from the
13  Defendants, which has not been generously forthcoming to pay
14  the fees--
15      MS. SMITH: Objection, Your Honor.
16      THE COURT: I'm sorry, what's the basis for the
17  objection?
18      MS. SMITH: I mean, gratuitous. It's not
19  necessary her adding commentary to the questions about
20  her position on the Defendants.
21      THE COURT: Okay, sustained.
22      Q. (BY MS. DOOLEY): Where else do you-- otherwise,
23  you seek money from the rents, is that correct?
24      A. Right. So fees have-- all of the fees and costs of
25  the estate-- excuse me, not estate, the fees and costs of the

Page 38

1  buildings-- you know, fees and costs as far as operating the
2  buildings, property management fees, attorney's fees, all
3  need to be, at this point in time, paid from the rental
4  income or have been paid from the rental income.
5      Q. All right. Now, tell me about this. The 1341
6  building, how many units are in there?
7      A. I believe there's eight--
8      UNKNOWN SPEAKER: Six.
9      THE WITNESS: Six in that building.
10      MS. SMITH: You can't answer.
11      MS. DOOLEY: That's okay.
12      THE WITNESS: It's a small building.
13      Q. (BY MS. DOOLEY): Is it fully occupied?
14      A. 1341, I don't have the rent roll in front of me. I
15  mean, we regularly rent units out and evict people if they
16  don't pay.
17      Q. Right. But is it an occupiable building?
18      A. Yes, it's an occupiable building.
19      Q. It's earning money?
20      A. Yes.
21      Q. Do you know what the rent is on those apartments?
22      A. I can tell you how much rental income came in in
23  November on those few units.
24      Q. Okay.
25      A. 3,570 was the rent in November.

Page 39

1      Q. $3,570?
2      A. That's correct.
3      Q. Okay. And 1558, how many units?
4      Do you know how many units were in 1558, or can you
5  tell me the rental rolls for the 1558 building?
6      A. In that building, 16. I don't have the rent rolls
7  with me, I apologize.
8      So the rent that came in in November at 1558 was
9  $9,470, and that represented approximately 19.5 percent of
10  the rental income in November.
11      Q. Okay, of all of the Receivership?
12      A. That's right, of the eight properties that are
13  generating income.
14      Q. Okay. So it's almost 20 percent?
15      A. 19.5 percent, yes.
16      Q. The 1710 Northwest 1st Court? You can see I have a
17  pattern going on here.
18      A. So that property, in November, generated $10,170,
19  which is approximately--
20      Q. 7 or 70?
21      A. $10,170. And that is approximately 21 percent of
22  the income for the eight buildings. And then the 1341
23  building is seven percent approximately.
24      Q. And then we go to the 1730 building-- 1730
25  Northwest 1st Court?

Page 40

1      A. $4,910 in November. And so that's approximately
2  10.1 percent of the gross income for the eight buildings in
3  November.
4      Q. Okay. So these four buildings represent roughly
5  probably a little more than 57 percent of all of the--
6  probably 58 percent of all of the income for the
7  Receivership--
8      A. It's 57.6 percent approximately.
9      Q. There you go. I'm not a math person.
10      --Of all of the usable income to continue with
11  repairs and maintenance on the buildings, is that correct?
12      A. That's correct.
13      Q. And for you to pay-- because while something is
14  still in Receivership, you're still required to pay taxes for
15  the property, yes?
16      A. Yes.
17      Q. For the other properties?
18      A. That's correct.
19      Q. And we already know that the 6820 building has zero
20  income, correct? And that's a rather large building, is it
21  not?
22      A. Yeah, there's quite a few units. I believe it's 27
23  or so.
24      Q. Okay. And so that's zero income, right?
25      A. That's right.

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 41

1     Q. Zero income, zero percent.
2     The 1335 building, what was its November--
3     A. That particular building only brought in $1,625 in
4  November.
5     Q. Okay. Less than half of its sister building, 1341?
6     A. That's right.
7     Q. Is there a reason for that?
8     A. It just requires more repairs, and so it's actually
9  right on the list of being worked on as we speak.
10    Q. That has an electrical issue?
11    A. That's right, I'm sorry.
12    Q. It has a fire issue?
13    A. I spoke to the property manager, I don't believe it
14  has a fire code issue. I believe that it's up to fire code
15  correctly right now, but it did have some electrical upgrades
16  that were required.
17    Q. Okay. And that's the one that had the incorrect
18  40/50 involving electrical, is that correct, 1335?
19    A. That's correct.
20    Q. It had one that was submitted without your
21  permission?
22    A. That's correct.
23    Q. And it was the Defendant's contractor who submitted
24  a document that was inaccurate, is that correct?
25    A. So that building had a-- so the access order

Page 42

1  requires that the 40/50 recertification report be prepared by
2  a company called Allied Building, and the genesis of that was
3  actually from the beginning of the case when we learned that
4  it needed a 40/50, but it had actually already gone through a
5  40/50 year reinspection certification process, and had
6  received a letter back from the City-- you know, because the
7  way it works, the City just reviews the reports, and if they
8  have any questions-- they don't have the facilities or the
9  wherewithal to go out and look at every one of these
10  properties that has an engineer, so the City sent a letter
11  back with some minor issues with respect to the property. So
12  we're actually working with Ms. Rathman (phonetic). I
13  reached out to the engineer saying, "Hey, I'm the Receiver on
14  this property. We just want to fix these items, figure out
15  exactly what needs to be done in order to get the 40/50 from
16  you. It didn't look from all accounts from this report that
17  there was much going on."
18    So then what happened was, that particular
19  engineer, after a few calls-- and he just went basically
20  silent, would not respond to anything. So as a result, we
21  decided, "Well, look, you know, let's figure out what's going
22  on with the building." We went ahead and had Allied go out
23  and do a preliminary report, and Allied came back and
24  identified a host of issues that were not in the first
25  report-- were evidently not in the first report that was

Page 43

1  submitted to the City. So during that process-- so that's
2  why the access order required that Allied-- that a third
3  party, somebody that the Receiver picks, be the person that
4  does the 40/50 recertification report. So it was either
5  Allied or somebody that I picked.
6     So, in the end, the owner submitted a report,
7  unbeknownst to me, actually-- I just had figured it out-- a
8  report from an alternate engineer in order to try to get the
9  City to sign off on the 40/50. And it was interesting,
10  because it was this exact building that was basically ground
11  zero before the issue.
12    Q. Okay. And so at one point, a 40/50 was approved
13  and was then revoked, is that correct, for 1335?
14    A. Yeah. So within the last year, we had had the
15  preliminary recertification report which had identified a
16  number of electrical upgrades that were required, and there
17  might have been other things, as well. So we had that
18  report, that was done at a parallel building, the 1341
19  building, for which we have the 40/50 recertification. So it
20  required some electrical upgrades. We got the electrical
21  upgrades-- we did the electrical upgrades at the 1341
22  building.
23    The 1335 building was to be handled by the
24  Defendants under the access order. And so-- I apologize. I
25  lost sight of your question.

Page 44

1     Q. All I asked you was, the Defendants actually
2  submitted recently to the City a passing inspection that
3  really was not a passing inspection, yes?
4     A. So basically what happened was, Allied, they went
5  out and got-- a different inspector came out and produced a
6  passing report, which ultimately proved to be problematic,
7  because there were some previously identified electrical
8  issues that had maybe been missed on the second inspection.
9  So Allied realized that there was a problem and realized that
10  they had submitted a report to the City, and revoked it,
11  because it was not a passing inspection.
12    So ultimately, rather than actually do the repairs
13  that were required to meet the City of Miami Code
14  requirements, it's my understanding that the owners decided
15  to go a different route and did some different repairs, and
16  got a different engineer, that was not set forth under the
17  access order, to submit a report.
18    Q. And that report has since been--
19    A. I don't know if it's been revoked.
20    Q. Okay. You don't know--
21    A. I don't know that it's been revoked. I do know
22  that Allied spoke with the engineer, because they were
23  confused as to how they were able to issue a passing report
24  under the circumstances.
25    Q. Because the electrical was not for electrical, but

Page 45

1  rather an electrical panel that was from the beginning of the
2  building, and would be good for natural gas, not electricity?
3         MS. SMITH: Objection, Your Honor. She's
4  testifying now.
5         MS. DOOLEY: Actually, I'm asking a direct
6  question. I'm allowed to do that on Cross.
7         THE COURT: Overruled.
8         THE WITNESS: So it was my understanding and my
9  recollection was that there was a disconnect between the
10  panels that the owners put in, and then the service that
11  was in the meter room, and that they didn't match up.
12  And so that was Allied's issue with respect to that.
13         And they had consulted their own internal
14  electrical inspectors to figure out, is there a
15  possibility that that was correct, and they said, no.
16         Q. (BY MS. DOOLEY): Okay. And to your knowledge as a
17  Receiver, is the electrical issue now being worked on to be
18  fixed?
19         A. Well, after the last hearing, we all agreed that
20  the owners were going to have an opportunity to fix the
21  electrical on their own terms, but in connection with working
22  with the City and the Receiver. So they have a certain
23  amount of time, I believe, until December 14, to submit an
24  alternate plan.
25         I know that there's some discussion about

Page 46

1  converting it to natural gas, but I haven't seen an actual
2  plan nor have I seen a scheduled meeting with the City to
3  reach an agreement as to, is this course of action that the
4  owner believes to be less expensive a feasible appropriate
5  course of action.
6         Q. So you haven't seen anything with regard to what
7  their plan is going to be?
8         A. The only thing I have seen is some sort of purchase
9  and sale contract with respect to stoves that are operating
10  on natural gas.
11         Q. Okay. But nothing with respect to the wiring?
12         A. No.
13         Q. Okay.
14         A. And, in fact, my response with respect to seeing
15  the contract was, rather than purchase those stoves, I would
16  suggest setting up a meeting with the City so that we are all
17  on the same page that this is something that they're going to
18  accept, and that this repair is going to actually resolve the
19  City's issues with respect to Code compliance.
20         Q. Because once they install the new appliances, new
21  permits are going to have to be pulled for all of those
22  things, is that correct?
23         A. Well, to be honest with you, there was an access
24  order in place, and I totally had a full order in place for
25  the building. I wasn't going to make any type of changes

Page 47

1  like that.
2         Q. Is the building currently set up for natural gas or
3  is that running strictly on electrical?
4         A. Well, they're using electrical, but it's my
5  understanding that natural gas quite easily could be used at
6  that building.
7         Q. But it's not there now?
8         A. No.
9         Q. So it's running on electrical, when it shouldn't be
10  running on electrical, yes?
11         A. Oh, I don't know that. I can't speak to that.
12         MS. DOOLEY: Okay. I have nothing further at this
13  time.
14         MS. SMITH: I have a couple of questions on
15  Redirect, Your Honor.
16         THE COURT: Okay. After this, we'll have to stop
17  because I already have a 2:30 waiting.
18         MS. SMITH: I have two questions, and then I think
19  we can finish with this witness, at least for today, if
20  that's possible.
21         THE COURT: Okay.
22            REDIRECT EXAMINATION
23  BY MS. SMITH:
24         Q. As it relates to the properties at 1710, 1730, 1558
25  and 1341, since the Court entered the access order in October

Page 48

1  of 2016, to present, have the repairs that have culminated in
2  the approvals of these buildings been paid for by the
3  Defendants?
4         Let me rephrase.
5         A. It's my understanding that there actually is some
6  unpaid electrical work at the 1558 building. It's the paint
7  job-- the stylist paint job, there's a dispute with the
8  painter. I received multiple calls that that was not paid.
9         I can tell you that the owners have put money into
10  the buildings. I can't-- you know, we put money-- some of
11  the owners put money through the Receivership into the
12  buildings, as well. But nine owners have worked over the
13  last, I guess, year and three months or so to get those
14  buildings in a situation that they could be--get their 40/50
15  year recertification.
16         Q. Would it be fair to say that the bulk of the repair
17  money on these four properties has been paid for by the
18  Defendants over the last 15 months?
19         A. Yes, I believe that would be a fair statement.
20         Q. And you have had access to all of the rental
21  proceeds during that time, as well?
22         A. Yes, that's correct.
23         Q. Okay. And you haven't given any of that rental
24  money to the Defendants to use to pay for the repairs of
25  these buildings?

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 49

1    A. I think de minimis checks, I've given to Norman,
2  but nothing of any substance.
3    Q. Okay. Is it true that you have asked the Court for
4  a loan against those properties?
5    A. No, that's not true.
6    Q. You didn't request the authorization to seek a loan
7  for half a million dollars?
8    A. I did, but not with respect to those four
9  properties. The way the loan was set up was that the lien--
10  well, the lien would be on the other four properties-- there
11  would be a mortgage lien, and it would be 1335, 1231, 1250
12  and the 6040 building.
13    Q. So 1335, the building that you were discussing with
14  the City just now, was part of that request for the loan?
15    A. Yes.
16    Q. Okay. And these loan proceeds would be used to
17  make the repairs that you were discussing with the City?
18    A. Yes, that's correct.
19    Q. And they would also be used to make the repairs
20  that are on the buildings, that we're not seeking return
21  today, that still need work; 1250, 1231 and 6040? Would that
22  be fair to say?
23    A. That's correct.
24    Q. Okay. And is it true that you entered into an
25  agreement with the Defendants, that we're in the middle of

Page 50

1  preparing an agreed order, as to either funding of the loan
2  or funding of those repairs? Would that be fair to say?
3    A. Funding of the repairs? Funding of the loan? I'm
4  not sure what you mean by that.
5    Q. Let me rephrase it.
6    A. Okay.
7    Q. At the last hearing, you were seeking authorization
8  to secure funds to make the remaining repairs on the
9  buildings, correct?
10    A. That's correct.
11    Q. Okay. And--
12    A. Well, let me be clear. It's not the remaining
13  repairs. It's the substantial electrical repairs. There are
14  other violations that need-- that were going to potentially,
15  if there's not sufficient rent coming in, need money in order
16  to finalize the repairs, but it is to make electrical repairs
17  that were set forth in the motion.
18    Q. And some of those monies in the loan, as you
19  outlined-- you used the number of $500,000, were also used to
20  cover any fees of the Receivership?
21    A. That's right.
22    Q. Okay. So the Court has given you authorization,
23  going forward, that if the Receivership would need money, and
24  if the Defendants failed to provide funds for the
25  Receivership, you have the ability to go out on the

Page 51

1  properties that are under your custody and control and seek
2  loan funds to pay these repairs and bills?
3    A. I mean, subject to objection, yes.
4    Q. Okay. So, as we sit here today, do you anticipate
5  any problems raising-- getting a loan on these properties, if
6  you had to, to raise funds?
7    A. Well, right now, I have a term sheet under which a
8  lender has agreed to provide financing. It's high rate
9  financing. The best financing that we would have in place
10  would be from a bank, for example.
11    Q. But you have the ability to raise funds to pay for
12  the Receivership and pay for the repairs, if needed?
13    A. I think so, but I can't say that for sure.
14    Q. Okay. So to your knowledge, has the Court modified
15  the Receivership order authorizing you to get a loan from a
16  third party?
17    A. I don't recall if the order has been entered, but I
18  know that the Court verbally told us that.
19    MS. SMITH: Okay. No further questions.
20    MS. DOOLEY: One quick Redirect (sic) question.
21    THE COURT: Recross, okay.
22        RECROSS EXAMINATION
23  BY MS. DOOLEY:
24    Q. Since she brought up the financing, with the
25  remaining properties, what would be left in terms of the

Page 52

1  income from the remaining properties? Is that enough to run
2  them on their own?
3    A. So the loan was structured in a fashion that there
4  would be funds to do the electrical repairs which would
5  really open up a lot of the units for rental, but that's
6  really like six months down the line.
7      As we've seen, it's been 14, 15 months just to get
8  some of the electrical work resolved, although I believe we
9  can do it quicker with the funds. So it doesn't necessarily
10  leave us in the interim. Like if they were to fund the
11  repairs, and the buildings are released, the other four
12  buildings, I do believe we would be in a fairly quick cash
13  crunch from an operational perspective.
14    MS. DOOLEY: Okay. Nothing further.
15    THE COURT: I'm sorry, so the loan would somehow
16  be paid by all of the monies generated from all of the
17  buildings, not just from the buildings that require
18  these repairs?
19    THE WITNESS: So I have calculations-- projections
20  under which there are sufficient funds to pay the loan,
21  if we had the $500,000 loan. From those buildings,
22  there's enough money to front the interest, as well as
23  working capital, but the issue is, right now the way
24  it's structured is that loan could be a few months down
25  the line, and so we would be most likely in an immediate

13  (Pages 49 to 52)

Page 53

1  cash crunch as quickly as we are moving.  And right now
2  if those properties were released, we would probably be
3  in a cash crunch right now.
4       THE COURT:  So all of the properties would still
5  need to be part of the Receiver, or could it be maybe
6  not all four of the buildings, but some of the buildings
7  be released and still have enough money to fund the
8  loan?
9       THE WITNESS:  Well, the buildings that the
10  attention was put to, in the immediate, over the last
11  year, were the better buildings, and so we're kind of
12  stuck with the buildings like the 1231 building, which
13  is very low occupancy, because it really needs the
14  electrical update.
15       So to answer your question, I would have to run
16  the numbers on that.  If there was not immediate repairs
17  being done and not any access working capital, I think
18  we would have an immediate problem.
19       THE COURT:  Okay.  All right.  Any questions based
20  on my questions?
21       MS. DOOLEY:  No, Your Honor.
22       MS. SMITH:  No further questions.
23       THE COURT:  Thank you.  You may step down.
24  We'll have to continue this at another time.
25       How much additional time do you think you'll need?

Page 54

1       MS. SMITH:  Probably about the same.  I'll
2  probably need another hour just for my witness.  I'm not
3  sure if the City is calling anybody.
4       MS. DOOLEY:  I would be calling our Chief of
5  Unsafe Structures.
6       THE COURT:  So at least two hours?
7       MS. DOOLEY:  Yes, I would say two, out of
8  fairness.
9       THE COURT:  Okay.  I have availability-- I noticed
10  when I was checking this morning for another case here,
11  I have availability for December 21st.  I just thought
12  that a lot of people are out during that time.
13       MS. SMITH:  I'll be actually out of the country.
14  Though, I'd love to say that I can take that, I can't.
15       MS. DOOLEY:  I have hearings in the morning.  It's
16  appeal hearings that I have to be at, otherwise I was
17  available on that date.
18       MS. SMITH:  Yeah, I physically won't be able to.
19  It's just too close to Christmas.  Any other
20  opportunity?
21       MR. LIEBERMAN:  I'll be in the country, Your
22  Honor.
23       THE RECEIVER:  We're available.
24       THE COURT:  I'd have to get back to you because
25  I'm already going into January.

Page 55

1       So when is it that you actually leave?
2       MS. SMITH:  I leave the 20th, and then I'm back on
3  the 30th.  But I have-- actually, since this is really
4  my last case, my calendar is pretty clear after January
5  1st to be available when any of the other attorneys can
6  be here, and as well as the Court could.
7       THE COURT:  So maybe on January 4th?
8       MS. SMITH:  That's fine for me.
9       THE RECEIVER:  I'm actually on vacation that week.
10  School is out.
11       MS. SMITH:  I have a question, though.  Since the
12  Receiver's already completed her testimony, would it be
13  necessary to even have her come back?
14       MS. DOOLEY:  I may want to recall her.
15       MS. SMITH:  Okay.
16       THE COURT:  All right.  So I need to get back to
17  you, then, because the other weeks are trial weeks, and
18  I anticipate being in trial.  So, if anything, we'd be
19  looking at probably the last week of January or the
20  first day of February.
21       MS. SMITH:  I'm available both of those.
22       MS. DOOLEY:  Unless I have a Code Enforcement
23  hearing that morning, or whatever, or ticket appeals,
24  I'll make myself available.
25       MS. SMITH:  Thank you.  I appreciate that.

Page 56

1       MS. DOOLEY:  I'm just the only one who does those
2  hearings for the City of Miami.  So unless I have that,
3  I'll move anything else I have out of the way.
4       THE COURT:  I appear to have some time on February
5  1st, unless it's something that's already been promised
6  to somebody, but just hasn't been docketed or calendared
7  because it's that far out, so I need to confirm.  So
8  I'll make a note here to check to see February 1st, and
9  then you let me know-- it would have to be in the
10  afternoon, around 1:00 or so.
11       MS. SMITH:  I'm available at that time.
12       MS. DOOLEY:  I just got the schedule, so I can
13  tell you.
14       THE COURT:  So, I guess, just call the office to
15  confirm, and if there are issues, my J.A. would, I
16  guess, let me know, because since it's that far out, you
17  may not have put something on the calendar.  So we'll
18  try, then, for February 1st at-- did I say 1:00 or 1:30?
19       MS. SMITH:  One o'clock.
20       MS. DOOLEY:  Yeah, I just have Code hearings that
21  start at five o'clock in the evening, so that should be
22  fine.  It shouldn't be a problem for me.
23       MS. SMITH:  So what I'll do is, I'll just check
24  with your J.A.
25       MS. DOOLEY:  As long as I can leave by 4:30.

2c709e9b-ab44-4c20-b360-5fb66f7407a9

Page 57

```
1       MS. SMITH:  Okay.
2       THE COURT:  So double check, I guess, at one
3   o'clock, February 1st.  I'll just put parties shall
4   confirm.
5       MS. SMITH:  I'll reach out to the J.A., and make
6   sure it wasn't a problem, and then I'll notice it.  So
7   if you don't hear from me, you'll get a notice, is kind
8   of how that'll work.  Is that fine with you, Linda?
9       THE RECEIVER:  I'm sorry?
10      MS. SMITH:  Does February 1st look okay?
11      THE RECEIVER:  Yeah, that works fine.
12      MS. SMITH:  Okay.  Thank you, Your Honor, for
13  taking care of that in court.  And Happy Holidays, Merry
14  Christmas.
15      THE COURT:  Thank you.  Same to you.
16      (Thereupon, the proceedings were concluded at 2:45
17  p.m.)
18
19
20
21
22
23
24
25
```

Page 58

```
1
2              CERTIFICATE
3
4   STATE OF FLORIDA    )
                         )
5   COUNTY OF MIAMI-DADE )
6
7       I, ESTELA L. VALLE, Shorthand Reporter and Notary Public
8   for the State of Florida, do hereby certify that I was
9   authorized to and did stenographically report the foregoing
10  proceedings, and that the transcript is a true and complete
11  record of my stenographic notes.
12      DATED this 26th of December, 2017.
13
14      _____
            Estela L. Valle
15          Shorthand Reporter and Notary Public
16
17
18
19
20
21
22
23
24
25
```

2c709e9b-ab44-4c20-b360-5fb66f7407a9

# Exhibit "4"

Filing # 78013157 E-Filed 09/17/2018 04:53:19 PM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**
**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CITY OF MIAMI,                                    CASE NO. 2014-027781-CA-01

      Plaintiff,

vs.

MIAMI BEVERLY LLC; *et al.*,

      Defendants.

_____/

**RECEIVER'S WRITTEN RESPONSE AND ARGUMENT TO**
**DEFENDANT'S 4th AMENDED MOTION FOR**
**RELEASE OF COMPLIANT PROPERTIES**

      The court-appointed receiver, Linda Leali (the "**Receiver**"), by and through undersigned counsel, hereby files this *Receiver's Written Response and Argument to Defendant's 4th Amended Motion for Release of Compliant Properties* (the "**Motion**") in response to the *Defendant's 4th Amended Motion for Release of Compliant Properties* (the "**Release Motion**") filed by The Holdings at City II, LLC ("**Holdings**"). In support of this Motion, Receiver states the following:

      1.     On February 20, 2018 Holdings filed the Release Motion.

      2.     On August 17, 2018, Holdings filed its *Argument in Support of the 4th Amended Motion for Release of Compliant Properties* ("**Release Argument**").

      3.     On September 20, 2018 this Court entered its *Agreed Order on Defendant's Motion for Release of Complaint Property*, stating at paragraph 2: "The hearing currently set for September 17, 2018, is hereby canceled in favor of the submission of written argument. Any such written argument must be received by the Court no later than close of business September 17, 2018."

1

4.     Receiver contends the Release Motion and Release Argument constitute a violation of the automatic stay imposed pursuant to 11 U.S.C. § 362.

5.     Receiver hereby submits the *Motion for Contempt for Violation of the Automatic Stay and for Sanctions* ("**Contempt Motion**") attached hereto as **Exhibit "A."**

6.     The Contempt Motion was filed in the consolidated Chapter 11 case of Miami Beverly, LLC filed in the United States Bankruptcy Court, Southern District of Florida, Case No. 18-14506-BKC-LMI ("**Bankruptcy Case**") seeking compensatory and punitive sanctions against Holdings and its counsel, Renee M. Smith

7.     As stated in the Contempt Motion, efforts to bring the Release Motion are blatant and willful efforts to force immediate adverse economic consequences upon the entirety of the Receivership Properties [1] and the estate in the Bankruptcy Case. Those efforts are part of a bad faith, unprovoked initiative to undercut Receiver and the Bankruptcy Case to the detriment of the Receiver and creditors in the Bankruptcy Case.

8.     In addition to the Contempt Motion, Receiver further adopts factual findings in *City of Miami's Written Response and Argument to Defendant, the Holdings at City II, LLC, Motion to Release Compliant Property* dated September 17, 2018.

9.     Finally, orders appointing Receiver dated July 4, 2018 and July 10, 2018 render each of the Receivership Properties jointly and severally liable for payment of fees to Receiver and her counsel. Those fees are currently $14,070.00 for Receiver and $38,794.50 for her counsel. Non-payment fees is yet another reason this Court should deny the Release Motion.

WHEREFORE, the Receiver respectfully requests that this Court enter an order: (1) denying the Release Motion; and (2) for such other and further relief as the Court may deem necessary or appropriate.

---

[1] As defined in the Contempt Motion.

Respectfully submitted on September 17, 2018.

> Messana, P.A.
> *Counsel for the Receiver*
> 401 East Las Olas Boulevard, Suite 1400
> Fort Lauderdale, FL 33301
> Telephone:  (954) 712-7400
> Facsimile:  (954) 712-7401
> tmessana@messana-law.com
>
> /s/ Thomas M. Messana
> Thomas M. Messana
> Florida Bar No. 991422
> Chris M. Broussard
> Florida Bar No. 95894

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Receiver's Written Response and Argument to Defendant, The Holdings at  City II, LLC, Fourth Amended Motion for Release of Compliant Properties* was served via the Florida Courts E-Filing Portal E-Service on this 17th day of September, 2018 to: **Renee M. Smith, Esq.**, Renee M. Smith, P.A., 17071 West Dixie Highway, Suite 110, Aventura, Florida 33160 at renee@smithtitleservices.com, reneesmithesq@aol.com, and **Rachel S. Glorioso Dooley, Esq.**, Assistant City Attorney, Victoria Mendez, City Attorney, 444 Southwest 2nd Avenue, Suite 945, Miami, Florida 33130-1910 at rsdooley@miamigov.com and aidagarcia@miamigov.com.

> By:   /s/ Thomas M. Messana
> Thomas M. Messana
> Florida Bar No. 991422

3

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

In re:

Miami Beverly, LLC,

1336 NW 60, LLC
Reverend, LLC
13300 Alexandria Dr. Holdings, LLC
The Holdings at City, LLC

     Debtor.

_____/

Case No. 18-14506-BKC-LMI
Chapter 11 (Lead Case)

Jointly Administered
Case No. 18-14509-BKC-LMI
Case No. 18-14510-BKC-LMI
Case No. 18-14511-BKC-LMI
Case No. 18-14512-BKC-LMI

**MOTION FOR CONTEMPT FOR VIOLATION OF**
**THE AUTOMATIC STAY AND FOR SANCTIONS**

Linda Leali, the court-appointed Receiver (the "**Receiver**") in the matter styled *City of Miami v. Miami Beverly LLC, et al.* (Case No. 2014-027781-CA-01) (the "**Receivership Case**") in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (the "**State Court**"), by and through undersigned counsel, hereby files this *Motion for Contempt for Violation of the Automatic Stay and for Sanctions* (the "**Motion**") pursuant to 11 U.S.C. §§ 105 and 362 and Rules 9014 and 9020 of the Federal Rules of Bankruptcy Procedure, seeking compensatory and punitive damages for actions taken in the Receivership Case, which constitute acts to exercise control over and that have had an adverse impact on estate property in the above captioned chapter 11 case (the "**Bankruptcy Case**"). In support, Receiver states the following:

1

## PRELIMINARY STATEMENT

Both prior to and throughout the three year Receivership Case, the nine properties subject to the Receivership Case have operated as one, single financial entity. All revenue is deposited into one bank account and all expenses are paid from that one account. [1]

Eight properties subject to the Receivership Case filed for bankruptcy in April of 2018. Now, the only entity under the Receivership Case not a debtor in bankruptcy is Holdings at City II, LLC. Like the eight properties in bankruptcy, Abe and Denise Vaknin are the legal and equitable beneficial interest holders of Holdings at City II, LLC. Holdings at City II, LLC owns the best property in the Receivership Case.

Abe and Denise Vaknin know that even with all the revenue from all the Receivership Properties, [2] there is not enough revenue for Receiver to pay all the bills to operate the Receivership Properties. Nothing changed because one property – the best property – did not file for bankruptcy.

The property belonging to Holdings at City II, LLC provides approximately 22% of Receiver's revenue. Absent that revenue from that property, Receiver cannot carry out her heavy duties and operate the Receivership Properties on a positive cash flow basis.

Notwithstanding the five bankruptcy stays, Abe and Denise Vaknin continue to advance the Release Motion [3] and Release Argument, [4] effectively, seeking to deprive Receiver of necessary revenue derived from the property belonging to Holdings at City II, LLC.

---

[1] Receiver maintains adequate records as directed pursuant to paragraph 5 of the Cash Procedures Order, *see infra* paragraph 12. Any Debtor or non-Debtor entity is granted a chapter 11 administrative expense for net sums loaned to other Debtor entities. This was a purposeful arrangement, inducing Receiver to resolve her Turnover Motion, *see infra* paragraph 9, by entry of the agreed Turnover Order, *see infra* paragraph 11, and Cash Procedures Order and had the effect of compelling Receiver to withdraw her motion to dismiss Debtor's Bankruptcy Case as a bad faith filing.

[2] *See infra* paragraph 2.

[3] *See infra* paragraph 24.

[4] *See infra* paragraph 25.

2

Simply put, Holdings at City II, LLC and its counsel, Renee M. Smith, are interfering with the administration of the Bankruptcy Case and estate property. Receiver, by and through counsel, has advised Holdings at City II, LLC of their persistent violation of the automatic stay on numerous occasions. Moreover, it is beyond dispute that Holdings at City II, LLC and its counsel, Renee M. Smith, are aware of the Debtor's Bankruptcy Case. As such, Holdings at City II, LLC and its counsel, Renee M. Smith, are actively violating the automatic stay in a willful, knowing, and purposeful manner. Current actions are inline with a long history of sanctions and bad faith conduct. Accordingly, this Court ought to impose both compensatory and punitive sanctions against Holdings at City II, LLC and its counsel, Renee M. Smith.

## BACKGROUND

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      On October 29, 2014, the City of Miami filed a *Complaint for Injunctive Relief and Money Damages* against defendants in the Receivership Case (the "**Defendants**"), on behalf of itself and the citizens of the City of Miami in order to enforce its City Code and protect the tenants residing within the Defendants' properties (the "**Receivership Properties**").

3.      Thereafter, the City of Miami sought entry of a final judgment from the State Court. An Order Granting Default Final Judgment was entered on June 4, 2015 and a Final Judgment was entered on December 24, 2015 (collectively, the "**Final Judgment**").

4.      In connection therewith, the City of Miami sought appointment of a Receiver over the Receivership Properties. At that time, the Receivership Properties had been plagued by years of gross mismanagement.

3

5.      Based upon the evidence provided to the State Court at a hearing held June 4, 2015, the State Court determined that the Receivership Properties were in serious disrepair and threatened the health, safety, and welfare of the community.

6.      On account of the State Court's June 4, 2015 determinations, by orders dated June 4, 2015 and June 10, 2015 (together, the "**Receivership Order**"), the State Court appointed Receiver as receiver regarding the Receivership Properties. Among other things, the Receivership Order authorized Receiver to manage the Receivership Properties and to seek to correct the various code violations.

7.      Despite the hurtles erected by the Defendants, during a three year receivership of 147 units across several buildings owned by six companies, Receiver has been able to substantially improve the Receivership Properties and has increased the rent roll from rental deposits of $3,150.00 for the period June 10 through June 30, 2015, to rental deposits of $31,311.00 for the month of July 2015, to rental deposits of $48,281.00 for the month of February, 2018, and, most recently, to rental deposits of $57,108.16 for August, 2018.

**The Bankruptcy Case**

8.      On April 18, 2018, the City of Miami set its Final Judgment for foreclosure sale. On April 17, 2018 (the "**Petition Date**"), Debtor commenced the above captioned chapter 11 bankruptcy case (the "**Bankruptcy Case**"). Prior to this Motion, Debtor has, in fact, consented to Receiver remaining in possession of Debtor's assets and books and records.

9.      On May 17, 2018, Receiver filed the *Amended Motion Pursuant to 11 U.S.C. § 543(d)(1) to Excuse Receiver From Compliance with Turnover Requested and to Establish Powers and Duties of Receiver Nunc Pro Tunc to Petition Date* (ECF No. 46) (the "**Turnover Motion**").

4

10.    On May 31, 2018, Receiver filed the *Exigent Motion to Maintain Pre-Petition Integrated Cash Management Practice* (ECF No. 72).

11.    On June 15, 2018, this Court entered the *Agreed Order Granting, in Part, Amended Motion Pursuant to 11 U.S.C. § 543(d)(1) to Excuse Receiver from Compliance with Turnover Requirements and to Establish Powers and Duties of Receiver Nunc Pro Tunc to Petition Date* (ECF No. 78) (the "**Turnover Order**"). Regarding efforts to sell the Receivership Properties, the Turnover Order provides a clear and obvious timeline of events (the "**Sale Timeline**"), stating the following at paragraph 9: (1) "The Debtor shall file a motion to approve sale and for bidding procedures (the "Sale Motion") within 21 days from the date of this Order"; (2) "The Debtors shall seek a hearing on the Sale Motion on no later than 30 days' notice after the filing of the Sale Motion."; (3) "The Debtors shall seek a final hearing to be scheduled no for no later than 135 days after the filing of the Sale Motion."; and (4) "The closing shall take place no later than 150 days after the filing of the Sale Motion."

12.    On June 29, 2018, this Court entered the *Interim Order Granting, in Part, Exigent Motion to Maintain Pre-Petition Integrated Cash Management Practices, Including (I) Authorizing Continued Use of Existing Cash Management Practices, Bank Accounts, and Business Forms, (II) Waiving Investment and Deposit Requirements, and (III) Authorizing Continuance of Inter-Property Transactions Nunc Pro Tunc to Petition Date* (ECF No. 85) (the "**Cash Procedures Order**").

**Debtor's First Sale Motion & Objection**

13.    On July 12, 2018, Debtor filed *Debtors' Motion for Entry of an Order (A) Authorizing Sale of Real Properties Free and Clear of All Liens, Claims, and Encumbrances; (B) Approving Form and Manner of Notice of Sale and Bidding Procedures; (C) Approving The*

5

*Purchase and Sale Contract; (D) Approving Payment of Commission to Buyer's Broker; and (E)*
*Scheduling Final Sale Hearing* (ECF No. 96) (the "**Sale Motion**"). The Sale Motion attaches a
*Commercial Contract* with Finance Miami, LLC, specifying: (1) $8,500,000 purchase price; (2)
$50,000 down payment; (3) $3,450,000 due at closing; and (4) $5,000,000 in purchase financing.

14.    On August 3, 2018, The City of Miami, a Municipal Corporation ("**Miami**") filed
the *Objection of Creditor, City of Miami, Florida, to Debtor Motion for Entry of Order to*
*Authorize Sale of Real Property; Approving Form and Manner of Notice of Sale and Bidding*
*Procedures; Approving the Purchase and Sales Contract; Approving Payment of Commission to*
*Buyer's Broker and Scheduling a Final Hearing Filed July 12, 2018* (ECF No. 107) (the "**Miami**
**Objection**").

**Debtor's Second Sale Motion & Objections**

15.    On August 6, 2018, Debtor filed *Debtors' Amended Motion for Entry of an Order*
*(A) Authorizing Sale of Real Properties Free and Clear of All Liens, Claims, and Encumbrances;*
*(B) Approving Form and Manner of Notice of Sale and Bidding Procedures; (C) Approving The*
*Purchase and Sale Contract; (D) Approving Payment of Commission to Buyer's Broker; and (E)*
*Scheduling Final Sale Hearing* (ECF No. 109) (the "**Amended Sale Motion**"). The Sale Motion
attaches a *Commercial Contract* with The Next Corporation, LLC, specifying: (1) $11,000,000
purchase price; (2) $1,000,000 down payment; (3) $10,000,000 due at closing; and (4) $0 in
purchase financing.

16.    On August 27, 2018, Miami filed the *Objection of Creditor, City of Miami,*
*Florida, to Debtors' Amended Motion for Entry of an Order to Authorize Sale of Real Property;*
*Approving Form and Manner of Notice of Sale and Bidding Procedures; Approving The*

*Purchase and Sales Contract; Approving Payment of Commission to Buyer's Broker and Scheduling Final Sale Hearing [ECF 109]* (ECF No. 120) (the "**Amended Miami Objection**").

17.    On August 27, 2018, Gaynisha Williams, Nathanael Mars, Lakeisha Chatfield, Tamara Chatfield, and Shannon Daniels (collectively, the "**Tenants**") filed their *Creditors' Objection to Debtors' Amended Motion for Entry of a of an [sic] order (A) Authorizing sale of Real Properties Free and Clear of all Liens, Claims, and Encumbrances; (B) Approving form and Manner of Notice of Sale and Bidding Procedures; (C) Approving the Purchase and Sale Contract; (D) Approving Payment of Commission to Buyer's Broker; and (E) Scheduling a Final Sale Hearing (ECF No. 109)* (ECF No. 121) (the "**Tenant Objection**").

**August 29, 2018 Hearing & Proposed Instant Naked Sale Auction**

18.    Waiving around a new $11,500,000 purchase agreement in court hallway immediately preceding hearing on August 29, 2018, Debtor advised withdrawal of the Amended Sale Motion in favor of filing a new sale motion with buyer group associated with Alan Hardaman. Hardaman and Elizabeth the real estate professional attended the hearing along with other buyer representatives and heard the presentation by Debtor's counsel. Notwithstanding, no such motion was ever filed.

19.    Instead, on September 7, 2018, Debtor filed *Joint Debtors' Motion for Entry of an Order (A) Authorizing the Sale of Substantially all of Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances; (B) Approving Auction Sale and Bidding Procedures Including Break-up Fee and Forum Purchase and Sale Agreement; (C) Approving Form and Manner of Notice of Sale; (D) Scheduling an Auction Sale and (E) Scheduling Hearing to Approve Sale* (ECF No. 124) (the "**Second Amended Sale Motion**"). Essentially, the Second Amended Sale Motion proposes a naked sale by auction.

20.     On September 13, 2018, this Court entered the *Order Granting in Part, and Denying in Part, Debtors' Amended Motion for Entry of an Order (A) Authorizing Sale of Real Properties Free and Clear of All Liens, Claims, and Encumbrances; (B) Approving Form and Manner of Notice of Sale and Bidding Procedures; (C) Approving The Purchase and Sale Contract; (D) Approving Payment of Commission to Buyer's Broker; and (E) Scheduling Final Sale Hearing* (ECF No. 129) (the "**Order on Amended Sale Motion**").

21.     The Order on Amended Sale Motion advises at paragraph 4: "The Court, if necessary, shall conduct a final sale hearing or the Auction on October 26, 2018 at 1:30 p.m. at C. Clyde Atkins U.S. Courthouse, 301 N. Miami Ave., Courtroom 8 (LMI), Miami, FL 33128."

22.     Notwithstanding, the Second Amended Sale Motion at paragraphs 46-47 advise: "...it has been determined that an additional period of marketing will be necessary to conduct a competitive auction sale. As such, the Debtors request the Auction be scheduled for December 5-6, 2018, beginning on December 5, 2018 at 10:00 a.m. (EST) and ending on December 6, 2018 on or about 2:00 p.m. (EST), with a final hearing to approve the sale to be scheduled on or after December 7, 2018. Further, the Debtors request that all applicable deadlines in previous orders associated with the sale of the properties be extended accordingly."

23.     Debtor has subsequently advised they will require even more time than alluded to through the Second Amended Sale Motion, further stretching the Sale Timeline and calling into question Debtor's ability to actually accomplish a sale.

**State Court Release Motion**

24.     On February 20, 2018 (*i.e.*, *prior* to the Petition Date), Defendants filed in the Receivership Case, *Defendant's 4th Amended Motion for Release of Compliant Properties* (the "**Release Motion**"), seeking to release the following properties from oversight and control of

Receiver and the Receivership Order: (1) 1558 NW 1st Ave.; (2) 1341 NW 60th St.; (3) 1335 NW 60TH ST; (4) 1730 NW 1st Ct; and (5) 1710 NW 1st Ct.

25.     On August 17, 2018 (*i.e.*, *after* to the Petition Date), Defendant The Holdings at City II LLC filed in the Receivership Case, *Defendant's Argument in Support of 4th Amended Motion for Release of Compliant Properties* (the "**Release Argument**").

26.     The Release Argument narrows the Release Motion to a single Receivership Property (hereinafter, the "**1558 Property**"), stating: "Defendant by and through undersigned counsel, move this Honorable Court for release of complaint property as provided under Court Order dated October 24, 2016 located at 1558 NW 1st Ave..."

27.     On August 17, 2018, The City of Miami, a Municipal Corporation ("**Miami**") filed in the Receivership Case, *City of Miami's Response to Defendants Motion to Release of Property* (the "**Release Response**"). In the Release Response, Miami further confirms the Release Argument pertains only to one of the Defendants: Holdings at City II, LLC. [5]

28.     Additionally, Miami also argues: "It has always been and will continue to be the position of [Miami] that to parse of Properties will vitiate the ability of the Court-Appointed Receiver to manage and continue repair of any remaining Properties. To allow the release of a property for which the other Defendant properties rely upon for their continued operation and for which the United States District Court Judge Isicoff has approved would put the management of the buildings and the current tenants in an untenable situation."

## DISCUSSION

29.     The Bankruptcy Code addresses the automatic stay at 11 U.S.C. § 362, which states the following at subparagraph (a): "...a petition filed under section 301, 302, or 303 of this title,...operates as a stay, applicable to all entities, of – (3) any act to obtain possession of

---

[5] The 1558 Property is owned by Holdings at City II, LLC.

property of the estate or of property from the estate *or to exercise control over property of the estate*;" 11 U.S.C. § 362(a)(3) (emphasis added); *see also* 3 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 362.03 (16th rev. ed. 2013) ("The stay of section 362 is extremely broad in scope and...applies to almost any type of formal or informal action taken against the debtor or the property of the estate.").

30.     As emphasized above, when a petition is filed, the Bankruptcy Code effects a stay of, among other things, all efforts to exercise control over property of the estate. Bankruptcy Courts in the Eleventh Circuit and in other circuits, consistently advise 11 U.S.C. § 363(a)(3) is not limited to merely actions against the debtor and, instead, operates as a stay of non-debtor actions that "have an adverse impact on property of the estate." *In re Jefferson Cty., Ala.*, 491 B.R. 277, 295 (Bankr. N.D. Ala. 2013) (citing cases and quoting *Kagan v. Saint Vincents Catholic Med. Ctrs. of New York (In re Saint Vincents Catholic Med. Ctrs. of New York)*, 449 B.R. 209, 217-18 (S.D.N.Y.2011) ("...the automatic stay provision is not limited solely to actions against the debtor, but rather bars actions against even against third-parties that would have an adverse impact on the property of the estate"); *see also Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) ("The automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.").

31.     A violation of the automatic stay is "willful if the violator (1) knew of the automatic stay and (2) intentionally committed the violative act, regardless whether the violator specifically intended to violate the stay." *In re Govero*, 439 B.R. 917, 921 (Bankr. S.D. Fla. 2010) (internal quotations omitted); *In re WVF Acquisition, LLC*, 420 B.R. 902, 910 (Bankr. S.D. Fla. 2009) ("The requirement that the violator knew of the automatic stay does not mean that the

violator need be aware of the provisions of section 362. It is sufficient that the violator had actual knowledge of the bankruptcy case…or notice of sufficient facts to cause a reasonably prudent person to make additional inquiry to determine whether a bankruptcy petition has been filed.").

32.     In this case, as advised by Miami in the Release Response, relief sought by Holdings at City II, LLC through the Release Motion and Release Argument regarding release of the 1558 Property, forces immediate adverse economic consequences upon the entirety of the Receivership Properties and Debtor's Bankruptcy Case.

33.     The 1558 Property has, year to date, generated nearly 22% of total monthly revenue produced by the Receivership Properties, as detailed by the following:

|  | AUGUST | YTD |
|---|---|---|
| Consolidated: | $45,834.04 | $391,041.46 |
| 1558 NW 1 Ave: | $9,713.00 | $85,903.00 |
| PERCENT: | 21.19% | 21.97% |

34.     Removing the 1558 Property and income generated from same, jeopardizes viability of the entirety of the Receivership Property, which, generally, produce very little net income or are, in fact, cash flow negative. Additionally, because removal of income generated by 1558 Property puts the entirety of the Receivership Properties at risk, it further jeopardizes the Sale Timeline by reducing desirability and potential for sale of the Receivership Properties.

35.     Simply put, Holdings at City II, LLC and its counsel, Renee M. Smith, are interfering with the administration of the Bankruptcy Case and estate property. Receiver, by and through counsel, has advised Holdings at City II, LLC of their persistent violation of the automatic stay on numerous occasions. Copies of some of the several emails from Receiver's counsel to Renee M. Smith regarding stay violations are attached hereto as **Exhibit "A."**

36.     Moreover, it is beyond dispute that Holdings at City II, LLC and its counsel, Renee M. Smith, are aware of the Debtor's Bankruptcy Case. As such, Holdings at City II, LLC

and its counsel, Renee M. Smith, are actively violating the automatic stay in a willful, knowing, and purposeful manner.

**RELIEF REQUESTED**

37.    It is well settled that bankruptcy courts have inherent power to award compensatory damages for willful violations of the automatic stay, since that falls within the ambit of the bankruptcy court's civil contempt power. *See, e.g., Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1553-55 (11th Cir.1996) ("Damages may be awarded for violation of the automatic stay when the violation is willful."). The applicable standard of proof, at least with regard to compensatory damages, is clear and convincing evidence. *In re WVF Acquisition, LLC*, 420 B.R. at 910 (citing *Jove Eng'g, Inc.*, 92 F.3d at 1555).

38.    11 U.S.C. § 105(a) provides, in pertinent part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

39.    Bankruptcy courts hold 11 U.S.C. § 105(a) "...constitutes express authority to award punitive damages for contempt to the extent necessary or appropriate to carry out the provisions of the Bankruptcy Code." *In re WVF Acquisition, LLC*, 420 B.R. at 914 ("Section 105 creates a statutory contempt power distinct from the court's inherent contempt powers."); *see also In re San Angelo Pro Hockey Club, Inc.,* 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003) (a "major purpose of civil contempt is to compensate a party for damages sustained as the result of a violation of a court order or injunction. The automatic stay is a self-executing injunction, and therefore, for contempt purposes, constitutes an order issuing from the bankruptcy court.").

40.    Case law awarding punitive damages for stay violations consider the following: (1) the nature of the violator's conduct; (2) the nature and extent of the harm to the debtor; (3) the violator's ability to pay; (4) the motives of the violator; and (5) any provocation by the debtor. *In*

*re WVF Acquisition, LLC*, 420 B.R. at 914–15 ("Punitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes…To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of whether he was doing so.").

41.     The United States Supreme Court has established the following guideposts for consideration when setting an amount of punitive damages: (1) the degree of reprehensibility of the violator's conduct; (2) the disparity between the harm or potential harm suffered by the debtor and the punitive damages awarded; and (3) the difference between the award granted and the civil penalties imposed in similar cases. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *see also In re WVF Acquisition, LLC*, 420 B.R. at 915 ("Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.").

42.     In this case, compensatory and punitive damages should be awarded against Holdings at City II, LLC and its counsel, Renee M. Smith. As detailed above, efforts regarding the Release Motion, Release Argument, and the 1558 Property are blatant and willful efforts to force immediate adverse economic consequences upon the entirety of the Receivership Properties and Debtor's Bankruptcy Case. Those efforts are part of a bad faith, unprovoked initiative to undercut Receiver and Debtor's Bankruptcy Case to the detriment of Receiver and creditors in Debtor's Bankruptcy Case, both jeopardizing the Sale Timeline and forcing Receiver to incur significant expense combating same.

43.     Actions of Holdings at City II, LLC and its counsel, Renee M. Smith, are additionally reprehensible given the history of bad acts by Renee M. Smith in the Receivership Case. Receiver has already sought sanctions for violation of the Barton Doctrine against Renee

M. Smith in the Receivership Case through the *Receiver's Motion for Order of Contempt and for Sanctions* and, in fact, received sanctions against Renee M. Smith and Denise Vaknin for bad faith conduct through the *Order Granting Receiver's Motion for Order of Contempt and for Sanctions* (the "**Sanctions Award**"). A copy of the Sanctions Award is attached as **Exhibit "B."**

WHEREFORE, for all the reasons outlined above, Receiver hereby requests this Court: (1) grant this Motion; (2) find Holdings at City II, LLC and legal and equitable interest holders Abe and Denise Vaknin and their counsel, Renee M. Smith, is willfully violating the automatic stay through the Release Motion, Release Argument, and related efforts regarding same; (3) compelling Holdings at City II, LLC and its counsel, Renee M. Smith, to withdraw the Release Motion and Release Argument and cease pursuit of related proceedings; (4) imposing a monetary per diem sanction for each day Holdings at City II, LLC and its counsel, Renee M. Smith, for each day they refuse to withdraw the Release Motion and Release Argument and cease pursuit of related proceedings; (5) entering a monetary sanction against Holdings at City II, LLC and its counsel, Renee M. Smith, for reasonable costs associated with filing and prosecuting this Motion; (6) entering an award of punitive damages against Holdings at City II, LLC and its counsel, Renee M. Smith; (7) in addition to monetary sanctions and punitive damages, directing Holdings at City II, LLC and legal and equitable interest holders Abe and Denise Vaknin and their counsel, Renee M. Smith, to fund an eleemosynary initiative; and (7) granting any further or additional relief this Court deems necessary or appropriate.

Respectfully submitted on September 17, 2018.

**MESSANA, PA**
*Counsel for Receiver*
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
Telephone: (954) 712-7400
Facsimile: (954) 712-7401

Email: tmessana@messana-law.com

/s/ Thomas M. Messana
Thomas M. Messana
Florida Bar No. 991422
Chris M. Broussard
Florida Bar No. 95894

# EXHIBIT "A"

**From:** Thomas M. Messana
**Sent:** Tuesday, September 04, 2018 6:20 PM
**To:** 'Renee Marie Smith Esq.'
**Cc:** 'Ido J. S. Alexander, Esq.'; 'zbs@lsaslaw.com'
**Subject:** RE: FW: SERVICE OF COURT DOCUMENT CASE NUMBER 132014CA027781000001 City Of Miami vs Miami Beverly Llc

Renee,

Respectfully, you are missing the point. I agree with you that there is no bankruptcy stay from the non-debtor Holdings at City II because it never filed for bankruptcy. Rather it is you, Mr. and Mrs. Vaknin and Holdings at City II who are violating the automatic stay created by the several related entities bankruptcy cases: Miami Beverly, LLC, case no 18-14506-BKC-LMI; 1336 NW 60, LLC, case no 18-14509-BKC-LMI; Reverend, LLC, case no 18-14510-BKC-LMI; 13300 Alexandria Dr. Holding, LLC, case no 18-14511-BKC-LMI; and, The Holdings at City, LLC, case no 18-14512-BKC-LMI (the "Related Entity Bankruptcy Cases"). Simply put, you and your clients are interfering with the administration of the Related Entity Bankruptcy Cases and property of those bankruptcy estates and as such, you and they are actively violating the bankruptcy stays of the several Related Entity Bankruptcy Cases in a knowing and purposeful manner. The bankruptcy system takes a dull view of such acts and, if you don't heed these warning and continue to advance the Motion to Release Compliant Properties you are going to get in more trouble than I've seen you get in (and, earlier in these proceedings, you and your clients were found to have acted in bad faith, held in contempt of court and sanctioned). See generally, National Tax Credit Partners, L.P. v. Havlik, 20 F.3d 705 (7th Cir 1994)(post bankruptcy actions by partners of the debtors found to be impermissible acts to gain control over bankruptcy estate property); In re General Growth Properties, Inc., 426 B.R. 71 (Bankr. S.D.N.Y. 2010)(state court action by debtor's shareholder to enjoin debtor's corporate directors found a violation of the stay as threatening to directly interfere with the administration of the bankruptcy estate and the core purpose of the automatic stay).

The Vaknins know that even with all the revenue from all the properties it is not enough revenue for the Receiver to pay all the bills to operate the properties. Nothing changed because one property—the best property--did not file bankruptcy. 11 USC 362(a) states, in part "...a [bankruptcy] petition ... operates as a stay ... of ...(3) any act to obtain possession of property of the estate or against property of the estate or to exercise control over property of the estate ..." In the Related Entity Bankruptcy Cases, Mr. and Mrs. Vaknin and the Receiver have crafted a carefully struck deal to go forward together where Mr. and Mrs. Vaknin play the central role in selling the real property of the Related Entity Bankruptcy Cases and the Vaknin's committed to providing resources to fix the electric and bring it in compliance with the City Code and provide the Receiver with the same resources she had to operate the non-debtor property and all of the debtor properties notwithstanding the bankruptcy. As an example, for that Holdings at City II, the Order granting Receiver's Motion to Maintain integrated Cash Management Practices (ECF # 85) includes borrowing between and among the properties under the Receiver's charge, where Holdings at City II gets an administrative claim in the Related Entity Bankruptcy Cases. If granted, your Motion to

1

Release Complaint Property seeks to eliminate that revenue from the common fund, which is approx. 22% of the revenue of all of the properties. Over a short period, if granted your motion would undermine the Related Entity Bankruptcy Cases. (Perhaps you are unaware but a chapter 11 debtor can not lose money on a cash basis and continue to be in chapter 11.) The Receiver will not let that happen quietly.

If the stakes are not high enough for you in being accused of a willful and wonton violation of the bankruptcy automatic stay, in addition to violating of law, it makes no sense for the Vaknin's to pick a fight with the Receiver. We've made a deal and the Receiver has abided by it. Why do you and the Vaknins want to go backward? Just sell the property or your client risks bungling the opportunity and having a chapter 11 trustee sell it. You know that Holdings at City II is jointly and severally liable for the approx. $60,000+ in fees and costs owed the Receiver and my law firm. So, even if they win, they lose because they claim this is an equity case and therefore they pay the administrative costs, including the Receiver's fee and that of her professional. If you are successful in your motion, you are accelerating the timing of making those payments.

Let me respectfully suggest you counsel with your client representative and ask them to withdraw the Motion to Release Complaint Property and focus on selling the several properties for the most money possible and, if you get that done, you'll have done a substantial service to your clients and everyone else involved in this case.

If not, you've been warned.

You've got until close of business Thursday to cancel the Notice of Hearing and withdraw the Motion to Release Complaint Property or I'm filing a Motion in bankruptcy court.

Tom



**Messana P.A.**

**Thomas M. Messana**
Attorney at Law

**Messana, P.A.**
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
954-712-7400 - Office Telephone
954-712-7415 - Direct Telephone
954-712-7401 - Office Facsimile
tmessana@messana-law.com
www.messana-law.com

---

**From:** Renee Marie Smith Esq. [mailto:Renee@smithtitleservices.com]
**Sent:** Tuesday, September 04, 2018 4:43 PM
**To:** Thomas M. Messana
**Cc:** 'Ido J. S. Alexander, Esq.'; 'zbs@lsaslaw.com'
**Subject:** RE: FW: SERVICE OF COURT DOCUMENT CASE NUMBER 132014CA027781000001 City Of Miami vs Miami Beverly Llc

Hello Tom;

There is no stay in place against Holdings at City II as it did not seek protection from the BK Court nor does its assets fall under the jurisdiction of the BK court.

As in Bk, the circuit court joined Defendants for convenience into one receivership.

The defendants remain separate companies with separate incomes.

Which is why there were multiple BK filings not a single one on behalf of all the properties under the circuit court ordered receivership.

Further, as common in multi-defendant circuit court cases where one defendant files BK, the circuit court case proceeds as to the other defendants.

11 USC 362(a) does not benefit non-bk defendants nor prevent Plaintiff's for continuing to litigate against them.

There is nothing improper here by a defendant in circuit court proceeding with his case.

If you can clarify what sanction-able offense you are referring, I am happy to reconsider my position.

Sincerely;

Renee Marie Smith, Esq.


-------- Original Message --------
Subject: FW: SERVICE OF COURT DOCUMENT CASE NUMBER 132014CA027781000001
City Of Miami vs Miami Beverly Llc
From: "Thomas M. Messana" <tmessana@messana-law.com>
Date: Tue, September 04, 2018 3:52 pm
To: "Renee@smithtitleservices.com" <Renee@smithtitleservices.com>
Cc: "'Ido J. S. Alexander, Esq.'" <ialexander@aslawpllc.com>,
"'zbs@lsaslaw.com'" <zbs@lsaslaw.com>

Renee,

By advancing this motion and noticing it for hearing, you and your client are violating the bankruptcy automatic stay.  See 11 USC 362(a).  Please cancel the hearing and withdraw the motion for release of compliant property immediately or in addition to any other relief available, you will force me to file a Motion seeking sanctions against you, your client and the individual client representative instructing you to advance this violation of the automatic stay and since the violations are willful and wanton, I will seek punitive damages.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Tom




**Thomas M. Messana**
Attorney at Law

**Messana, P.A.**

3

401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, Florida 33301
954-712-7400 - Office Telephone
954-712-7415 - Direct Telephone
954-712-7401 - Office Facsimile
tmessana@messana-law.com
www.messana-law.com

**From:** eservice@myflcourtaccess.com [mailto:eservice@myflcourtaccess.com]
**Sent:** Tuesday, September 04, 2018 1:51 PM
**Subject:** SERVICE OF COURT DOCUMENT CASE NUMBER 132014CA027781000001 City Of Miami vs Miami Beverly Llc

Notice of Service of Court Documents
Filing Information

| | |
|---|---|
| Filing #: | 77386938 |
| Filing Time: | 09/04/2018 01:51:03 PM ET |
| Filer: | Renee M Smith 305-363-2399 |
| Court: | Eleventh Judicial Circuit in and for Miami-Dade County, Florida |
| Case #: | 132014CA027781000001 |
| Court Case #: | 2014-027781-CA-01 |
| Case Style: | City Of Miami vs Miami Beverly Llc |

Documents

| Title | File |
|---|---|
| Notice Of Hearing | Notice of hearing.pdf |

E-service recipients selected for service:

| Name | Email Address |
|---|---|
| Ido J Alexander | ija@lsaslaw.com |
| | info@lsaslaw.com |
| Linda M. Leali | lleali@lealilaw.com |
| | probate@lealilaw.com |
| Victoria Pajaujis | vpajaujis@lealilaw.com |
| Rachel G Dooley | rsdooley@miamigov.com |
| | smfernandez@miamigov.com |
| | gcarby@miamigov.com |
| Renee M Smith | renee@smithtitleservices.com |

| Name | Email Address |
|------|---------------|
|  | reneesmithesq@aol.com |
| Thomas M. Messana | tmessana@messana-law.com |
|  | tmessana@bellsouth.net |
|  | mwslawfirm@gmail.com |
| Thomas G Zeichman | tzeichman@messana-law.com |

E-service recipients not selected for service:

| Name | Email Address |
|------|---------------|
| Brett D. Lieberman | brett@elrolaw.com |
|  | eservice@elrolaw.com |
|  | morgan@elrolaw.com |
| Eric Irons | eric@ironslawgroup.com |
| Inger M Garcia | attorney@ingergarcia.com |
|  | attorney@FloridaPotLawFirm.com |
|  | ServiceIMGLAW@yahoo.com |
| Keith David Silverstein | keith@silversteinpa.com |
|  | service@silversteinpa.com |
|  | vanessa@silversteinpa.com |
| Linda Leali | lleali@lealilaw.com |
| Melissa Groisman | mgs@rrrlaw.com |
|  | cah@rrrlaw.com |
| Rebecca Parsons Schram | rschram@legalservicesmiami.org |
|  | pgonzalez@legalservicesmiami.org |
|  | pleadings@legalservicesmiami.org |
| Agustin Barbara | agustin@smithtitleservices.com |
| Robert A. Stok | service@stoklaw.com |
|  | jkon@stoklaw.com |
|  | dsuazo@stoklaw.com |
| Brett D. Lieberman, Esq. | blieberman@messana-law.com |
|  | nbarrus@messana-law.com |

| Name | Email Address |
|------|---------------|
| Kenneth E Trent | trentlawoffice@yahoo.com |

This is an automatic email message generated by the Florida Courts E-Filing Portal. This email address does not receive email.
Thank you,
The Florida Courts E-Filing Portal
The following identifier(s) are associated with this transaction:

  request_id#:77386938;Audit#:262007869;UCN#:132014CA027781000001;

# EXHIBIT "B"

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CITY OF MIAMI,                                     Case No. 2014-027781-CA-01

               Plaintiff,

vs.

MIAMI BEVERLY LLC; 1336 NW 60 LLC;
REVEREND LLC; 13300 ALEXANDRIA
DRIVE HOLDINGS LLC; THE HOLDINGS
AT CITY LLC; THE HOLDINGS AT CITY II LLC,

               Defendants.

_____/

**ORDER GRANTING RECEIVER'S MOTION FOR
ORDER OF CONTEMPT AND FOR SANCTIONS**

THIS CAUSE came before the Court on October 5, 2016 to consider the *Receiver's Motion for Order of Contempt and for Sanctions* dated August 31, 2016 (the "Contempt Motion"). The Court has reviewed the Contempt Motion, the *Defendants' Motion to Dismiss Receiver's Motion for Order of Contempt and for Sanctions* dated September 27, 2016, and the *Receiver's: (I) Supplement to Receiver's Motion to Dismiss Receiver's Motion for Order of Contempt and for Sanctions; & (II) Reply to Defendants' Motion to Dismiss Receiver's Motion for Order of Contempt and for Sanctions*, finds that proper notice has been given of the Motion, has been advised of the agreement of the parties and the entry of the instant Order, and upon review of the pleadings and docket in this matter and in the Lawsuit[1] (including that the Lawsuit was voluntarily dismissed by the Defendants on October 4, 2016), finds good cause for the relief requested therein. Accordingly, it is

ORDERED AND ADJUDGED as follows:

1.      The Contempt Motion is granted in its ENTIRETY.

---

[1] Any capitalized term not defined herein shall have the meaning ascribed to it in the Contempt Motion.

1

2.      This Court finds that the Defendants and Smith acted in bad faith in commencing the Lawsuit.

3.      This Court finds that the Defendants and Smith have acted in contempt of this Court by purposefully violating the Receivership Order by commencing the Lawsuit without first seeking leave of this Court.

4.      This Court finds that the Receiver suffered damages in the form of, among other things, legal fees and costs in prosecuting the Contempt Motion and defending the Lawsuit occasioned by the Defendants and Smith.

5.      Sanctions are hereby entered against the Defendants and Smith, jointly and severally, for the amount of reasonable fees and costs incurred by the Receiver related to bringing and prosecuting the Motion for Contempt (the "Sanctions"). The amount of the Sanctions shall be determined by further Court order.

6.      The Lawsuit having been voluntarily dismissed shall not be refiled by the Defendants absent court order from the court with jurisdiction over the receivership.

7.      This Court has no objection to the Lawsuit and the complaint therein being sealed and marked Confidential pursuant to Rule 2.420(3)(B) of the Florida Rules of Judicial Administration and the court overseeing the Lawsuit directing the Clerk of Court to designate the Lawsuit and the complaint therein as confidential and maintain the confidentiality of same.

8.      Smith is hereby required to complete 10 continuing learning education credits in ethics and professional responsibility within the next six months and to report back to the Court promptly upon expiration of the allotted time or completion.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 10/17/16.

_____
BARBARA ARECES
CIRCUIT COURT JUDGE

> No Further Judicial Action Required on **THIS MOTION**
> **CLERK TO RECLOSE** CASE **IF** POST JUDGMENT

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter.   The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.

# Exhibit "5"

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI- DADE COUNTY, FLORIDA.

City of Miami
               Plaintiff,

v.

CASE NO.:  2014-27781-CA-01 (23)

Miami Beverly LLC
The Holding at City II LLC,
 Et al.,

               Defendants.

---

**ORDER ON DEFENDANT'S**
**MOTION FOR RELEASE OF COMPLAINT PROPERTY**

THIS CAUSE came before the Court on December 4, 2017, August 20, 2018 and written arguments submitted by the Parties on September 17, 2018 upon Defendant's, The Holdings at City II, *Motion for Release of Complaint Property* as defined by *Agreed Order on Defendants' Motion to Close Violations* dated October 24, 2016. The Court having considered the entire record in this case, including the representations of counsel presented at the hearing, noting the agreement of the Receiver and the Defendant to the relief granted herein, and noting that due and adequate notice has been given to all parties-in-interest, and no further or other notice is required, it is

ORDERED AND ADJUDGED as follows:

1. Defendant's, The Holdings at City II LLC, property located at 1558 NW 1st Ave Miami, Florida 33136 is deemed compliant and no longer poses a risk to the public.

2. Property located at 1558 NW 1st Ave Miami, Florida 33136 shall be released to Defendant, The Holdings at City II LLC, custody and control no later than fourteen (14) days from this Order.

1

3. Receiver shall submit an accounting to the Defendant, The Holdings at City II LLC, within seven (7) days of this order as to amounts satisfying all outstanding receivership fees and costs without setoff, including fees and costs of the Receiver's counsel.

4. Defendant, The Holdings at City II LLC shall pay any and all outstanding fees or costs due the Receivership related to oversight of the Civil Court's Receivership created per Court Order dated June 10, 2015 within ten (10) days of this Order.

5. Receiver will file with the Court confirmation of payment on or before the fourteenth (14) day and effectuate release and turnover of custody and control of 1558 NW 1st Ave Miami, Florida 33136 to The Holdings at City II LLC.

DONE AND ORDERED in Chambers at Miami-Dade County, Florida, on 09/19/18.


BARBARA ARECES
CIRCUIT COURT JUDGE

> **No Further Judicial Action Required on THIS MOTION**
> **CLERK TO RECLOSE CASE IF POST JUDGMENT**

The parties served with this Order are indicated in the accompanying 11th Circuit email confirmation which includes all emails provided by the submitter. The movant shall IMMEDIATELY serve a true and correct copy of this Order, by mail, facsimile, email or hand-delivery, to all parties/counsel of record for whom service is not indicated by the accompanying 11th Circuit confirmation, and file proof of service with the Clerk of Court.

Signed original order sent electronically to the Clerk of Courts for filing in the Court file.
Copies furnished to:
**Renee Smith, Esq** who is directed to serve copies on the following:

**Linda M. Leali, Esq.,** Receiver
**Rachel Dooley, Esq.,** Assistant City Attorney
**Messana, PA.,** Counsel to the Defendants

2