## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
**Miami Division**

IN RE:

Miami Beverly, LLC,


1336 NW 60, LLC
Reverend, LLC
13300 Alexandria Dr. Holdings, LLC
The Holdings at City, LLC

     Debtor.
_____/

CASE NO. 18-14506-BKC-LMI
Chapter 11 (Lead Case)


Jointly Administered
Case No. 18-14509-BKC-LMI
Case No. 18-14510-BKC-LMI
Case No. 18-14511-BKC-LMI
Case No. 18-14512-BKC-LMI

### RECEIVER'S RESPONSE TO EQUITY'S OBJECTION TO FEES OF CUSTODIAN'S COUNSEL FOR THE MONTH OF OCTOBER

Linda Leali, the state court-appointed receiver excused from turnover (the "**Receiver**") in the matter styled *City of Miami v. Miami Beverly LLC, et al.* (Case No. 2014-027781-CA-01) in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida (the "**State Court**" or "**Receivership Case**"), by counsel, hereby files this *Response to Equity's Objection to Fees of Custodian's Counsel for the Month of October* (the "**Motion**") seeking entry of an order allowing the fees of the Receiver's counsel (sometimes referred to as "**Messana**") in the full amount sought of $36,343.50 for the month of October, 2018. In support of this Motion, Receiver[1] states the following:

### PRELIMINARY STATEMENT

The Court is aware of this case's exasperating history. The Court is also aware that, despite the Equity (defined supra) holders' dilatory tactics and managerial ineptness, the

---

[1] The Receiver's counsel, Thomas Messana and Messana, P.A., joins in this Response on its own behalf.

Receiver has had substantial success in both bringing the Receivership Properties[2] up to City of Miami housing code and increasing the value of Debtors' holdings. In fact, during the time period challenged, the Debtor closed a transaction where six properties managed by the Receiver were sold, with $4.7 million of the net proceeds going to Equity. This sale would not have been possible without the Receiver's diligence.

Despite this success, Abraham and Denise Vaknin[3], owners and prior operators of the Receivership Properties have filed an Objection to fees charged by Messana, P.A., the Receiver's counsel, for legal services provided in October, 2018 (ECF No. 250) (the "**Objection**"). Between this case and the related State Court proceedings, this Objection is the owners' ninth attempt to challenge Messana's fees. Zero of these challenges have thus far succeeded.

Instead of complying with the orders of this Court, Debtors have continuously attempted to maximize their own economic return at the expense of an efficient and orderly disposition of this case. The present Objection is another such attempt, and, as discussed below, is without merit because Messana's fees for October were eminently reasonable.

## BACKGROUND

Contrary to Equity's assertion, the Receiver and her counsel have not played a minimal role in this case at any point, including during October 2018. As such, the work Messana did for the Receiver during October cannot be observed in a vacuum. This section sets forth the relevant background leading up to the events of October 2018, and the relevant events that required Messana's efforts during the same period.

---

[2] The Receivership Properties are currently comprised of 46 units located in Miami in the communities commonly known as Liberty City and Overtown, as identified in the Receiver's **Motion to Excuse Turnover** (ECF No. 36).
[3] Miami Beverly, LLC; 1336 NW 60, LLC; Reverend, LLC; 13300 Alexandria Dr. Holdings, LLC; and The Holdings at City, LLC are the Debtor entities that nominally own the Receivership Properties. Collectively, the Vaknins and these entities are herein referred to as the "Debtors" when referring to their roles as such. The Vaknins and their entities are referred to as "Equity" when referring to their current status as Equity holders.

1.      As this Court is aware, Linda Leali was appointed receiver by the Eleventh Judicial Circuit on June 10th, 2015. The Debtors and Ms. Leali have been involved in protracted litigation for nearly three and a half years. On June 15, 2018, this Court entered an **Order** (ECF No. 78) setting out a clear and obvious timeline of events regarding the efforts to sell Receivership Properties. The Order stated, among other things, (1) "The Debtor shall file a motion to approve sale and for bidding procedures (the "**Sale Motion**") within 21 days from the date of this Order"; (2) "The Debtors shall seek a hearing on the Sale Motion on no later than 30 days' notice after the filing of the Sale Motion"; (3) "The Debtors shall seek a final hearing to be scheduled for no later than 135 days after the filing of the Sale Motion"; and (4) "The closing shall take place no later than 150 days after the filing of the Sale Motion."

2.      The Debtors did not abide this timeline. Had the Debtors complied with the timeline, the Receivership may have been dissolved, and this case largely resolved, weeks ago. Instead, the Debtors persisted in advocating a sale process that an attorney for the Office of the United States Trustee characterized as "fake."[4]

The Debtors' Failed Efforts to Sell the Properties

3.      In August 2018, the Debtors filed an "**Amended Sale Motion**" (ECF No. 107) with a new buyer and a higher asking price.

4.      On August 29th, this Court held a hearing on the Amended Sale Motion. However, waiving around a new $11,500,000 purchase agreement in the court hallway immediately preceding the hearing, Debtor advised withdrawal of the Amended Sale Motion in

---

[4] At page 25, line 21 through page 26, line 3 of the transcript from the hearing in this Bankruptcy Case dated August 29, 2018, an attorney with the Office of the United States Trustee states: "Your Honor, the debtor has agreed to a timeline. The reality, the debtor has failed to adhere to that timeline, because the motion that was filed to meet the first hurdle was fake. I'll use that word. It wasn't a real contract. It was $3 million cash, with five and a half million dollars of seller financing. $3 million isn't even enough to satisfy the city's lien…So they blew the timeline already."

favor of filing a new sale motion with buyer group associated with Alan Hardaman. Neither Vaknin attended the August 29th hearing and no such motion was ever filed.

5.       Instead, on September 7, 2018, the Debtors filed the *Joint Debtors' Motion for Entry of an Order (A) Authorizing the Sale of Substantially all of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances; (B) Approving Auction Sale and Bidding Procedures Including Break-up Fee and Forum Purchase and Sale Agreement; (C) Approving Form and Manner of Notice of Sale; (D) Scheduling an Auction Sale and (E) Scheduling Hearing to Approve Sale* (ECF No. 124) (the "**Second Amended Sale Motion**"). Essentially, the Second Amended Sale Motion proposed a naked sale by auction.

6.       On September 13, 2018, this Court entered the *Order Granting in Part, and Denying in Part, Debtors' Amended Motion for Entry of an Order (A) Authorizing Sale of Real Properties Free and Clear of All Liens, Claims, and Encumbrances; (B) Approving Form and Manner of Notice of Sale and Bidding Procedures; (C) Approving The Purchase and Sale Contract; (D) Approving Payment of Commission to Buyer's Broker; and (E) Scheduling Final Sale Hearing* (ECF No. 129) (the "**Order on Amended Sale Motion**").

7.       The Order on Amended Sale Motion advises at paragraph 4, "The Court, if necessary, shall conduct a final sale hearing or the Auction on October 26, 2018."

8.       Notwithstanding, the Second Amended Sale Motion, at paragraphs 46-47, advises: "…it has been determined that an additional period of marketing will be necessary to conduct a competitive auction sale. As such, the Debtors request the Auction be scheduled for December 5-6, 2018, beginning on December 5, 2018 at 10:00 a.m. (EST) and ending on December 6, 2018 on or about 2:00 p.m. (EST), with a final hearing to approve the sale to be

scheduled on or after December 7, 2018. Further, the Debtors request that all applicable deadlines in previous orders associated with the sale of the properties be extended accordingly."

<u>The Debtor Again Seeks Release of A Property Crucial to the Receiver's Operations</u>

9.      While these attempts to sell the Receivership Properties were ongoing, the Debtors again petitioned the State Court to release a single Receivership Property (the "1558 Property") from the Receivership.  As this Court is aware, this Property generated nearly 22% of the total monthly revenue for all of the properties, and was vital to the Receiver's efforts to improve the properties.

10.     Also on August 17, 2018, The City of Miami, a Municipal Corporation (the "**City**") filed in the Receivership Case the *City of Miami's Response to Defendants Motion to Release of Property* (the "**Release Response**"). The City wrote that:

> It has always been and will continue to be the position of the City that to parse of Properties will vitiate the ability of the Court-Appointed Receiver to manage and continue repair of any remaining Properties. To allow the release of a property for which the other Defendant properties rely upon for their continued operation and for which the United States District Court Judge Isicoff has approved would put the management of the buildings and the current tenants in an untenable situation."

11.     On September 17, 2018, the Receiver filed with this Court the *Motion for Contempt for Violation of the Automatic Stay and for Sanctions* (ECF No. 140) (the "**Sanctions Motion**") in response to efforts to remove the 1558  Property from the Receivership Case.  In the Sanctions Motion, the Receiver argued, among other things, the following:

> "Simply put, Holdings at City II, LLC [Abraham and Denise Vaknin] and its counsel, Renee M. Smith, are interfering with the administration of the Bankruptcy Case and estate property. Receiver, by and through counsel, has advised Holdings at City II, LLC of their persistent violation of the automatic stay on numerous occasions. Moreover, it is beyond dispute that Holdings at City II, LLC and its counsel, Renee M. Smith, are aware of the Debtor's Bankruptcy Case. As such, Holdings at City II, LLC and its counsel, Renee M. Smith, are actively violating the automatic stay in a willful, knowing, and purposeful

manner. Current actions are inline with a long history of sanctions and bad faith conduct. Accordingly, this Court ought to impose both compensatory and punitive sanctions against Holdings at City II, LLC and its counsel, Renee M. Smith."

12.     Also on September 17, 2018, the City filed with the State Court the *City of Miami's Written Response and Argument to Defendant, the Holdings at City II, LLC, Motion to Release Compliant Property*, arguing, among other things, the following: "All of the properties that have been a part of this case are owned by the same person. In filing this motion, they have decided to use the shield of Bankruptcy court as a sword against the Receiver to gut her ability to maintain and manage the properties. This should not stand."

13.     On September 19, 2018, notwithstanding the pendency of the Sanctions Motion before this Court and at the urging of The Holdings at City II, LLC, its beneficial interest owners the Vaknins, and its state court counsel Renee M. Smith, the State Court entered the *Order on Defendant's Motion for Release of Compliant Property* (the "**Release Order**").

14.     However, on September 26, 2018, this Court held that, among other things, (a) entry of that Order was a violation of the automatic stay, and (b) the order was therefore void. Consequently, the State Court entered an order vacating the Release Order on October 11, 2018.

15.     On October 4, 2018, this Court entered its *Order Granting Receiver's Motion For Contempt For Violation Of The Automatic Stay And Reserving On Sanctions* (ECF No. 191), ruling that the Release Argument (and associated filings) violated the automatic stay.

The Receiver Seeks to Expand her Powers

16.     In response to the Debtors' continuing efforts to stretch and disregard the Sale Timeline, combined with their attempts to gut the Receiver's ability to maintain and manage the Properties, the Receiver filed a *Motion to Expand Powers to: (1) Conduct Sale of Receivership Properties as Going Concern; and (2) Borrow Money to Repair Property and Cover Operational Shortfalls; or (3) in the Alternative, Convert Case to Chapter 7* (ECF No. 146) on September 21,

2018. A hearing was set on this motion for September 26, 2018. On September 24, 2018, Equity filed its *Response in Opposition to Receiver's "Self-Serving" Motion to Expand her Powers and Grow Her Fees* (ECF No. 155).

17.    On October 4, 2018, this Court heard the *Joint Debtors' Expedited Motion For Entry Of Order (A) Authorizing Private Sale Of Real Properties Pursuant To 11 U.S.C. § 363, Free And Clear Of All Liens, Claims, And Encumbrances; (B) Approving Purchase And Sale Contact And Authorization To Execute Any And All Documents To Effectuate Closing Of The Sale; (C) Authorizing The Debtors To Assume And Assign Apartment Lease Contracts; (D) Approving Payment Of Compensation To Proposed Broker/Auctioneer Associated With Transaction; (E) Shortening Required Notice Period* (ECF No. 177) (the "**October 4th Hearing**").

18.    On October 26, 2018, this Court heard the *Joint Debtors' Emergency Motion For An Order Releasing Certain Properties From Custodianship In Order To Effectuate The Sale Pursuant To Court's Order Authorizing Sale Of The Properties* (the "**October 26th Hearing**").

19.    On November 16, 2018, Equity filed its *Limited Objection to Fees of Custodian's Counsel for the month of October* (ECF No. 250) (the "**Objection**").[5]

**DISCUSSION**

20.    Equity is objecting to Messana's fees for the month of October, 2018, which total $36,343.50. It is unclear whether the objection is to the entire fee or to any specific portion thereof. It is just as unclear which particular entry or entries Equity finds objectionable, or under which legal standard Equity believes Messana's fees were unreasonable. In any event, Messana's fees were reasonable under either of the relevant standards.

---

[5] This Motion responds only to the language included above opposing counsel's signature block, and not the following pages, which appear to contain language from a separate pleading.

21.     As a preliminary matter, under Florida law, the reasonableness of a receiver's fee is a determination within the trial judge's discretion. <u>Frank v. Feller</u>, 188 So. 2d 17, 18 (Fla. 4th DCA 1966); <u>Johnson v. Kruglak,</u> 246 So. 2d 617, 620 (Fla. 3rd DCA 1971). If legal services are required, a receiver may be allowed a reasonable sum for legal fees even when she did not obtain prior court approval for retaining such services. <u>Lewis v. Gramil Corp</u>., 94 So. 2d 174, 177 (Fla. 1957); <u>Creative Prop. Mgmt., Inc. v. Gen. Elec. Credit Corp. of Georgia,</u> 314 So. 2d 807, 808 (Fla. Dist. Ct. App. 1975).

22.     Bankruptcy Courts in the Eleventh Circuit evaluate the reasonableness of attorney's fees using the twelve factors enumerated in *Matter of First Colonial Corp. of Am.*, 544 F.2d 1291, 1298-99 (5th Cir. 1977);[6] s*ee also* <u>In re Bilgutay</u>, 108 B.R. 333 (Bankr. M.D.Fla. 1989).[7]

23.     With regards to state law, as a result of this Court's *Order Excusing Turnover* (ECF No. 78), the Receiver's fees are subject to the terms and conditions of the order appointing her Receiver.[8]

24.     In Florida, the reasonableness of an attorney's fees is determined using the factors enumerated in Rule 4-1.5 of the Florida Bar Code of Professional Responsibility. <u>Kuhnlein v. Dep't of Revenue</u>, 662 So. 2d 309, 312 (Fla. 1995) (citing <u>Florida Patient's Compensation Fund v</u>

---

[6] The twelve *First Colonial* factors are: (1) time and labor required; (2) novelty and difficulty of the questions presented; (3) skill required to perform the legal services properly; (4) preclusion from other employment by the attorney due to acceptance of the case; (5) customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) amount involved and results obtained; (9) experience, reputation and ability of the attorneys; (10) undesirability of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases.

[7] First Colonial remains applicable in the Eleventh Circuit to the determination of reasonableness of fees to be awarded under the Bankruptcy Code. See, e.g., <u>Grant v. George Schumann Tire & Battery Co.</u>, 908 F.2d 874, 877–78 (11th Cir. 1990); see also <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981).

[8] "The Custodian will act as a fiduciary and exercise the same duties as she has been exercising since she was appointed as Receiver in the Receivership Case under the terms and conditions of the order appointing her as Receiver, except to the extent the Bankruptcy Code or this Order modifies such duties, *nunc pro tunc* from April 17, 2018 (the "**Petition Date**")." ECF No. 78, p. 2, ¶ 3.

Rowe, 472 So. 2d 1145 (Fla. 1985)). Rule 4-1.5(b)(1) sets forth eight factors that, while organized differently, are substantively identical to *First Colonial* factors one through nine and eleven. FL St. Bar. R. 4-1.5.

25.      The Receiver's requested fees, including those for her counsel, are reasonable when analyzed using the applicable factors set forth either in the *First Colonial* case law or by Rule 4-1.5. In October, this was especially true considering the time, nature and extent of services Messana devoted to this case, the time constraints imposed upon Messana by the Debtor's failure to abide by both this Court's timeline, and the ultimate results obtained by the Receiver.

**Time, Nature and Extent of Services Rendered, and Related First Colonial Factors.**

26.      During October 2018, Messana billed the Receiver for **94.50 hours** of work. As illustrated by Exhibit "A," in the exercise of its billing judgment, Messana did not bill the Receiver for an additional **23.0 hours** of work, representing a reduction of approximately **19.5%.** By discounting these 23 hours, Messana lowered its blended hourly rate for **117.5 hours** of work to **$309.31.** In other words, Messana gave the Receiver a discount of **$7,114.13.**

27.      In so doing, Messana exercised careful billing judgment regarding any multi-timekeeper conferences. As detailed in Exhibit "A", Messana declined to charge the Receiver for **12.8** hours of inter-office conferences.

28.      Contrary to Equity's assertions, time entries for multi-lawyer conferences are not *per se* unreasonable. It is well accepted that conferences between co-counsel are compensable, so long as, "at a minimum," such entries are adequately explained. In re Kohl, 421 B.R. 115, 128 (Bankr. S.D.N.Y. 2009). As Messana's itemized time-billing logs show, and as the Debtors do not dispute, every time entry Messana logged during October was adequately explained. Under

all circumstances, "there is nothing wrong with different attorneys working on different aspects of such projects even if both describe their efforts only as working on the project." <u>In re SAIF, Inc.</u>, No. 07-04500-PB11, 2009 WL 6690964, at *1 (Bankr. S.D. Cal. Sept. 25, 2009).

29.    Moreover, "having two attorneys kept apprised of the case may prove to be beneficial to all parties in some circumstances—e.g., when one attorney is suddenly unavailable due to unforeseen circumstances." <u>In re Pan Am. Gen. Hosp., LLC</u>, 385 B.R. 855, 873 (Bankr. W.D. Tex. 2008).

30.    Accordingly, inter-office conferences that were billed to the Receiver demonstrate Messana's attempt to ensure that both attorneys substantially involved in this matter were adequately prepared to represent the Receiver. To the extent that any conferences were not necessary to represent the Receiver, Messana declined to charge for those entries.

31.    Equity writes that, regarding conferences between Messana and the Receiver, "the nature of the conferences pertain more to non-legal issues, such as the ongoing repairs and management of the properties – which the Custodian should have been capable of managing otherwise she should not have accepted the position." Equity fails to cite any specific time entry relating to a "non-legal" issue, nor any authority explaining why such conversations would be either "non-legal" or non-billable. On the contrary, the Official Comment to Florida Rule of Professional Conduct 4-2.1, which states that "[a]dvice couched in narrowly legal terms may be of little value to a client, especially where practical considerations, such as cost or effects on other people, are predominant," encourages attorneys to holistically counsel a client when doing so is in the client's best interest. Given the long record of this case, any conversations Equity suggests should be reduced as pertaining to "non-legal" matters represent Messana's efforts to

ensure the Receiver was fully protected from the then-Debtor/Equity's attempts to undermine her authority.

**Time Limitations Imposed by Client or Other Circumstances.**

32.      Generally, the circumstances of this case imposed typical time constraints on Messana. However, hearings on October 4th and on October 29th necessitated significant time pressures on both the Receiver and on Messana.

33.      Many of the fees incurred during October came as a result of the expedited October 4th hearing on the Debtor's *Expedited Motion to Sell Free and Clear of Liens (Real Properties) pursuant to 11 USC 363(f)* (ECF No. 177) and pursuant to this Court's Oral Ruling on September 26, 2018. At this hearing, the Debtor asked this Court to a) approve the sale of the Properties for $6,555,000; (b) waive the fourteen day stay required by Bankruptcy Rule 6004(h); (c) give Debtor authority to Assume and Assign to the purchaser all apartment leases associated with the properties; and (d)  shorten (in fact, eliminate) the notice of sale requirement pursuant to Bankruptcy Rules 2002(a), 6004 and Local Rules 2002-1(K) and 6004(1)(A).

34.      In total, Messana billed **19.9** hours related to this hearing, including four hours for Thomas Messana's attendance. Here too, in the exercise of billing judgment, Messana did not bill for **8.3** hours of time spent preparing for the hearing—a 29% reduction. Messana's fees are reasonable considering the exigency with which this hearing was held; the October 4th hearing was scheduled on September 26th, leaving Messana with eight calendar days to prepare. As a result, much time was spent in conferences, both internally and with the Receiver, in an effort to pool resources and divide labor immediately and efficiently. These fees are even more reasonable considering the importance of the issues brought forth by the Debtors. The October 4th hearing was the most important hearing at that point in the case. Considering the extensive list

of items at issue, the exigency with which the hearing was set, and the significant resources at risk, Messana's work in preparation for the hearing was reasonable.

35.    Similarly, the *Joint Debtors' Emergency Motion For An Order Releasing Certain Properties From Custodianship In Order To Effectuate The Sale Pursuant To Court's Order Authorizing Sale Of The Properties* was heard before this Court on October 29, 2018, three calendar days (and one business day) after it was noticed. Time entries concerning this hearing were made under similar pressures.[9]

**Results Obtained**

36.    The Receiver has obtained admirable results for both the Debtor's tenants, the City of Miami, and, ironically, Equity itself. Since 2015 the Receiver has been seeking to repair all of the Receivership Properties and bring them into compliance with the Miami City Code for electrical, structural and other remediation. Significant effort by the Receiver has brought four of eight buildings in bankruptcy substantially in compliance (one company with one building, which comprises nearly 22% of Receivership Case revenue did not file bankruptcy and is now in compliance).

37.    During October 2018, six of the Receivership Properties that are subject to this Court's jurisdiction were sold for the amount of $6,550,000 pursuant to this Court's Order (ECF No. 195). Multiple creditors were satisfied, including the City of Miami's judgments in this case on account of the relevant properties, the Miami-Dade County Property Tax Assessor, and certain of the unpaid fees and expenses of the Receiver and her counsel.

38.    Despite the hurdles erected by the Debtors, during a three year plus receivership of 147 units across several buildings owned by six companies, Receiver has been able to

---

[9] Query: Could the Debtor be purposefully seeking multiple exigent hearings as a willful litigation tactic, or is it just poor at planning?

substantially improve the Receivership Properties and has increased the rent roll from rental deposits of $3,150.00 for the period June 10 through June 30, 2015, to rental deposits of $31,311.00 for the month of July 2015, and to rental deposits of $48,281.00 for the month of February, 2018. The "Net Rent Income" from October was $44,198.00, not, as Equity asserts, "$20,000 or so."

39.     The Receiver's efforts during October were so effective that the City, Equity, and the Debtors entered into a complete settlement agreement on December 6 (*see* ECF No. 259).[10]

**Novelty and Difficulty of Questions Presented.**

40.     Obtaining those results was by no measure simple. Equity argues that Messana recorded excessive time entries "given the narrow responsibilities of Custodian's counsel during October." This statement belies the nature of both this case in general and of the October docket. Messana has expended considerable resources, both in October and throughout this and related cases, defending its client against harassing litigation by Debtors. As a result, this case has been "difficult" from its inception. October was no different than any of the previous thirty nine months, during which the Debtors have refused to operate in good faith.

41.     This Court has held that "unforeseen difficulties" that expand "the quality and scope of representation" beyond what was reasonably expected can be considered with regards to awarding attorney's fees. In re Atlas, 202 B.R. 1019, 1022 (Bankr. S.D. Fla. 1996).[11] As discussed above, such "unforeseen difficulties" have plagued this case from the beginning.

---

[10] The Receiver reserves the right to file a motion in relation to this settlement.

[11] In In re Atlas, the United States Trustee ("U.S.T") argued against a fee enhancement for the Chapter 7 Trustee's attorney. This Court awarded the fee enhancement due to the "extraordinary" efforts of the attorney, who kept a crucial deal "from falling through." In re Atlas, 202 B.R. 1019, 1022 (Bankr. S.D. Fla. 1996). Neither the Receiver nor Messana are currently seeking a fee enhancement.

42.     Additionally, this Court has considered "obstructive" actions by Debtors in relation to the awarding of attorney's fees. In *In re Janata*, the debtor engaged in a series of "obstructive efforts" to disrupt administration of a case that the Court described as "carnival-esque." In re Janata, 395 B.R. 496, 498 (Bankr. S.D. Fla. 2008). Despite this, the chapter 7 Trustee's attorney, like Messana in this instance, "demonstrated the requisite creativity in working with various secured creditors and a municipality to achieve efficient ends, maximizing value accordingly." Id., at 498. As the attorney was successfully able to overcome "the Debtor's infatuation with slight of hand" to create a "generous creditor payout," the Court not only awarded the attorney his entire fee, but allowed an enhancement of $30,000. Id., at 499.[12]

43.     In the present matter, Debtor's actions have been unexpectedly obstinate. Much of the difficulty Messana has seen in representing the Receiver has come not from any particular question of law, but rather from trying to anticipate and defeat the Debtors', and now Equity's, frivolous and harassing litigation.

44.     In addition to their willful and wanton disregard for both this Court's orders and the Bankruptcy Code (as described above), the Debtors in this case have burdened the Receiver with a plethora of vexatious and harassing litigation in the Receivership Case. On August 4, 2016 the Defendants filed a frivolous lawsuit against Ms. Leali in her individual capacity and against her law firm, Linda Leali, P.A.. Defendants did so without leave of court to avoid the State Court's scrutiny in purposeful violation of the Receivership Order and Florida law. The State Court found the Debtors and their attorney acted in bad faith, found both counsel and the Debtors in contempt, and imposed sanctions upon all.

---

[12] The Receiver does not intend to imply that Equity has been as disruptive as the debtor in *In re Janata*. That the *Janata* debtor was significantly worse to deal with than Equity is not important, however, because here the Receiver is seeking only her fees, and not an enhancement.

45.     Debtors have objected to the Custodian's fees in State court no less than eight times. These objections were also meritless. In January 2018, the parties entered an *Agreed Order on Settlement of Defendants' Objections to Receiver and Counsel Fees and Expenses*. There, in addition to agreeing to all payments made by the Receiver to the Receiver and her counsel between the Receivership's inception and October 31, 2017 (plus $84,000 for payments outstanding as of November 9, 2017), the Debtors withdrew all of their outstanding objections to fees and costs.

46.     Additionally, The Debtors' obstructionism includes their having (i) filed multiple appeals designed to terminate the Receivership, (ii) filed a motion to set-aside the City's judgment, (iii) filed a motion for an order to show cause that was, in fact, another (failed) attempt to terminate the receivership, (iv) objected to administrative measures sought by the Receiver (including the Receiver's motion to employ counsel), (v) objected to repairs on the Properties, (vi) filed a motion to approve a sale on a contract that was already terminated by the buyer as the time of the filing of the motion, (vii) filed a motion to approve a sale to a party that now seems to have not been at arms length, (viii) filed a motion to increase the Receiver's bond from $30,000 to over $2.5 million, and (ix) filed a notice of non-availability for medical reasons in the State Court case while simultaneously scheduling a mitigation hearing with City of Miami Code Enforcement during that same time-frame.

47.     As this record illustrates, the current objection is the latest in a series of harassing tactics by Debtors and their attorneys. Messana has been conditioned over three plus years of litigation to expect the Debtors fight over every inch, especially with regard to fees. If, in the course of this litigation, Messana did bill for any "excessive" time, it was almost certainly out of

an abundance of caution in the face of Debtor's continued and unreasonable intransigence.[13] Considering the difficulty Messana has faced in defending its client from the Debtor's obstinacy, the firm's fees are more than reasonable.

**Skill Requisite to Perform Services Properly.**

48.    In rendering services to the Receiver, Messana demonstrated substantial legal skill and bankruptcy expertise. This Court has observed Messana's oral and written advocacy and, as such, can evaluate the level of skill presented.

**Preclusion from Other Employment by Attorney Due to Acceptance of Case.**

49.    Messana's representation in this case did not preclude it from accepting other employment. Messana submits it has treated matters in this case in an expeditious and professional manner and has attempted to accelerate issues in an effort to minimize costs.

**Customary Fee.**

50.    The hourly rates Messana charged in October reflect the hourly rates Messana bills to its clients in other similar bankruptcy cases. This Court has approved these rates, as have other courts within and outside of this district, in other bankruptcy matters in which Messana and other counsel of like reputation and experience have been involved. Further, Messana did not bill the client for approximately **23 hours**, or **$7,114.13.**, which represents a discount of **19.5%.** As detailed in Exhibit "A," this discount takes into account a) time spent training attorney Anibal Manzano, who had only recently been admitted to the Florida Bar and b) exercise of substantial billing judgment by attorney Thomas Messana.

---

[13] Messana directs the Court to the extraordinary detail in the entries, suggesting the care it took in fulfilling its professional responsibilities.

**Whether Fee is Fixed or Contingent.**

51.     Messana's compensation in this matter is subject to approval by this Court and therefore contingent. Messana has no retainer.

**Experience, Reputation and Ability of Attorneys.**

52.     Messana attorneys are experienced in matters of this kind and are well known to this Court. Thomas M. Messana, the senior partner in the firm, has experience in bankruptcy and business workouts and litigation that span a twenty-year period. For the past almost 20 years, Mr. Messana has been Treasurer and a Director of the Bankruptcy Bar Foundation for the Southern District of Florida, a non-profit corporation which funds the pro bono legal effort of the local bankruptcy bar association. Mr. Messana is a past president of The Bankruptcy Bar Association of the Southern District of Florida; former chairperson of the Florida Bar Bankruptcy/UCC Committee; former co-chairperson of the Bankruptcy Judicial Liaison Committee of the Business Law Section of the Florida Bar; and a former adjunct professor at St. Thomas University School of Law teaching bankruptcy law. Mr. Messana served as the chairperson or co-chairperson of The Florida Bar Business Law Section's Receivership Study Group and is active on its Assignment for the Benefit of Creditors sub-committee. He has served on the Executive Council of the Florida Bar's Business Law Section and regularly lectures and publishes on bankruptcy related subjects in national, regional and local forums.  In addition to many other professional distinctions, Mr. Messana's legal acumen has been noticed by inclusion in Chambers & Partners, USA; as a Best Lawyer in America; a Super Lawyer; a Member of Florida's Legal Elite Lawyers by Florida Trend; as Bankruptcy Lawyer of the Year Fort Lauderdale for 2017 by Best Lawyers in America Litigation; and is "AV" preeminent rated by Martindale-Hubbell.

53.     Chris Broussard, a senior associate attorney who worked on this matter, primarily focuses his practice on debtor, creditor, committee, and fiduciary representation in both chapter 7 and 11 bankruptcy, plaintiff and defendant representation in a wide range of federal and state court litigation, and state court fiduciary representation. Chris is admitted to the Florida Bar and the United States District Court for the Southern and Middle Districts of Florida. Chris was Chair of the Communications Committee and a Fellow through the Inclusion, Mentoring, and Fellowship Committee of the Business Law Section of the Florida Bar. Chris was also a Board Member and President for the Florida Chapter of the Next Gen Leadership Committee for Turnaround Management Association. Chris received his undergraduate degree in Economics from the University of Florida, his law degree from Emory University School of Law, and a Certificate in Intellectual Property from Georgia Institute of Technology. Chris was an Executive Editor for the Bankruptcy Developments Journal at Emory Law School.

54.     Anibal Manzano was an associate attorney who worked on this matter. He was admitted to the Florida Bar in October 2018. He graduated *magna cum laude* from the University of Miami School of Law, where he was a Harvey T. Reid Scholar and won CALI Excellence for the Future Awards in three courses, including Bankruptcy. Anibal also possesses and M.B.A. from Lynn University.

**"Undesirability" of Case.**

55.     This case was not undesirable. Messana is privileged to have had the opportunity to represent the Receiver and appear before the Court in this proceeding.

**Nature and Length of Professional Relationship with Client.**

56.     Messana's relationship with the Receiver began before its employment in this case at a Bench-Bar Conference; however, this is the one and only case where Messana has represented the Receiver.

**Awards in Similar Cases.**

57.     The amount requested by Messana is reasonable in terms of awards in cases of similar magnitude and complexity. The compensation Messana requests comports with the mandate of the Bankruptcy Code, which directs that services be evaluated in light of comparable services performed in non-bankruptcy cases in the community. The fees requested by Messana in this Application reflect an average hourly rate of approximately **$309.31**. Considering the stage of the case, the results obtained, and the manner in which Messana has represented the Receiver, the contingent nature of Messana's employment, and the amount of unnecessary litigation forced upon the Receiver by the Debtors, Messana's average hourly rate is commensurate with similar professionals of like skill and experience.  Likewise, as with all law firms, Messana's overhead expenses are absorbed in the hourly rate. A large portion of any fee which the Court awards Messana will merely defray significant overhead expenses already incurred and paid during the pendency of this case.

## CONCLUSION AND RELIEF REQUESTED

58.     Messana's fees were entirely reasonable under either the *First Colonial* analysis or the Florida Rules of Professional Conduct. Messana exercised substantial billing judgment, including by not charging for 19.5% of the time spent on this matter. Further, Debtor's arguments—that Messana's time entries were duplicitous or excessive—are without merit. The time Messana spent on this matter during October was completely proportional to the difficulty it

has faced during the administration of this case. That difficulty is entirely traceable to the Debtor's obstructive and dilatory antics. Indeed, had the Debtors complied with this Court from the start of this case, this matter would likely be concluded, and Messana would have ceased charging fees weeks ago. Despite this difficulty, the Receiver was able to procure a result that has substantially benefited all parties involved, including those objecting to her attorney's fees.

59.    For all the reasons outlined above, the Receiver respectfully requests that Messana's fees for October 2018 be allowed in their entirety.

Respectfully submitted this 13th day of December, 2018.

**Messana, P.A.**
Counsel for the Receiver
401 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
Telephone: (954) 712-7400
Facsimile: (954) 712-7401
Email: tmessana@messana-law.com

/s/ Thomas M. Messana
Florida bar No. 991422
Anthony J. Tamburro
Florida Bar No. 1010144

# Exhibit A

| Attorney | Item N/C | Date | Time | Time for multi timekeeper conferences | | |
|---|---|---|---|---|---|---|
| AM | conference with T. Messana and C. Broussard discussing case status and strategy going forward, sale motion, and preparation in advance of show cause hearing | 1-Oct | 2 | 2 | | |
| AM | multiple conferences with C. Broussard and T. Messana discussing case status and strategy going forward generally and in particular regarding property summary spreadsheett | 1-Oct | 1.5 | 1.5 | | |
| CB | review and analyze draft of proposed order to show cause and multiple conferences and email correspondence with A. Manzano and T. Messana and telephone conference with T. Messana discussing same | 1-Oct | 0.5 | 0.5 | | |
| CB | conference with T. Messana and A. Manzano discussing case status and strategy generally and in particular regarding properties, ownership, and liens in relation to recently filed sale motion | 1-Oct | 1.5 | 1.5 | | |
| AM | multiple conferences with A. Manzano and T. Messana discussing case status and strategy going forward generally and in particular regarding property summary spreadsheet prepared by A. Manzano | 2-Oct | 1.5 | 1.5 | | |
| AM | confer with T. Messana regarding judgment perfection issues, materials to be produced in advance of hearing, and research related to §§ 362(b)(4) and 363(f) | 2-Oct | 0.8 | 0.8 | | |
| AM | confer with T. Messana and C. Broussard regarding summary spreadsheet and sale motion hearing | 2-Oct | 0.5 | 0.5 | | |
| AM | telephone conference with T. Messana, C. Broussard, and R. Dooley regarding sale motion and City of Miami's position regarding private sale | 2-Oct | 0.9 | | | |
| AM | confer with T. Messana regarding notice of filing of summary of records | 2-Oct | 0.2 | 0.2 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| CB | Multiple conferences with T. Messana and A. Manzano discussing case status and strategy going forward generally and in particular regarding spreadsheet summary of case information | 2-Oct | 1 | | 1 | |
| | telephone conference with R. Dooley, T. Messana, and A. Manzano and conference with T. Messana and A. Manzano discussing cases status and strategy going forward generally and in particular regarding recent efforts to sell real property and efforts and sentiment regarding City of Miami with respect to same | 2-Oct | 1.2 | | | |
| CB | multiple conferences with A. Manzano and telephone conferences and email correspondence with L. Leali and T. Messana discussing changes to notice of filing summary regarding Debtors' sale motion and summary chart attached as exhibit to same | 2-Oct | 0.5 | | | |
| AM | Confer with T. Messana regarding sale motion hearing | 3-Oct | 0.3 | | 0.3 | |
| AM | confer with C. Broussard regarding sale motion hearing | 3-Oct | 0.1 | | 0.1 | |
| AM | review pleadings in advance of hearing | 3-Oct | 0.2 | | | |
| AM | confer with C. Broussard and T. Messana regarding hearing | 3-Oct | 0.1 | | 0.1 | |
| CB | Conference with A. Manzano and T. Messana discussing case status and strategy going forward generally and in particular regarding upcoming hearing | 3-Oct | 1 | | 1 | |
| AM | Travel to/from US Bankruptcy Court, Miami Division to attend hearing | 4-Oct | 2 | | | |
| AM | attend hearing regarding debtors' sale motion | 4-Oct | 2 | | | |
| AM | confer with T. Messana and C. Broussard regarding hearing and proposed order regarding hearing | 4-Oct | 0.4 | | 0.4 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| CB | Conference with T. Messana and A. Manzano discussing case status and strategy generally and in particular regarding results from hearing on October 4, 2018 | 6-Oct | 0.5 | | 0.5 | |
| TMM | review detailed time billing to separate contempt entries | 8-Oct | 1 | | | |
| NB | conferences with attorney | 9-Oct | 0.2 | | 0.2 | |
| CB | Multiple email correspondence with T. Messana, L. Leali, and A. Manzano discussing N. Moodie involvement in missing child case | 10-Oct | 0.3 | | | |
| TMM | telephone conference with A. Manzano regarding sale of other properties under receivership | 16-Oct | 0.2 | | 0.2 | |
| TMM | telephone conference with S. Schneiderman regarding fees | 19-Oct | 0.4 | | | |
| TMM | exchange email with G. Murphree regarding closing payment and objection to claim | 24-Oct | 0.1 | | | |
| CB | Email correspondence with T. Messana discussing case status and strategy going forward generally and in particular regarding upcoming hearing on sale motion | 24-Oct | 0.2 | | | |
| CB | conference with T. Messana discussing case status and strategy going forward generally and in particular regarding seeking fees for Messana, P.A. and L. Leali | 25-Oct | 0.5 | | 0.5 | |
| TMM | review email exchange with N. Moodie, G. Murphree and L. Leali regarding balance in repairs and permit fund (.2); draft email to I. Alexander regarding outstanding Custodian fees | 26-Oct | 0.4 | | | |
| CB | multiple email correspondence with N. Barrus and T. Messana discussing inquiry by A. Rey regarding closing proceeds and preliminary review of documents attached to same | 31-Oct | 0.2 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| NB | Conference with A. Rey, prepare email correspondence to attorney, conference with attorney, conference with A. Rey, prepare email correspondence to A. Rey | 31-Oct | 0.8 | | | |
| **Total hours not charged** | | | **23** | | | |
| **Multi-timekeeper conferences not charged** | | | | **12.8** | | |
| **Total hours charged** | | | **94.5** | | | |
| **Total hours worked (inc. not charged)** | | | **117.5** | | | |
| **Total fees charged** | | | **36,343.50** | | | |
| **Hourly Rate** | | | **309.306383** | | | |
| **Discount at hourly rate (hourly rate x hours not charged)** | | 7114.046809 | **$7,114.05** | | | |
| **Discount at hourly rate by %** | | 0.195744769 | **19.60%** | | | |